# EXHIBIT A

From: Dba123456@aol.com [mailto:Dba123456@aol.com]
Sent: Sunday, May 07, 2006 9:06 AM
To: richard.berger@brandgo.com
Subject: draft of rule 60 motion

Attachments: Pleading-Motion for New Trial estra draft.pdf

DOUGLAS B. ALLEN, SBN 99239
BURNETT, BURNETT, & ALLEN
160 WEST SANTA CLARA STREET
TWELFTH FLOOR
SAN JOSE, CALIFORNIA 95113
(408) 298-6540

SEYFARTH SHAW LLP
JACK L. SLOBODIN (SBN 34203) jslobodin@seyfarth.com
560 MISSION STREET, SUITE 3100
SAN FRANCISCO, CALIFORNIA 94105
TELEPHONE: 415-397-2823
FACSIMILE: 415-397-8549

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD W. BERGER; BRANT W. BERGER, | Case No. C05-02523 CRB |
| Plaintiff, | MOTION FOR ORDER SETTING ASIDE ORDER ON SUMMARY JUDGMENT AND JUDGMENT ON THE BASIS OF RULE 60 (B)(1) |
| vs. | |
| ROSSIGNOL SKI COMPANY, INCORPORATED, | |
| Defendants. | |
| _____/ | |
| ROSSIGNOL SKI COMPANY, INC., | |
| COUNTERCLAIM PLAINTIFF | |
| v. | |
| RICHARD W. BERGER AND BRANT W. BERGER | |
| COUNTERCLAIM DEFENDANTS | |
| _____/ | |

## BACKGROUND OF INVENTION

In 1996, the snowboard industry was an evolving industry emerging on to ski slopes across

the world. Different types of boots and bindings were being attempted in an effort to determine

efficient and convenient snowboard riding systems. Early snowboard boots and binding systems

entailed a soft snowboard boot, to be distinguished from a hard ski boot, and

strap-on-bindings. The straps were affixed directly to a plate on the board. The board had

BURNETT, BURNETT
& ALLEN
160 W. Santa Clara St.
12th Floor
San Jose, CA 95113

MOTION FOR ORDER SETTING ASIDE ORDER ON SUMMARY JUDGMENT AND JUDGMENT ON THE BASIS OF RULE 60 (B)(1)    PAGE 1

1  pre-drilled holes and each of the strap on binding systems a center plate screwed directly on to the

2  board facilitating anchorage of the binding to the board.  Adjustment for foot angle etc., was

3  accomplished by removing the boot, loosening the four screws on the center plate of the binding and

4  making the appropriate adjustments, re-tightening the screws and then reusing the binding.

5      Another attempted system was the attempt to apply ski boot binding systems to snowboards.

6  These are releasable binding systems, such as the "AITEC", and "Scott" bindings referenced in the

7  summary judgment.  These systems involved a hard ski boot (unacceptable for snowboarding), and a

8  releasable binding (also unacceptable for snowboarding).  With each of these systems, attempts were

9  made to be able to rotate the systems while the boot was engaged to the binding.  This was always

10 accomplished by inserting an additional plate or layer of devise, which elevated the riders foot off

11 the board to an impermissible height.  This denied the rider positive application of foot pressure on

12 the board and control of the two edges of the board.  "Metzger"attempted the same system to rotate a

13 strap on binding with the same undesirable effect.

14     A third type of binding was the emerging step-in-binding systems.  As seen by the attached

15 article from "Snowboard Life", all of the step-in-binding systems, designed specifically for

16 snowboarding, involved a integrated upper attachment integrated into the boot.  This upper

17 attachment allowed for the coupling of the boot to a lower attachment affixed directly to the board.

18 By using this method, both a soft boot could be used, and the riders foot was in close proximity  to

19 the board for control.  Each of these systems had the nearly identical anchor system that the strap-in-

20 binding systems had, which was a center plate screwed to the board by four screws directed into the

21 pre-drilled holes.  The novelty of each of the step-in systems was to allow for the rider, in soft

22 snowboard boots, to automatically engage with the lower attachment affixed to the board by merely

23 stepping on to the coupling mechanism.  The Emery binding purchased by Rossignol (depicted in the

24 article as the Rossignol step in binding), was precisely one of these systems and exemplified the

25 identical mounting by four screws on to the pre-drilled holes into the board through a central disc.  In

26 each of these step-in-binding systems rotation adjustment could be facilitated by unscrewing the

27 center plate with a screwdriver.  Once the plate was loosened, the rotational aspect of the binding

BURNETT, BURNETT
& ALLEN
160 W. Santa Clara St.
12ᵗʰ Floor
San Jose, CA  95113

MOTION FOR ORDER SETTING ASIDE ORDER ON SUMMARY JUDGMENT AND JUDGMENT ON THE BASIS OF RULE 60(B)(1)    PAGE 2

1   could be adjusted and then the screws re-tightened to facilitate boarding.

2        In 1996, when Brant Berger went to Bear Valley for the first time, he quickly saw the need

3   for rotatable step-in-binding to be used by rental shops. He discussed this need with the rental shops

4   at Bear Valley and many of the ski instructors (see declaration of Richard Berger).

5        The innovation of the Berger binding was to take a step-in-binding system and permit

6   rotation between the boot and its integrated upper attachment and the lower attachment, which was

7   fixed and anchored the binding directly to the board with the four screw holes. The Berger invention

8   created a coupling that did not restrict rotation and a devise that allowed the rider to select a desired

9   position on a 360 degree rotation.

10       The Berger's applied for a provisional patent and proceeded to market their binding in early

11  1997, introducing it at the Snow Industry Association Trade Shows( "S.I.A." )(see declaration of

12  Richard Berger, also see the "Snowboard Life"article which shows the 1997 version of the Rossignol

13  step in binding which did not rotate). At the initial S.I.A. trade show, Rossignol sent over a

14  representative who photographed the Berger devise. By 1998, Rossignol, had created the "tool free"

15  S.I.S. system, which duplicated the Berger rotation in a step-in-binding system. The Rossignol

16  binding, likewise, allowed rotation without inserting an extra layer of device between the riders boot

17  and the board surface.

18       What Rossignol did, was add the base plate (item 4 in the plaintiffs claim chart of preliminary

19  infringement contentions), to their coupler. The base plate (Item 4) sat exterior to the center disc

20  which anchored the binding to the board and contained a release allowing the upper attachment to

21  rotate relative to the anchor disc screwed on to the board. The Rossignol "tool free" S.I.S. binding

22  system was anchored to the board, as was every other binding in the world, by four screws in the

23  center of the plate. Rossignol, however, infringed upon Berger's concept by creating a new plastic

24  base upon which their coupler was riveted that sat exterior to the anchor disc held on by anchors that

25  slid under a geared lip on the anchor disc.

26       The conclusion of Rossignol's efforts was to precisely duplicate the Berger invention.

27  Rossignol took the elements of a step-in-binding, which is to have an upper attachment comprising a

BURNETT, BURNETT
& ALLEN
160 W. Santa Clara St.
12th Floor
San Jose, CA 95113

MOTION FOR ORDER SETTING ASIDE ORDER ON SUMMARY JUDGMENT AND JUDGMENT ON THE BASIS OF RULE 60(B)(1)          PAGE 3

1  boot (as in every other step-in-binding, and upper attachment with an integrated coupler or coupling

2  mount), and a lower attachment connectable to the board (the same circular plate found in all

3  bindings which is the direct connection to the board through the four screws into the pre-drilled

4  holes which anchors the binding directly to the board). The Rossignol binding contained "a coupler

5  attached to one of said upper and lower attachments and a coupling mount attached to other of said

6  upper and lower attachments." This language duplicates existing step-in bindings, all of which

7  contained a coupler and coupling mount designed to automatically engage to lock the rider to the

8  board. The language of the Berger patent reads "...the coupling mount and coupler being configured

9  to automatically engage with each other to lock the upper attachment to the lower attachment when a

10 user wearing the boot steps on to the lower attachment..." (once again this describes every step in

11 binding available in the industry at the time).

12      Various forms of couplers and coupling mounts were used to attach the integrated upper

13 attachment and boot on to the lower attachment which was thereupon anchored to the board by the

14 pre-drilled screw holes and screws. What made the Berger patent unique, and what was duplicated

15 in the Rossignol S.I.S. "tool free"devise, was the  language that when the upper attachment was

16 locked to lower attachment,  "...when the user ...steps on to the lower attachment and to permit

17 rotation of the upper attachment relative to the lower attachment when the upper attachment is

18 locked to the lower attachment without release of said upper attachment from said lower

19 attachment."

20      With Berger, the lower attachment was the circular disk anchored directly to the board by the

21 four screws. With the Rossignol S.I.S. system, the lower attachment was the identical disc anchored

22 by four screws directly to the board and which did not rotate or move. The Rossignol system, by

23 addition of the base plate (item 4 of the Berger infringement contentions), allowed for rotation of the

24 upper attachment relative to the lower attachment ( i.e. the disc that was anchored directly to the

25 board, "5b" in the preliminary infringement contentions).

26      Characterization of the base plate found in the Rossignol binding is troubling because it did

27 not exist in the earlier Emery binding. In the earlier Emery binding, the coupler was attached

BURNETT, BURNETT
& ALLEN
160 W. Santa Clara St.
12th Floor
San Jose, CA  95113

MOTION FOR ORDER SETTING ASIDE ORDER ON SUMMARY JUDGMENT AND JUDGMENT ON THE BASIS OF RULE 60 (B)(1)                    PAGE 4

1  directly to the base plate, and rotated only upon loosening of the four screws.  Production of the

2  Emery product by Rossignol prior to rotation in the "tool free" design involved a lower attachment

3  that was only the disc anchored directly to the board.  When Rossignol duplicated the Berger

4  rotation, they added the plastic base plate which facilitated the release mechanism allowing rotation

5  around the lower disc which was anchored directly to the board.  The new base (item 4) was at the

6  same elevation as the anchor plate (5b), and therefore presented some confusion to counsel analyzing

7  the binding.  Whether the base plate (item 4 in the infringement chart), is described as part of the

8  lower attachment or better described as part of the "coupler" all of those products are "attached".

9       Review of the patent language describes precisely this condition where the claims states, "...a

10  coupler **attached** to one of said upper and lower attachments, and a coupling mount **attached** to the

11  other of said upper and lower attachments...".  Since the coupler and coupling mount are attached to

12  the lower attachment it is difficult to distinguish between the coupling mount and the lower

13  attachment.  In either event, the splitting of the lower attachment by Rossignol through the addition

14  of the base characterized either as part of lower attachment or as part the coupler does not change the

15  fact that the part of the lower attachment that anchors the Rossignol binding to the board is stationary

16  and never rotates.  The infringement contentions contain a diagram that specifically identifies that

17  part "5b" is "stationary".  It is to this portion of the lower attachment to which the upper attachment

18  rotates in relation.

19  THE NATURE OF THE BINDING CONSTRUCTION MADE COUNSEL'S MISTAKE FORESEEABLE

20       Both Rossignol and Berger disclosed to each other that the term "attached", the terms

21  "coupler" and "coupling mount", all needed to be construed.  Construction of the term "lower

22  attachment" would shed light on the characterization and/or mis-characterization of the base plate of

23  Rossignol's accused devise.  That process is precisely the process which gives rise to an opportunity

24  for the parties to amend their infringement contentions, and for that matter invalidity contentions.

25  The difficulty is in the characterization of the Rossignol base plate, but whether it is part of the

26  coupler or lower attachment, it nonetheless facilitates rotation of the upper attachment relative to the

27  lower attachment.  Since the coupler and the lower attachment are all attached, it is a forseeable

BURNETT, BURNETT
& ALLEN
160 W. Santa Clara St.
12ᵗʰ Floor
San Jose, CA  95113

MOTION FOR ORDER SETTING ASIDE ORDER ON SUMMARY JUDGMENT AND JUDGMENT ON THE BASIS OF RULE 60 (B)(1)       PAGE 5

1   mistake to characterize the base plate as part of the lower attachment. In either event, this does not

2   change the fact that the function of the Rossignol binding is a duplication of the Berger patent

3   allowing the upper attachment to rotate relative to the lower attachment i.e. that portion of the lower

4   attachment actually anchored to the board. The practical use of the Rossignol product allowed them

5   to effectively complete with the Berger binding in sales to rental shops across America where no

6   other binding could so do. No either binding, other then Berger's and Rossignol's, create a

7   circumstance where the rider could have a step-on snowboard binding facilitating the riders

8   application of direct pressure to the board for control while boarding and yet having something that

9   could be adjusted in the rotation of the foot position without having to use a screwdriver. The only

10  two bindings in the world that facilitate this were the Rossignol S.I.S "tool free" and the Berger 360.

11  Claim 1 of the 530 Patent encompasses the description of both of devises.

12  BACKGROUND OF THE LITIGATION AGAINST ROSSIGNOL AND ROSSIGNOLS ACTIONS CONTRIBUTED TO
    THE CONFUSION THAT LED TO THE MISTAKEN CONTENTION

13  In 1996, Brant Berger and his father first conceived of the Berger Binding, which from the

14  inception was born of the need for rapid adjustment arising from the rental of snowboard equipment

15  at a resort. A provisional patent application was filed, a corporation was formed to gain investors

16  and promote the binding, and the binding was previewed at major snow industry trade shows in early

17  1997.

18  At one of the first shows, Rossignol sent representatives to the Berger show booth who took

19  pictures of the Berger binding. Rossignol had acquired the Emery step in binding, which

20  automatically engages with the configuration of an upper attachment integral to the boot and a lower

21  attachment connected to the board by four screws, with automatically locking coupler and coupling

22  mount, as did every other step in snow board binding on the market. Likewise, as with every other

23  step in snow board on the market, the Emery design that Rossignol had purchased did not rotate.

24  The next snow season, in 1998, it did rotate. It duplicated the Berger design photographed a

25  year earlier, where the upper attachment, comprising the boot and integrated coupling mount when

26  locked to the board by the coupler attached to the lower attachment connected or affixed to the

27

BURNETT, BURNETT
& ALLEN
160 W. Santa Clara St.
12th Floor
San Jose, CA 95113

MOTION FOR ORDER SETTING ASIDE ORDER ON SUMMARY JUDGMENT AND JUDGMENT ON THE BASIS OF RULE 60 (B)(1)    PAGE 6

1  board, rotated relative to the lower attachment, that anchored the binding to the board.  Not only did
2  Rossignol copy the Berger design, but they marketed the binding to Berger's primary market, the
3  Rental shops of resorts across the nation.  In addition Rossignol undercut the Berger pricing by 30%
4  (probably below cost), and offered financing to the rental shops on terms of 3 years (unheard of in
5  the industry at the time which ordinarily limited terms of payment to a matter of months).  The
6  superior bargaining position of Rossignol combined with the similar design caused the fledgling
7  Berger company to loose the contracts it had placed and put the thinly financed company out of
8  business (The Court may note that the original complaint herein included unfair trade practice
9  allegations and the company as a plaintiff.  The claims were dropped due to statute of limitation
10  defenses).

11      Reginald Suyat, a senior partner in the multi national law firm of Fish and Richardson, was
12  retained to prosecute the patent on the Berger binding, following the provisional application filed by
13  a small firm in Colorado.  Precious investor capital was applied to the fees of Fish and Richardson to
14  allow for the completion of the patents in the U.S. and for P.T.O. and foreign patents.  Mr. Suyat was
15  an eminently qualified industry respected patent prosecutor with many years of experience.  While
16  the prosecutions of the Berger patents were pending, Rossignol infringed and usurped the market.
17  Naturally, Berger used the services to Mr. Suyat to address Rossignol's infringement.
18  Communications with between Mr. Suyat and Rossignol of France continued for two snow market
19  seasons after the first introduction and massive marketing of the offending Rossignol product.  The
20  Berger patent had yet to issue by the time of the May 1999, letter sent form Rossignol.

21      Once again however, Rossignol was not content to refrain from abusing its superior economic
22  power.  Notwithstanding a year long correspondence exchange which included personally written
23  letters from two general directors of Rossignol, discussing an obviously adverse relationship with
24  Berger, Rossignol hired Berger's law firm, Fish and Richardson to handle unrelated litigation against
25  K-2.  The value of the Rossignol business caused the law firm to instruct Mr. Suyat that he could no
26  longer represent Berger adverse to Rossignol.  This is why no letter was written in response to the
27  May 1999, letter from Rossignol.  Yet Rossignol knew exactly why Berger did not respond.  They

1  had usurped Berger's lawyer.

2      Mr. Suyat was relegated to completion of the patent. During the correspondence exchange

3  Rossignol and Berger exchanged bindings. Mr. Suyat (on a date undertrained), prepared a claims

4  chart and infringement contentions. In Mr. Suyat's original claims chart, the base plate, which was

5  added to the Emery design to facilitate rotation, (item 4) in the chart ultimately disclosed as part of

6  the preliminary infringement contentions, was not listed as one of the items included in the lower

7  attachment.

8      Once the patents issued Berger interviewed numerous counsel to consider litigation with

9  Rossignol. In 2003, as second claim chart was created by Sayfarth and Shaw in Chicago, which

10  chart did include the base plate (item 4), as part of the lower attachment along with 5b, and 17, in

11  claim one. The Sayfarth firm, along with every other firm interviewed, required substantial capital

12  to contribute to the cost of the litigation, which Berger, due to the loss of the business, had not

13  raised.  Berger's investors were understandably reluctant to contribute more funds toward the failed

14  snowboard business.

15      Mindful of 35 U.S.C. 286, Berger and some of his investors, became anxious to file an action

16  against Rossignol prior to the sixth anniversary of the issuance of the first patent, the '530 patent.

17  They sought the aide of the undersigned who had represented Berger in past litigation involving real

18  estate. Because of the prior relationship, and the existence of Mr. Suyat's opinion regarding

19  infringement, and with the promise that funds would be raised once the litigation was commenced,

20  the undersigned undertook the litigation and filed. Funds were not raised quite as promised, and

21  informal support from Mr. Slobotin and Mr. Suyat was likewise slow to materialize (this latter

22  circumstance was understandable due to the lack of funds to compensate them for their time).

23      By fall of 2005, however, the funds were raised. Service, parties, and other matters had been

24  sorted out. Initial disclosures were being prepared and communication had begun with opposing

25  counsel regarding scheduling. The first conferences with opposing counsel revolved around their

26  contentions about prior art, and the first meeting with Mr. Slobotin and Mr. Suyat was scheduled for

27  an hour following the first CMC.

BURNETT, BURNETT
& ALLEN
160 W. Santa Clara St.
12th Floor
San Jose, CA  95113

MOTION FOR ORDER SETTING ASIDE ORDER ON SUMMARY JUDGMENT AND JUDGMENT ON THE BASIS OF RULE 60(B)(1)

PAGE 8

8

1       The undersigned had to obtains unorganized files from the defunct corporation in order to

2   comply with the initial disclosure requirements. Most of the files were in a storage locker, and some

3   were in other counsel's files. Collecting these together caused the delay in making the initial

4   disclosures. All of these matters pressed up upon the Christmas holiday season, and an extremely

5   hectic trial schedule for the undersigned in December through February (6 trials in three months in

6   four courts), and response to extensive interrogatories and document requests by Rossignol.

7       The undersigned intended to utilized the claims chart of Mr. Suyat in the preliminary

8   infringement contentions, however the original had not been located, only a copy with inter-lineation

9   (underlining in the text). Due to the lateness of the disclosures already, the undersigned despaired of

10  finding the original. In actually making the disclosure, however, the undersigned mistook the claims

11  chart from the Sayfarth Chicago office as a clean copy of the Suyat chart, not noticing the mistaken

12  identification of the base plate (item 4) in claim one. The undersigned therefore erroneously

13  disclosed the wrong claims chart. Instead of using the chart prepared by the patent's prosecutor, the

14  chart by a former associate of Sayfarth in Chicago was erroneously used.

15      Since the opposing counsel and myself were meeting and conferring on numerous topics, I

16  further erroneously assumed we would meet and confer regarding our respective contentions once

17  their preliminary invalidity contentions were issued. This did not occur. No discussion regarding

18  the infringement contentions occurred. No one raised any question about the inclusion of the base

19  plate as part of the lower attachment in claim one, but not in claim 31. Instead a surprise motion for

20  summary judgment was filed. I immediately called and requested that I be given more time to

21  respond to the summary judgement which had been set without even clearing the date with my

22  calender.

23      Mr. Slobotin had simultaneously agreed to enter the case. Upon review of the motion, he

24  discovered the mistake, and immediately called opposing counsel to see if they would stipulate to

25  modification of the infringement contentions. They refused and the motion to amend the contentions

26  was prepared.

27  COUNSEL'S GOOD FAITH BELIEF THAT THE PRELIMINARY INFRINGEMENT

BURNETT, BURNETT
& ALLEN
160 W. Santa Clara St.
12th Floor
San Jose, CA  95113

MOTION FOR ORDER SETTING ASIDE ORDER ON SUMMARY JUDGMENT AND JUDGMENT ON THE BASIS OF RULE 60 (B)(1)

PAGE 9
9

### CONTENTIONS WERE SUBJECT TO AMENDMENT WITHOUT LEAVE OF THE COURT

As described above, the undersigned, although an experienced trial counsel was not experienced in patent litigation or in the application of the local patent rules of the Northern District. Simultaneous with the undersign's preparation for the disclosure of the asserted claims and preliminary infringement contentions as required under Rule 3-1, discussion was transpiring between the parties regarding a schedule to be submitted to the Court in the "Joint Case Management Conference Statement". A copy of that schedule is attached as an exhibit to the "Declaration of Douglas B. Allen". The schedule did not contemplate summary judgment motions until well after the Markman hearing. At the "Case Management Conference" the Court set the date for the Markman hearing and no person at the hearing discussed the possibility of any intervening motions, but only obligation of disclosure and to meet and confer.

Rule 3-6, reviewed by the undersigned, indicates that the preliminary infringement contentions become final after the Markman hearing. Thirty days following the Markman hearing, the preliminary infringement contentions would be subject to modification without leave of Court pursuant to Rule 3-6(a).

With the understanding that experienced patent litigation counsel would be available to assist in the Markman hearing i.e. Mr. Slobodin, the undersigned was of the belief that appropriate amendments or modifications of the preliminary infringement contentions would occur following a process that included meeting and conferring prior to the Markman hearing, conduct of the Markman hearing, construction of claims terms and later consideration of the Court's ruling following a Markman hearing. The undersigns belief in the ability to amend these matters is not only based upon the undersigns plain reading of the rules, but was compounded by the defendant's proposed litigation schedule indicating that no motions for summary judgment or other dispositive motions would be filed until after the Markman hearing.

### RULE 60(B)1 PROVIDES AUTHORITY FOR THE COURT TO RELIEVE THE PARTY OF COUNSEL'S GOOD FAITH MISTAKES

BURNETT, BURNETT
& ALLEN
160 W. Santa Clara St.
12th Floor
San Jose, CA 95113

Motion for Order setting aside Order on Summary Judgment and Judgment on the basis of Rule 60(b)(1)

PAGE 10
10

1   Rule 60(b)1 had been used in patent cases to allow relief from inadvertent mistakes [see:

2   *Bros. Inc. v. W. E. Grace Manufacturing Company* (1965) 351 Fed. 2nd 208]. A mistaken belief by

3   counsel in opportunities to utilize later proceedings was grounds for granting a 60(b)1 motion [see:

4   *Corning Glassworks v. Sumitomo Electric USA Inc. 683 Fed. Supp. 979*]. The United States

5   Supreme Court in *Pioneer Investments Services Company v. Brunswick Associates Limited*

6   *Partnership et, al.* (1992) 507 U.S. 380; 113 S. Ct. 1489; 123 L. Ed. 2nd 74, defined the factors for

7   the Court's consideration in determining excusable neglect pursuant to Rule 60(b)1 [507 U.S. 380,

8   395]. The Court indicated that the determination should be based upon equity taking into account

9   the relevant circumstances. At page 398, the Court observed that unusual procedural circumstances

10  reinforced the excusable nature of counsel's mistake.

11      Picking up the wrong claim chart and affixing it to the preliminary infringement contentions

12  was the undersign's mistake. Assuming that there would be meet and confer on the contentions, and

13  believing that the contentions would not be contested until the scheduled Markman hearing where

14  more experienced patent litigation counsel would review the contentions and have an opportunity to

15  make appropriate revisions was a further mistake. Those mistakes were not intentional and

16  reasonable foreseeable in light of the history of the invention and difficulties in Berger's getting

17  representation following Rossignol's usurpation of their previous counsel.

18      It is unlikely that Rossignol relied upon the mistake, so much as they sized upon it. They

19  changed their anticipated schedule for summary judgment and immediately filed without raising any

20  question or discussion with the undersigned, regarding the inclusion of the base plate with the lower

21  attachment, in one but not all of the claims. Comparing the accused device with the claims reveals

22  infringement in that the industry recognized lower attachment remained stationary while the upper

23  attachment rotated. In so far as Plaintiff failed to address the stationary character of part (5b) at the

24  hearing that was neglect.

25      Hiring someone else's attorney foreseeably interferes with his assertion of his rights, and

26  contributes to delay. The resulting and foreseeable consultation with subsequent counsel give rise to

27  a greater probability of mistakes. Plaintiff requests that this Court excuse the neglect of counsel and

BURNETT, BURNETT
& ALLEN
160 W. Santa Clara St.
12th Floor
San Jose, CA 95113

MOTION FOR ORDER SETTING ASIDE ORDER ON SUMMARY JUDGMENT AND JUDGMENT ON THE BASIS OF RULE 60(B)(1)

PAGE 11
11

1  set aside the Courts judgment.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

BURNETT, BURNETT
& ALLEN
160 W. Santa Clara St.
12th Floor
San Jose, CA 95113

MOTION FOR ORDER SETTING ASIDE ORDER ON SUMMARY JUDGMENT AND JUDGMENT ON THE BASIS OF RULE 60 (B)(1)

PAGE 12
12

# EXHIBIT B

Yahoo! Mail - burnettburnettallen@yahoo.com
Page 1 of 3

Case 3:07-cv-05279-JSW    Document 36-2    Filed 11/20/2007    Page 16 of 87

Yahoo!  My Yahoo!  Mail



Search
the Web
[        ]  Search

**YAHOO! MAIL**  Welcome, burnettburnettall...
[Sign Out, My Account]

Mail Home - Mail Tutorials - Help

FREE FLIP PHONES  X cingular
Certain restrictions
apply. 2 year
agreement required.

Mail  ▾  |  Addresses  ▾  |  Calendar  ▾  |  Notepad  ▾

What's New - Mail For Mobile - Upgrades - Options

[ Check Mail ]  [ Compose ]

[        ]  Search Mail ▾  [ Search the Web ]

**Mail Accounts**

burnettallen...
allenforjudg...
yahoo.com

**Folders**  [Add - Edit]

**Inbox (1)**
Draft
Sent
**Bulk (2)**    [Empty]
Trash    [Empty]

See your
credit score: $0

$200,000 Loan
Only $771/Mo.!

Online Degree
Programs

Ugly credit?

Previous | Next | Back to Messages

[ Delete ]  [ Reply ▾ ]  [ Forward ▾ ]  [ Spam ]  [ Move... ▾ ]

This message is not flagged. [ Flag Message - Mark as Unread ]    Printable View

**From:**  Dba123456@aol.com  ◉View Contact Details  🔖 Add Mobile Alert

**Date:**  Mon, 8 May 2006 10:23:11 EDT

**Subject:**  📎 Fwd: Motion for setting aside order

**To:**  burnettburnettallen@yahoo.com

*[handwritten: FILE / COPY TO CLIENT / CALENDAR SECTY / CALENDAR ATTNY / RETURN W/FILE / SEE ME / COPY TO]*

**Forwarded Message** [ Download File | Save to Yahoo! Briefcase ]

**From:**  "David Tunno" <david@tunno.com>

**To:**  "David Newman" <DNewman@Seyfarth.com>, "Jack Slobodin" <jslobodin@seyfarth.com>, "Matt Werber" <MWerber@Seyfarth.com>, "Richard Berger" <richard.berger@brandgo.com>

**CC:**  dba123456@aol.com

**Subject:**  Motion for setting aside order

**Date:**  Sun, 7 May 2006 11:52:08 -0700

**HTML Attachment** [ Download File | Save to Yahoo! Briefcase ]

Gentlemen,
I have read the brief. Thanks to Richard for sending it.

Attractive card.

Overall, I like it very much. It represents the first time I have seen the history of the matter laid out in one document that has a nice flow to it and I like the arguments.

There is one aspect of it that strikes me as being a potential problem. I believe this will be the first time the court will have learned of the involvement of Seyfarth, some 3 years ago (pg. 8, 2nd paragraph). How the Chicago office became involved at that point is not explained in the brief and my concern is that the court may interpret that involvement as a contradiction to what Jack told the court in the April 14 hearing, specifically that he was not directly or substantially involved until March, '06. If not a contradiction to Jack's claim, it may at least seem to that Jack's claim was misleading.

Following are some additional concerns and recommendations:

pg. 2, line 16 - Change "a" to "an"

Pg. 4, 2nd paragraph - The second sentence seems to express an incomplete thought. The phrase, "..., was the language that when the up attachment locked to the lower attachment," does not seem to be completed by the excerpt from the patent.

Pg. 5, line 4 - I would substitute "housed" for "facilitated."

Pg.5, line 8 - I think there should be a distinction made between "attached" as it relates to the lower attachment vs. the base 4. I would add another sentence to that paragraph that would read, "5b is directly attached to the snowboard, while the base (4) is rotatably attached to 5b."

Pg. 5, lines 11,12 - Consistent with the above recommendation, I would insert "rotatably" between "are" and "attached" on line 11 and after "attachment" on line 12, I would insert ",via the base(4) which covers the lower attachment (5b).." I believe that would also help explain the problem the paragraph is describing.

Pg. 5, lines 13,14 - From my point of view, the phrase "splitting of the lower attachment" does not describe the Rossignol binding, particularly the base (4). The addition of the base 4 does not split the lower attachment, it adds an element to the coupler so that it can engage the lower attachment. 4 is a coupler component, not a lower attachment component.

Pg. 6, line 6 - delete "either."

That's all from me.
David Tunno
(805) 650-2709
david@tunno.com



# EXHIBIT C

From: Douglas Allen [burnettburnettallen@yahoo.com]
Sent: Monday, May 15, 2006 10:34 AM
To: MWerber@seyfarth.com; JACK SLOBODIN
Subject: Berger v. Rossignol- Draft of Motion

Attachments: Berger Rule 60 Motion.doc

1   Attorneys for Plaintiff
    Douglas B. Allen, SBN 99239
2   Burnett, Burnett, & Allen
    160 WEST SANTA CLARA STREET, SUITE 1200
3   San Jose, California 95113
    (408) 298-6540
4

5                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
6                        (SAN FRANCISCO DIVISION)
7   Richard W. Plaintiffs and Brant W. Plaintiffs    )   Case No. 3:05-CV-02523-CRB
                                                      )
8                    Plaintiff,                       )   **PLAINTIFF'S MOTION UNDER FED.
                                                      )   R. CIV. P. 59(E) AND 60(B) TO
9            v.                                       )   VACATE JUDGMENT
                                                      )
10  Rossignol Ski Company, Incorporated              )   ** HEARING TIME AND DATE**
    Rossignol S.A.; Skis Rossignol S.A.              )
11                                                    )
12                                                    )
                     Defendant.                       )
13                                                    )
                                                      )
14  Rossignol Ski Company, Inc.,                     )
                                                      )
15               Counterclaim Plaintiff              )
                                                      )
16                                                    )
    v.                                                )
17                                                    )
    Richard W. Plaintiffs and Brant W. Plaintiffs    )
18                                                    )
                 Counterclaim Defendants             )
19  _____ )

20

21

22

23

24

25

26

27

28

CH1 11057438.4

# TABLE OF CONTENTS

Memorandum of Points and Authorities ............................ Page 1

    I. Summary of the Argument ............................ Page 1

    II. Factual Background ............................ Page 1

Background of the Intvention of the Berge Binding ............... Page 3

Rossignol's Infringement ............................ Page 5

Rossignol's Actions Forseeably Contributed to the Conclusion that Led

    to the Mistaken Contention ............................ Page 8

Counsel had a Good Faith Belief that the Preliminary Infringement

    Contentions were Subject to Amendment without Leave of

    the Court ............................ Page 12

Defendant was not Predjuiced, but Rather Seized Upon the

    Mistake of Counsel ............................ Page 13

The Court's Grant of Summary Judgment Should be Vacated Due to

    Error ............................ Page 15

The Court has the Power to Vacate its Grant of Summary Judgment

    Under Rule 60 and Rule 59(e) ............................ Page 16

The Court's Grant of Summary Judgment was Based on its Mistaken

    Belief that Plaintiff's Preliminary Infringement Contentions

    Failed to Disclose a Proper Corresponding Lower Attachment ... Page 17

The Preliminary Infringement Contentions Disclosed Item 5(b), the

    Stationary "Hold-Down Disk," as the Lower Attachment ........ Page 17

The Court's Finding was also Based on the Mistaken Belief that

    Plaintiff's Conceded Non-Infringement Under the Preliminary

    Infringement Contentions by its Statements Regarding Item 4 ... Page 20

Defendant's Discussion of Item 4 in its Summary Judgment Motion

i

CH1 11057438.4

was a Red Herring Attempt to Divert the Court's Attention Away

from Plaintiff's Inclusion of Item 5(b)                          Page 20

Plaintiff's Responded to Defendant's Red Herring Attempt, Refocusing

the Court's Attention on Item 5(b), the Hold-Down Disk           Page 21

The Court's Error was not Merely Harmless Error Because Defendant's

Remaining Noninfringement Arguments Failed to Support

Summary Judgment                                                 Page 22

The Order of the Court is Flawed Because it Failed to Perform a Claim

Construction                                                     Page 24

The Nature of the Binding Construction Made Counsel's Mistake

Forseeable                                                       Page 25

Rule 60(b) Provides Authority for the Court to Relieve the Party of

Counsel's Good Faith Mistakes                                    Page 26

Conclusion                                                       Page 27

ii

CH1 11057438.4

1  **<u>TABLE OF AUTHORITIES</u>**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CH1 11057438.4

## TABLE OF EXHIBITS

Exhibit 1    The Infringement Claim Chart attached to Plaintiffs' Preliminary Infringement Contentions submitted January 4, 2006 under Local Rule 3.1.

Exhibit 2    Numbered photographs attached to Plaintiffs' Preliminary Infringement Contentions.

Exhibit 3    Excepts from Defendant's March 21, 2006 "Motion for Summary Judgment of Unenforceability (Due to Equitable Estoppel), Noninfringement and/or Invalidity."

Exhibit 4    Excepts from Rossignol Ski Company Inc's Preliminary Invalidity Contentions submitted February 17, 2006.

Exhibit 5    Unpublished Cases

iv

CHI 11057438.4

1

## TABLE OF ABBREVIATIONS

2

3

**Allen Decl.** refers to the March 27, 2006 "Declaration of Douglas B. Allen in Support of Motion for Leave to File Amended Disclosure of Asserted Claims and Preliminary Infringement Contentions"

4

5

**Berger Decl.** refers to the March 21, 2006 "Declaration of Richard W. Berger in Support of Plaintiffs' Opposition To Rossignol's Motion for Summary Judgment"

6

7

**Def's Opp. Memo Re: Motion to Amend.** refers to Defendant's April 3, 2006 "Memorandum in Opposition re motion for Leave to File Amended Disclosure of Asserted Claims and Preliminary Infringement Contentions"

8

9

**Def's S.J. Motion** refers to Defendant's March 21, 2006 "Motion for Summary Judgment of Unenforceability (Due to Equitable Estoppel), Noninfringement and/or Invalidity."

10

11

**Def's S.J. Reply Memo** refers to Defendant's April 3, 2006 "Reply Memorandum in Further Support of Rossignol's Motion for Summary Judgment"

12

13

**Motion to Amend Disclosure** refers to Plaintiffs' March 27, 2006 "Motion for Leave to File Amended Disclosure of Asserted Claims and Preliminary Infringement Contentions"

14

15

**Order** refers to the Honorable Judge Charles R. Breyer's April 25, 2006 "order granting Defendant's Motion for Summary Judgment, denying Plaintiffs' Motion for Leave to File and denying Plaintiffs' Motion for Summary Judgment."

16

17

**Preliminary Infringement Contentions** refers to Plaintiffs' Preliminary Infringement Contentions submitted January 4, 2006 under Local Rule 3.1.

18

**Pls' Cross Motion** refers to Plaintiff's March 27, 2006 "Cross Motion for Summary Judgment"

19

20

**Pls' Opp. Memo Re: Motion to Amend** refers to Plaintiffs' March 7, 2006 Reply Memorandum In Support of Leave to File Amended Disclosure."

21

**Pls' Reply** refers to "Plaintiff's April 7, 2006 Reply Memorandum To Rossignol's Opposition to Plaintiff's Cross-Motion For Summary Judgment"

22

23

**Pls' S.J. Opp. Memo** refers to Plaintiff's March 27, 2006 "Memorandum in Opposition To Rossignol's Motion for Summary Judgment."

24

25

**Proposed Amended Contentions** refers to Plaintiffs' March 27, 2006 "Disclosure Of Asserted Claims And Preliminary Infringement Contentions."

26

27

**Slobodin Decl.** refers to the March 27, 2006 "Declaration of Jack Slobodin in Support of Motion for Leave to File Amended Disclosure of Asserted Claims and Preliminary Infringement Contentions"

28

v

1    PLEASE TAKE NOTICE that on ___ June _, 2006, at 10:00 am, we will appear before

2    the Honorable Charles R. Breyer at the United States Courthouse, 450 Golden Gate Avenue,

3    Courtroom 8, 19th floor, San Francisco, California, and then and there present Plaintiffs' /

4    Counterclaim Defendants' Richard W. Berger and Brant W. Berger ("Plaintiffs'") Rule 59(e)

5    Motion to Vacate Judgment.

6

7    More specifically, Plaintiffs will move this court to vacate its April 25, 2006 order

8    granting Defendant Rossignol Ski Company's ("Defendant's") Motion for Summary Judgment

9    (the "Order") under Federal Rule of Civil Procedure 59(e), where the court's finding was based

10    on three critical errors.

11    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

12    **I.**    Statement of the Issues.

13

14        **A.**    Should plaintiffs be relieved from the adverse judgment due to excusable neglect
             under Rule 60 (b), specifically was the inadvertent attachment of the wrong claim
15             chart (which included the rotatable base, item 4, in the chart of preliminary
             infringement contentions, as part of the non rotatable lower attachment),
16             excusable neglect?

17        **B.**    Was the error on the part of plaintiff harmless, in light of the fact that the
             identified components of the lower attachment ( 5[b] and 17, in the chart of
18             preliminary infringement contentions), were stationary, thus satisfying the
             limitations of claim 1, establishing infringement by the application of claim 1 of
19             the '530 patent to the accused devise where the upper attachment does rotate
             relative to the lower attachment?
20

21        **C.**    Was plaintiff's error compounded by the court's failure to perform a claim
             construction for the claim terms at issue?
22

23

24    **II.**    Summary of the Argument.

25    Plaintiffs move under Rule 60(b) to vacate the court's judgment, where excusable neglect by

26    Plaintiffs' attorney lead to the inclusion of item 4 in the Preliminary Infringement Contentions,

27    which ultimately lead to summary judgment.    The neglect was excusable due to the unfair

28

CH1 11057438.4

1  competitive actions on the part of defendant that contributed to plaintiffs disorganization and

2  utilization of different counsel.  Defendants copied plaintiff's invention, undercut their pricing in

3  the very market targeted by plaintiff, then hired away plaintiffs' attorneys due to superior

4  bargaining position.  Then defendant upon realizing the mistake of plaintiff's counsel advanced

5  their motion for summary judgment to sieze the opportunity, instead of allowing plaintiffs

6  counsel an opportunity to correct their mistake.

7

8      The court's grant of summary judgment was further based on its mistaken belief that the

9  Preliminary Infringement Contentions failed to disclose a corresponding lower attachment in the

10  accused device that satisfied the requirements of claim 1 -- in particular, the limitation that the

11  upper attachment be permitted to rotate relative to the lower attachment (the "Rotate

12  Limitation").  However, the Preliminary Infringement Contentions disclosed three alternative

13  corresponding items that could have been the lower attachment, the first of which was item 5B,

14  the hold-down disk.  With item 5B being the lower attachment, the Rotate Limitation of claim 1

15  was satisfied because, in the accused device, item 5B remains stationary while the upper

16  attachment, plate 3, is permitted to rotate relative to it.  The fact that the Preliminary

17  Infringement Contentions disclosed item 5B as the lower attachment should have raised a

18  genuine issue of material fact, at the very least, thereby precluding summary judgment, thus

19

20  rendering plaintiffs' error harmless.

21

22      Plaintiffs concession that item 4, in the Preliminary Infringement Contentions, the

23  rotatable base, would not satisfy the Rotate Limitation, should not have been read, nor were they

24  intended as a general concession that there were no other items disclosed, such as 5B, that could

25  have served as a valid corresponding lower attachment.  Plaintiffs' statement related only to item

26

27

28
                                    2

4, and did not preclude the remaining item 5B from supporting Plaintiff's infringement contentions for claim 1.

As well, Defendant's arguments in regard to item 4 was a red herring attempt to divert the court's attention to item 4, when the proper item 5B had been present and properly identified from the start. As "5B" has been identified by Plaintiff in its Preliminary Infringement Contentions, Plaintiff had not acted in bad faith to "shuffle its position" (vis-à-vis their attempt to correct the mistake of including item "4" by moving to amend Plaintiffs' Preliminary Infringement Contentions) nor had attempted a "shifting sands" approach to claim construction. Rather plaintiff merely attached the wrong claim chart to the Preliminary Infringement Contentions, and attempted to correct the error as soon as it was discovered.

Finally, the Order failed to provide a claim construction for, at least, the disputed claim terms "upper attachment" and "lower attachment." Such construction would have again revealed plaintiff's mistake to be harmless, and subject to correction under the local rules.

## BACKGROUND OF THE INVENTION OF THE BERGER BINDING

In 1996, the snowboard industry was an evolving industry emerging on to ski slopes across the world. Different types of boots and bindings were being attempted in an effort to determine efficient and convenient snowboard riding systems. Early snowboard boots and binding systems entailed a soft snowboard boot (to be distinguished from a hard ski boot), and strap-on-bindings. The straps were affixed directly to a plate on the board. The board had pre-drilled holes to attach the bindings. Strap on binding systems had a center plate screwed directly on to the board facilitating anchorage of the binding to the board. Adjustment for foot angle etc., was accomplished by removing the boot, loosening the four screws on the center plate of the binding and making the appropriate adjustments, re-tightening the screws and then reusing the binding.

3

CHI 11057438.4

1    Other early designs attempted to apply ski boot binding systems to snowboards. These

2    are releasable binding systems, such as the "AITEC", and "Scott" bindings referenced in the

3    summary judgment. These systems involved a hard ski boot (unacceptable for snowboarding),

4    and a releasable binding (also unacceptable for snowboarding). Often in strap on and ski boot

5    systems, attempts were made to rotate the systems while the boot was engaged to the binding.

6    This was accomplished by inserting an additional plate or layer of devise, which elevated the

7    riders foot off the board to an impermissible height. This denied the rider positive application of

8    foot pressure on the board and control of the two edges of the board.

9

10    A third type of binding was the emerging step-in-binding systems. As seen by the article

11    from "Snowboard Life"(attached to the declaration of Douglas B. Allen as exhibit 1), all of the

12    step-in-binding systems, designed specifically for snowboarding, involved a integrated upper

13    attachment integrated into the boot. This upper attachment allowed for the coupling of the boot

14    to a lower attachment affixed directly to the board. By using this method, a soft boot could be

15    used. The systems were generally more efficient since with the integrated upper attachment to

16    the boot, the riders foot was in close proximity to the board for control. These systems had the

17    nearly identical anchor system that the strap-in-binding systems had, which was a center plate

18    screwed to the board by four screws directed into the pre-drilled holes. The novelty of each of

19    the step-in systems was to allow for the rider, in soft snowboard boots, to automatically engage

20    with the lower attachment affixed to the board by merely stepping on to the coupling mechanism.

21    The Emery binding purchased by Rossignol (depicted in the article as the Rossignol step in

22    binding), was precisely one of these systems and exemplified the identical mounting by four

23    screws on to the pre-drilled holes into the board through a central disc. In each of these step-in-

24    binding systems rotation adjustment could be facilitated by unscrewing the center plate with a

25    screwdriver. Once the plate was loosened, the rotational aspect of the binding could be adjusted

26

27

28

4

1    and then the screws re-tightened to facilitate boarding.

2        In 1996, when Brant Berger went to Bear Valley for the first time, he quickly saw the

3    need for rotatable step-in-binding to be used by rental shops.  He discussed this need with the

4    rental shops at Bear Valley and many of the ski instructors (see declaration of Richard Berger).

5        The innovation of the Berger binding was to take a step-in-binding system and permit

6    rotation between the boot and its integrated upper attachment and the lower attachment, which

7    was fixed and anchored the binding directly to the board with the four screw holes.  The Berger

8    invention created a coupling which allowed the rider to select a desired position on a 360 degree

9    rotation, then a lock was included to fix the rotational movement of the binding (claim 4 of the

10   530 patent).

### ROSSIGNOL'S INFRINGEMENT

11        The Berger's applied for a provisional patent and proceeded to market their binding in

12   early 1997, introducing it at the Snow Industry Association Trade Shows( "S.I.A." )(see

13   declaration of Richard Berger, also see the "Snowboard Life"article which shows the 1997

14   version of the Rossignol step in binding which did not rotate).  At the initial S.I.A. trade show,

15   Rossignol sent over a representative who photographed the Berger devise.  By 1998, Rossignol,

16   had created the "tool free" S.I.S. system, which duplicated the Berger rotation in a step-in-

17   binding system.  The Rossignol binding, likewise, allowed rotation by using a step in snow board

18   system, with a soft boot and integrated upper attachment.

19        What Rossignol did, was add the base plate (item 4 in the plaintiffs claim chart of

20   preliminary infringement contentions), to their coupler/coupling mount.  The base plate (Item 4)

21   sat exterior to the center disc which anchored the binding to the board and contained a release

22   allowing the upper attachment to rotate relative to the anchor disc screwed on to the board.  The

23   Rossignol "tool free" S.I.S. binding system was anchored to the board, as was every other

5

1    binding in the world, by four screws in the center of the plate. Rossignol, however, infringed

2    upon Berger's concept by creating a new plastic base upon which their coupler was riveted that

3    sat exterior to the anchor disc held on by anchors that slid under a geared lip on the anchor disc.

4        The conclusion of Rossignol's efforts was to precisely duplicate the Berger invention.

5    Rossignol took the elements of a step-in-binding, which is to have an upper attachment

6    comprising a boot (as in every other step-in-binding, and upper attachment with an integrated

7    coupler or coupling mount), and a lower attachment connectable to the board (the same circular

8    plate found in all bindings which is the direct connection to the board through the four screws

9    into the pre-drilled holes which anchors the binding directly to the board). The Rossignol

10   binding contained "a coupler attached to one of said upper and lower attachments and a coupling

11   mount attached to other of said upper and lower attachments." This language duplicates existing

12   step-in bindings, all of which contained a coupler and coupling mount designed to automatically

13   engage to lock the rider to the board. The language of the Berger patent reads "...the coupling

14   mount and coupler being configured to automatically engage with each other to lock the upper

15   attachment to the lower attachment when a user wearing the boot steps on to the lower

16   attachment..." (once again this describes every step in binding available in the industry at the

17   time).

18       Various forms of couplers and coupling mounts were used to attach the integrated upper

19   attachment and boot on to the lower attachment which was thereupon anchored to the board by

20   the pre-drilled screw holes and screws. What made the Berger patent unique, and what was

21   duplicated in the Rossignol S.I.S. "tool free"devise, was the rotation relative to the lower

22   attachment,

23       "...when the user ...steps on to the lower attachment and to permit rotation of the upper

24       attachment relative to the lower attachment when the upper attachment is locked to the

6

1    lower attachment without release of said upper attachment from said lower attachment."

2    With Berger, the lower attachment was the circular disk anchored directly to the board

3    by the four screws. With the Rossignol S.I.S. system, the lower attachment was the identical

4    disc anchored by four screws directly to the board and which did not rotate or move. The

5    Rossignol system, by addition of the base plate (item 4 of the Berger infringement contentions),

6    allowed for rotation of the upper attachment relative to the lower attachment ( i.e. the disc that

7

8    was anchored directly to the board, "5b" in the preliminary infringement contentions).

9    Characterization of the base plate found in the Rossignol binding is troubling because it

10   did not exist in the earlier Emery binding. In the earlier Emery binding, the coupler was attached

11   directly to the base plate, and rotated only upon loosening of the four screws. Production of the

12   Emery product by Rossignol prior to rotation in the "tool free" design involved a lower

13   attachment that was only the disc anchored directly to the board. When Rossignol duplicated the

14

15   Berger rotation, they added the plastic base plate to the coupler which facilitated the release

16   mechanism allowing rotation around the lower disc which continued to be anchored directly to

17   the board. The new base (item 4) was at the same elevation as the anchor plate (5b), and

18   therefore presented some confusion to various counsel analyzing the binding. Whether the base

19   plate (item 4 in the infringement chart), is described as part of the lower attachment or better

20   described as part of the "coupler" all of those products are "attached".

21

22   Review of the patent language describes precisely this condition where the claims states, "...a
     coupler **attached** to one of said upper and lower attachments, and a coupling mount **attached** to
23   the other of said upper and lower attachments...". Since the coupler and coupling mount are
     attached to the lower attachment it is difficult to distinguish between components of the coupling
24   mount and the lower attachment. The infringement contentions contain a diagram that
     specifically identifies that part "5b" is "stationary".
25

26

27

28

7

## ROSSIGNOL'S ACTIONS FORSEEABLY CONTRIBUTED TO THE CONFUSION THAT LED TO THE MISTAKEN CONTENTION

In 1996, Brant Berger and his father first conceived of the Berger Binding, which from the inception was born of the need for rapid adjustment arising from the rental of snowboard equipment at a resort. A provisional patent application was filed, a corporation was formed to gain investors and promote the binding, and the binding was previewed at major snow industry trade shows in early 1997.

At one of the first shows, Rossignol sent representatives to the Berger show booth who took pictures of the Berger binding. Rossignol had acquired the Emery step in binding, which automatically engages with the configuration of an upper attachment integral to the boot and a lower attachment connected to the board by four screws, with automatically locking coupler and coupling mount, as did every other step in snow board binding on the market. Likewise, as with every other step in snow board on the market, the Emery design that Rossignol had purchased did not rotate while engaged.

The next snow season, in 1998, it did rotate. It duplicated the Berger design photographed a year earlier, where the upper attachment, comprising the boot and integrated coupling mount when locked to the board by the coupler attached to the lower attachment connected or affixed to the board, rotated relative to the lower attachment, that anchored the binding to the board when engaged. Not only did Rossignol copy the Berger design, but they marketed the binding to Berger's primary market, the Rental shops of resorts across the nation. In addition Rossignol undercut the Berger pricing by 30% (probably below cost), and offered financing to the rental shops on terms of 3 years (unheard of in the industry at the time which ordinarily limited terms of payment to a matter of months)(see the declaration of Richard Berger). The superior bargaining position of Rossignol combined with the infringing design

8

CHI 11057438.4

caused the fledgling Berger company to loose the contracts it had placed and put the thinly

financed company out of business (The Court may note that the original complaint herein

included unfair trade practice allegations and the company as a plaintiff. The claims were

dropped due to statute of limitation defenses).

Reginald Suyat, a senior partner in the multi national law firm of Fish and Richardson,

was retained to prosecute the patent on the Berger binding, following the provisional application

filed by a small firm in Colorado. Precious investor capital was applied to the fees of Fish and

Richardson to allow for the completion of the patents in the U.S. and for P.T.O. and foreign

patents. Mr. Suyat was an eminently qualified industry respected patent prosecutor with many

years of experience. While the prosecutions of the Berger patents were pending, Rossignol

infringed and usurped the market. Naturally, Berger used the services to Mr. Suyat to address

Rossignol's infringement. Communications with between Mr. Suyat and Rossignol of France

continued for two snow market seasons after the first introduction and massive marketing of the

offending Rossignol product. The Berger patent had yet to issue by the time of the May 1999,

letter sent form Rossignol.

Once again however, Rossignol was not content to refrain from abusing its superior

economic power. Notwithstanding a year long correspondence exchange which included

personally written letters from two general directors of Rossignol, discussing an obviously

adverse relationship with Berger, Rossignol hired Berger's law firm, Fish and Richardson to

handle unrelated litigation against K-2. The value of the Rossignol business caused the law firm

to instruct Mr. Suyat that he could no longer represent Berger adverse to Rossignol. This is why

no letter was written in response to the May 1999, letter from Rossignol. Yet Rossignol knew

exactly why Berger did not respond. They had usurped Berger's lawyer.

Mr. Suyat was relegated to completion of the patent. During the two year period of

9

1  correspondence exchange, Rossignol and Berger exchanged bindings.  Mr. Suyat (on a date

2  undertrained), prepared a claims chart and infringement contentions.  In Mr. Suyat's original

3  claims chart, the base plate, item 4, which was added to the Emery design to facilitate rotation,

4  was not listed as one of the items included in the lower attachment.

5
6      Once the patents issued, Berger interviewed numerous counsel to consider litigation with

7  Rossignol.  In 2003, as second claim chart was created by prospective counsel, which chart did

8  include the base plate (item 4), as part of the lower attachment along with 5b, and 17, as to claim

9  one.  Every firm interviewed, required substantial capital to contribute to the cost of the

10  litigation, which Berger, due to the loss of the business, had not raised.   Berger's investors were

11  understandably reluctant to contribute more funds toward the failed snowboard business.

12
13      Mindful of 35 U.S.C. 286, Berger and some of his investors, became anxious to file an

14  action against Rossignol prior to the sixth anniversary of the issuance of the first patent, the '530

15  patent.  They sought the aide of the undersigned who had represented Berger in past litigation

16  involving real estate.  Because of the prior relationship, and the existence of Mr. Suyat's opinion

17  regarding infringement, and with the promise that funds would be raised once the litigation was

18  commenced, the undersigned undertook the litigation and filed.  Funds were not raised quite as

19  promised, and informal support from Mr. Slobotin of the Sayfarth firm (one of the firms

20  interviewed for the litigation), and Mr. Suyat was likewise slow to materialize (this latter

21  circumstance was understandable due to the lack of funds to compensate them for their time).

22
23      By fall of 2005, however, the funds were raised.  Service, parties, and other matters had

24  been sorted out.  Initial disclosures were being prepared and communication had begun with

25  opposing counsel regarding scheduling.  The first conferences with opposing counsel revolved

26  around their contentions about prior art, and the first meeting with Mr. Slobotin and Mr. Suyat

27  was scheduled for an hour following the first CMC.  That was the first substantive

28
                                                          10

1  communication between the undersigned and these attorneys, the subject of which was prior art

2  and Rossignol's estoppel argument.

3      The undersigned had to obtain unorganized files from the defunct corporation in order to

4  comply with the initial disclosure requirements. Most of the files were in a storage locker, and

5  some were in other counsel's files. Collecting these together caused the delay in making the

6

7  initial disclosures. All of these matters pressed up upon the Christmas holiday season, and an

8  extremely hectic trial schedule for the undersigned in December through February (6 trials in

9  three months in four courts). Further extensive interrogatories and document requests had been

10 served by Rossignol, requiring additional time.

11     The undersigned intended to utilized the claims chart of Mr. Suyat in the preliminary

12 infringement contentions, however the original had not been located, only a copy with inter-

13 lineation (underlining in the text). Due to the lateness of the disclosures, the undersigned

14

15 despaired of finding the original. In actually making the disclosure, however, the undersigned

16 mistook a claims chart created by un-retained counsel interviewed for the patent litigation, as a

17 clean copy of the Suyat chart, not noticing the mistaken identification of the base plate (item 4)

18 in claim one. The undersigned therefore erroneously disclosed the wrong claims chart. Instead

19 of using the well considered chart prepared by the prosecutor of the patent, the chart by

20

21 prospective but unretained litigation counsel was erroneously used.

22     Since the opposing counsel and myself were meeting and conferring on numerous topics,

23 I further erroneously assumed we would meet and confer regarding our respective contentions

24 once their preliminary invalidity contentions were issued. This did not occur. No discussion

25 regarding the infringement contentions occurred. No one raised any question about the inclusion

26 of the base plate as part of the lower attachment in claim one. Instead a surprise motion for

27 summary judgment was filed. The undersigned immediately called and requested to be given

28

11

1  more time to respond to the summary judgement which had been set without the courtesy of

2  clearing the date.

3      Mr. Slobotin had simultaneously agreed to enter the case.  Upon review of the motion, he

4  discovered the mistake, and immediately called opposing counsel to see if they would stipulate

5  to modification of the infringement contentions.  They refused and the motion to amend the

6  contentions was prepared.

7

8      **COUNSEL HAD A GOOD FAITH BELIEF THAT THE PRELIMINARY
INFRINGEMENT CONTENTIONS WERE SUBJECT TO AMENDMENT WITHOUT
LEAVE OF THE COURT**

9

10

11     As described above, the undersigned, although an experienced trial counsel was not

12  experienced in patent litigation or in the application of the local patent rules of the Northern

13  District.  Simultaneous with the undersign's preparation for the disclosure of the asserted claims

14  and preliminary infringement contentions as required under Rule 3-1, discussion was transpiring

15  between the parties regarding a schedule to be submitted to the Court in the "Joint Case

16  Management Conference Statement"( A copy of that schedule is attached as an exhibit to the

17  "Declaration of Douglas B. Allen" as exhibit 2).  The schedule did not contemplate summary

18  judgment motions until well after the *Markman* hearing.  At the "Case Management Conference"

19  the Court set the date for the *Markman* hearing and no person at the hearing discussed the

20  possibility of any intervening motions, but only obligations of disclosure and to meet and confer.

21

22     Rule 3-6, reviewed by the undersigned, indicates that the preliminary infringement

23  contentions become final after the *Markman* hearing.  For  thirty days following the *Markman*

24  hearing, the preliminary infringement contentions would be subject to modification without leave

25  of Court pursuant to Rule 3-6(a).

26

27     With the understanding that experienced patent litigation counsel would be available to

28

12

CH1 11057438.4

1    assist in the *Markman* hearing i.e. Mr. Slobodin, the undersigned was of the belief that

2    appropriate amendments or modifications of the preliminary infringement contentions would

3    occur following a process that included meeting and conferring prior to the *Markman* hearing,

4    conduct of the *Markman* hearing, construction of claim terms and later consideration of the

5    Court's ruling following a *Markman* hearing. The undersign's belief in the ability to amend

6    these matters is not only based upon the undersigns plain reading of the rules, but was

7    compounded by the defendant's proposed litigation schedule indicating that no motions for

8    summary judgment or other dispositive motions would be filed until after the Markman hearing.

9

10   **DEFENDANT WAS NOT PREJUDICED, BUT RATHER SEIZED UPON THE**
     **MISTAKE OF COUNSEL**

11

12   Plaintiffs brought this action against Defendant alleging that certain snowboard bindings

13   manufactured and/or sold by Defendant infringed U.S. Patent No. 5,913,530, (the "530 patent").

14   On January 4, 2006, Plaintiffs submitted their Preliminary Infringement Contentions to opposing

15   counsel pursuant to Patent Local Rule 3.1 ("L.R. 3.1"). (Allen Decl. at pg. 2, lns. 9-12). Claim 1

16   of the '530 patent ("claim 1"), requires, in-part, an upper attachment, a lower attachment, and

17   permitting "rotation of the upper attachment relative to the lower attachment," (the "Rotation

18   Limitation"). (Exh. 1 at pg. 1). As such, the Preliminary Infringement Contentions disclosed

19   plate 3 as the upper attachment, and <u>three</u> alternative corresponding items that could have been

20   the lower attachment, including "**5B**, 4, 17 connectable to a board." (Exh. 1 at pg. 1) (*emphasis*

21   *added*); (Order at Pg. 9, ln. 16) ((quoting ) (Exh. 1 at pg. 1)). In the accused device, item 5B

22   remains stationary while the upper attachment, part 3, is permitted to rotate relative to it. (Exh. 3

23   at pg. 4, lns. 3-4) (Defendant describing "hold-down disk 5B … fixed to the snowboard"); (Exh.

24   2 at pg. 6) ("remains stationary"). Plaintiffs' disclosed also item 4, a rotatable base, as a lower

25

26

27

28

13

attachment. As plaintiffs have conceded, the Rotation Limitation is not satisfied if item 4 was the only lower attachment because item 4 rotates with the upper attachment.[1]

On March 21, 2006, Defendant filed a motion for summary judgment on unenforceability, non-infringement and/or invalidity. In its summary judgment motion, Defendant *conveniently* bypassed addressing the inclusion of item 5B in the Preliminary Infringement Contentions in favor of addressing only Plaintiffs' inclusion of item 4, the rotatable base. (Exh. 3 at pg. 4, 14). Despite Defendant's acknowledgement that the Preliminary Infringement Contentions disclosed "hold-down disk 5B .... fixed to the snowboard" in referring to the lower attachment, Defendant proceeded to focus only on the inclusion of "rotatable base 4" in arguing non-infringement of the Rotation Limitation. (Exh. 3 at pg. 14, lns. 2-15).

Plaintiffs responded to Defendant's red herring argument concerning item 4 by explaining that item 5B, the hold down disk, was the proper lower attachment. (Pls' Reply at pg. 2); (Pls' S.J. Opp. Memo. at pg. 11); (Motion to Amend Disclosure, Exhs. A, C); (Motion to Amend Disclosure, Exhs. A); (Berger Decl. at pg. 4, lns. 1-4).

The court granted Defendant's motion for summary judgment based on the mistaken belief that Plaintiffs' Preliminary Infringement Contentions failed to disclose a corresponding lower attachment that satisfied the Rotation Limitation. According to the court: " it is undisputed that plate 3--the upper attachment--does not rotate relative to what plaintiffs' identify as the lower attachment...." (Order at pg. 9, lns. 19-24). In light of finding merely that item 4 did not rotate nor satisfy the Rotation Limitation, the court found that accused device "does not infringe as a matter of law." (Order at pg. 9, lns. 19-24). The court did not address Plaintiffs' inclusion

---

[1] Plaintiffs also disclosed item 17 as an alternative lower attachment. Item 17 was not shown in the diagrams accompanying the original contentions. However item 17 is the white disk disposed under item 5B, the hold-down disk. The white disk was labeled as part 2 in Rossignol's Summary Judgment Motion, and in the Proposed Amended Disclosures. (Exhibit 3, at pg. 4); (Proposed Amended Disclosures, Exh. A, E); (Berger Decl. at pg. 4, lns. 1-4).

14

of part 5B in the Preliminary Infringement Contentions, nor did it address Plaintiff's assertions that part 5B, the hold-down disk was the proper lower attachment. The diversion of the Court's attention away from part 5b to the rotatable base item 4, reinforces that Rossignol was not prejudiced by the mistaken inclusion of part 4, but rathere knowingly seized upon the mistake to advance their anticipated schedule for a motion for summary judgment from late 2006, early 2007, as set forth in their proposed schedule to the Court and counsel in November 2005, and take advantage of the technical defect in plaintiff's disclosure before it was discovered.

## THE COURT'S GRANT OF SUMMARY JUDGMENT SHOULD BE VACATED DUE TO ERROR

Plaintiffs request that the court vacate its grant of summary judgment because the court's finding was based on errors invited by defendant. The court granted Defendant's motion for summary judgment based on the apparent mistaken belief that Plaintiffs' Preliminary Infringement Contentions failed to disclose a corresponding lower attachment in the accused device that satisfied the requirements of claim 1 -- in particular the limitation that the upper attachment be permitted to rotate relative to the lower attachment. According to the court, the upper attachment disclosed in the Preliminary Infringement Contentions did not rotate relative to what the Plaintiffs disclosed as the lower attachment. However, this finding was based only on the description of item 4 as the lower attachment. The emphasis by the defense diverted attention from what the Preliminary Infringement Contentions actually disclosed as the lower attachment. In that regard, the Preliminary Infringement Contentions did disclose a corresponding lower attachment that satisfied the Rotation Limitation. Furthermore, the court's finding was also based on the mistaken belief that Plaintiffs conceded non-infringement under the Preliminary Infringement Contentions by admitting merely that item 4 would not satisfy the Rotation Limitation. Finally, the court's finding was not based on any interpretation of the

15

CHI 11057438.4

1    disputed claim term "lower attachment," which in light of the mistake by plaintiff's counsel,

2    compounded by the opportunism and artful diversion by the defense, was overlooked.

3    ## THIS COURT HAS THE POWER TO VACATE ITS GRANT OF SUMMARY
4    ## JUDGMENT UNDER RULE 60 AND RULE 59(E)

5

6        Rule 60(b) gives courts the power to "relieve a party . . . from a final judgment, order, or

7    proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; . .

8    . or (6) any other reason justifying relief from the operation of the judgment." Fed. R. Civ. P.

9    60(b) (2006).  The Ninth Circuit has made it clear that "mistake" or inadvertence" under Rule

10   60(b) "may include mistake and inadvertence by the judge" *Kingvision Pay-Per-View v. Lake*

11   *Alice Ba*r, 168 F.3d 347, 350 (9th Cir. 1999) (a "district court can correct its own mistake" under

12   rule 60(b)); *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 387 F.3d 1021, 1024 (9th Cir. 2004) ("The

13   district court has discretion to correct a judgment for mistake or inadvertence, either on the part

14   of counsel or the court itself.").  For example, a court may vacate its grant of summary judgment

15   under rule 60(b) where excusable neglect by the plaintiffs and a factual oversight by the court

16   ultimately caused the court to mistakenly believe the plaintiffs failed to raise a genuine issue of

17   fact in the earlier proceedings.  *O'Connor v. Boeing N. Am., Inc., 114 F. Supp. 2d 949, 950* (C.

18   Dist. Cal. 2000).  Federal Rule 59(e) gives district courts the power to "alter or amend a

19   judgment" based on errors of law or fact controlling the outcome of a final judgment.  Fed. R.

20   Civ. P. 59(e); *Norman v. Arkansas Dep't of Educ.*, 79 F.3d 748, 750 (8th Cir. 1996) ("a [r]ule

21   59(e) motion is therefore appropriate in cases where the court has based an order on a factual

22   error"); *Nikko Materials USA, Inc. v. R.E. Serv. Co.*, 2006 U.S. Dist. LEXIS 15775 (N.D. Cal.

23   2006) ("Rule 59(e) also provides that a party may move to alter or amend a final judgment ....")

24   (citations omitted); *see generally Kingvision Pay-Per-View v. Lake Alice Bar*, 168 F.3d 347, 350

25   (9th Cir. 1999) (applying the rule 59(e) standard for mistake of fact by judge in affirming lower

16

1  court's decision to amend unduly harsh judgment); *see generally First Ave. West Bldg., LLC v.*

2  *James (In re Onecast Media)*, 439 F.3d 558, 561-562 (9th Cir. 2006) ("[a] timely motion for

3  reconsideration is governed by Federal Rule of Civil Procedure 59(e).")  Thus, this court has the

4  power to alter or amend a grant of summary judgment that was based on clear factual or legal

5  errors.

6

7  ### THE COURT'S GRANT OF SUMMARY JUDGMENT WAS BASED ITS MISTAKEN BELIEF THAT PLAINTIFF'S PRELIMINARY INFRINGEMENT CONTENTIONS FAILED TO DISCLOSE A PROPER CORRESPONDING LOWER ATTACHMENT

8

9  The court granted Defendant's motion for summary judgment based on the mistaken

10  belief that Plaintiffs' Preliminary Infringement Contentions failed to disclose a corresponding

11

12  lower attachment that satisfied the Rotate Limitation.  According to the court:

13  > it is undisputed that plate 3--the upper attachment--does not rotate relative to what
> plaintiffs' identify as the lower attachment; rather, the upper attachment rotates
14  > with the lower attachment. Accordingly, under plaintiffs' infringement
> contentions Defendant's accused device does not read on at least one limitation of
15  > claim 1 of the '530 and therefore does not infringe as a matter of law.

16  (Order at pg. 9, lns. 19-24).  As such, the court granted summary judgment based on its mistaken

17  belief as to "what plaintiffs' identify as the lower attachment" in the Preliminary Infringement

18

19  Contentions.  (Order at 10).

20  ### THE PRELIMINARY INFRINGEMENT CONTENTIONS DISCLOSED ITEM 5B, THE STATIONARY "HOLD-DOWN DISK," AS THE LOWER ATTACHMENT

21

22  The court failed to recognize that the Preliminary Infringement Contentions disclosed

23  three alternative corresponding items that could have been the lower attachment, the first of

24  which was item 5B, the hold-down disk.  (Order at Pg. 9, ln. 16) (*quoting* (Exh. 1 at pg. 1)) ("**5B**,

25  4, 17 connectable to board") (emphasis added).  In the accused device, item 5B remains

26  stationary while the upper attachment, part 3, is permitted to rotate relative to it.  (Exh. 3 at pg. 4,

27  lns. 3-4) (Defendant describing "hold-down disk 5B ... fixed to the snowboard"); (Exh. 2 at pg.

28

17

1) (showing disk 5B was bolted to the board via four bolts); (Exh. 2 at pg. 6); (Exh. 2 at pg. 6)

("remains stationary").  Understanding that the lower attachment, item 5B, remains stationary, it

is clear that the upper attachment is permitted to rotate relative to it.  (Exh. 2 at pg. 1).  Had the

court considered Plaintiffs' unmistakable disclosure of item 5B as being the lower attachment,

summary judgment would not have been granted because the upper attachment <u>does</u> "rotate

relative to the [disclosed] lower attachment" as required by claim 1.  (Order at pg. 9, lns. 19-22).

   To the extent that Plaintiffs' inclusion of item 4 in the second row of the Preliminary

Infringement Contentions may have confused the reader, a further reading of the chart shows that

Plaintiff's intended 5B as the lower attachment, not item 4.  In that regard, the fourth row of the

Preliminary Infringement Contentions disclosed "a coupling mount attached to the other of said

upper and lower attachments" as "5A, attached to **5B** ...."[2]  (Exh. 1 at pg. 1).  Similarly, for

claim 19, the Preliminary Infringement Contentions disclosed a coupling mount "attached to said

<u>lower attachment</u>" as "5A attached to **5B** via 4, 17."  (Exh. 1 at pg. 2) (emphasis added).  Next,

for claim 31, the Preliminary Infringement Contentions disclosed "rotation of said upper

attachment relative to said <u>lower attachment</u>" as "3 rotates relative to **5B**."  (Exh. 1 at pg. 4)

(emphasis added).  Thus, by disclosing item 5B as the corresponding lower attachment in claim 1

and throughout the Preliminary Infringement Contentions, Plaintiffs' original contentions

unmistakably disclosed a lower attachment that satisfied the Rotate Limitation.

   Furthermore, the Preliminary Infringement Contentions' inclusion of item 4 as a

potential, albeit failed, alternative to item 5B as the corresponding lower attachment should have

been harmless to the reader.  Plaintiffs' should not be faulted for disclosing alternative items in

their "preliminary" disclosure.

---

[2] Under the for Claim 1, the lower attachment would be the "other" of the upper and lower attachments.

18

Preliminary Infringement Contentions are merely a discovery tool to aid the parties and imperfect contentions should not be fatal. In *Renesas Tech. Corp. v. Nanya Tech. Corp.*, 2004 U.S. Dist. LEXIS 23601 (N.D. Cal. 2004), this court declined to strike preliminary contentions where the contentions contained deficiencies. Rather, the court permitted the plaintiff opportunity to amend its preliminary infringement contentions to correct any deficiencies. *Id.* ("[t]hat Renesas' contentions are not perfect at this stage is not fatal"). According to the court:

> Patent L.R. 3-1 does not require [plaintiff] to produce evidence of infringement or to set forth ironclad and irrefutable claim constructions [sic], nor does it require a plaintiff to provide support for its contentions. .... Instead, a party need only set forth "particular theories of infringement with sufficient specificity to provide defendants' with notice of infringement" beyond the claim language itself."

Id. (quoting *Network Caching Technology Corp. v. Novell, Inc.*, 2003 U.S. Dist. LEXIS 9881 (N.D. Cal. 2003).

Besides, Plaintiffs should not be held to a different standard , where Defendant did the same in its Preliminary Invalidity Contentions. Defendant's Preliminary Invalidity Contentions show Defendant disclosing alterative corresponding items in prior art references, some possibly mistaken. For example, in identifying items in the prior art AITEC Patent that corresponded to the lower attachment of claim 1, Defendant disclosed <u>nine</u> alternative items including "element(s) 3, 7, 8, 22, 140, 145, 136, 137, and/or 135."[3] (Exh. 4 at pg _ ). Defendant would argue that it would be unfair if Defendant was require to stake its entire anticipation argument with respect to the AITEC patent on "screws 145" being the only possible element it could rely on to anticipate the lower attachment. Furthermore, Defendant's Invalidity Contentions included a notable disclaimer stating that: "Rossignol's preliminary invalidity contentions … are based on information currently available and include <u>alternative</u> positions ...." and that "Rossignol

---

[3] The nine alternative elements Defendant identified as a potential corresponding lower attachments included anchor plate 3, disk 7, ring gear 8, sliding plate 22, base 140, screws 145, spacer disk 136, holding plate 137 and rotor 135. (Def's S.J. Motion, Exh. 5, 10).

19

1   reserves the right to amend or supplement its Preliminary Invalidity Contentions depending, for

2   example, on how Plaintiff's asserted claims are construed or applied ... by Plaintiffs." (Invalidity

3   Contentions at pg. 2, lns. 5-15). Such disclaimers reinforced plaintiffs' counsel's good faith

4   belief that the preliminary infringement contentions would be subject to later amendment without

5   leave of Court.

6

7

8   ### THE COURT'S FINDING WAS ALSO BASED ON THE MISTAKEN BELIEF THAT PLAINTIFFS CONCEDED NONINFRINGEMENT UNDER THE PRELIMINARY INFRINGEMENT CONTENTIONS BY ITS STATEMENTS REGARDING ITEM 4

9

10

11      Furthermore, the court's finding was also based on the mistaken belief that Plaintiffs

12   conceded noninfringement under the Preliminary Infringement Contentions by admitting merely

13   that item 4, the rotatable base, would not satisfy the Rotation Limitation of claim 1. The court

14   erred when it stated, "…it is undisputed that plate 3--the upper attachment--does not rotate

15   relative to what plaintiffs' identify as the lower attachment …." (Order at pg. 9, lns. 19-24). The

16   only thing that Plaintiffs were not disputing, was that item 4, in and of itself, would not satisfy

17   the Rotation Limitation. However, Plaintiffs' statements regarding item 4 in claim 1 should not

18   have been read as a general concession that there where no other items disclosed, such as 5B,

19   that could have served as the infringing lower attachment.

20   ### DEFENDANT'S DISCUSSION OF ITEM 4 IN ITS SUMMARY JUDGMENT MOTION WAS A RED HERRING ATTEMPT TO DIVERT THE COURT'S ATTENTION AWAY FROM PLAINTIFFS' INCLUSION OF ITEM 5B

21

22

23

24      Defendant's tunnel-vision like focus on Plaintiffs' inclusion of item 4 in the Preliminary

25   Infringement contentions was a red herring, used to divert the court's attention away from what

26   was actually disclosed in the claim chart. In its summary judgment motion, Defendant

27   *conveniently* bypassed the inclusion of item 5B in the Preliminary Infringement Contentions in

28

20

1   favor of addressing only Plaintiffs' inclusion of item 4, the rotatable base. (Exh. 3 at pg. 4, 14).

2   Despite Defendant's acknowledgement that the Preliminary Infringement Contentions disclosed

3   "hold-down disk 5B …. fixed to the snowboard" in referring to the lower attachment, Defendant

4
    suspiciously proceeded to focus only on the inclusion of "rotatable base 4" in arguing
5
    noninfringement of the Rotate Limitation. (Exh. 3 at pg. 14, lns. 2-15).  Defendant asserted that
6
7   Plaintiffs admitted that Defendant's binding did not meet the Rotate Limitation. (Exh. 3 at pg.

8   14, lns. 5-12) (referring to Plaintiffs' purported "admission" of non-infringement).  Furthermore,

9   page 4 of Defendant's Summary Judgment motion depicted the accused device with item 5B, the

10  "central hold down disk," removed.  (Exhibit C at pg. 4).

11
            As well, Defendant failed to cite any authority for the proposition that that the court can
12
    ignore one disclosed item in favor of another disclosed item in a claim chart to sustain a finding
13
14  of noninfringement.     Indeed, the rules of procedure permit plaintiffs to plead in the alternative.

15  (cite).  In light of Defendant's acknowledgment of "hold-down disk 5B …. fixed to the

16  snowboard" in its Summary Judgment Motion, Defendant can *hardly* assert that it was "severely

17  prejudiced" when Plaintiffs' re-disclosed item 5B as the lower attachment in its Proposed

18  Amended Disclosure.  (Opp. to Motion to Amend at pg. 11, ln. 1).

19          **PLAINTIFFS' RESPONDED TO DEFENDANTS' RED HERRING**
20      **ATTEMPT, REFOCUSING THE COURT'S ATTENTION ON ITEM 5B,**
                        **THE HOLD-DOWN DISK**
21
            For the court to state that Plaintiffs made "no other representation regarding infringement
22
23  based upon the original infringement contentions" was error because Plaintiffs responded to

24  Defendant's red herring argument regarding item 4 by explaining that item 5B, the hold down

25  disk, was the proper lower attachment. (Order at 10).  For example, Plaintiffs asserted that

26  "Rossignol's binding does have a lower attachment connectable to a board.  The lower

27  attachment is the disc which is attached to the board … Rossignol does not deny that they have
28
                                            21

1    this element." (Pls' Reply at pg. 2). Plaintiffs' asserted in their Opposition Memorandum that

2    where the rotatable base [4] "is not part of the lower attachment, the rotation f [sic] the upper

3    attachment relative to the lower attachment limitation' is fulfilled." (Pls' S.J. Opp. Memo. at pg.

4
5    11). Plaintiffs filed their Opposition Memorandum along with their Proposed Amended

6    Disclosure, which, again, disclosed item 5B as the corresponding lower attachment, referring to

7    precisely the same photograph, and the same "5B" label -- referred to in the Preliminary

8    Infringement Contentions. (Motion to Amend Disclosure, Exhs. A, C) ("5B, which comprises

9    what Rossignol refers to as a central hold-down disc."). Plaintiffs also responded to Defendant's

10   convenient removal of item 5B from the diagram appearing on page 4, pointing out that 5B was

11   "not shown in the photograph on page 4 of [Defendant's] Summary Judgment Brief." (Motion to

12
13   Amend Disclosure, Exhs. A); (Berger Decl. at pg. 4, lns. 1-4) ("[t]he white disc together with

14   what Rossignol calls the 'hold down disc,' which has been removed from the photograph,

15   comprise the lower attachment.").

16        Thus, while it is true Plaintiffs conceded the accused device would not infringe if item 4

17   was the only possible lower attachment, Plaintiffs' concession regarding item 4 in claim 1 should

18   not have been read as a general concession that there where no other items disclosed, such as 5B,

19   that could have served as a valid corresponding lower attachment.

20

### THE COURT'S ERROR WAS NOT MERELY HARMLESS ERROR BECAUSE DEFENDANT'S REMAINING NONINFRINGEMENT ARGUMENTS FAILED TO SUPPORT SUMMARY JUDGMENT

21
22

23        The court's ultimate finding of summary judgment was based solely on the Rotate

24   Limitation not being satisfied because the court did not review any remaining noninfringement

25   arguments. Thus, as the court's finding regarding the Rotate Limitation should be reversed, the

26   ultimate finding of summary judgment should be reversed as well. Nevertheless, besides the

27
28

22

1    Rotate Limitation, Defendant's remaining non-infringement arguments were also insufficient to

2    warrant summary judgment.

3         Defendant argues that the accused device does not meet the limitation of "permit[ing]

4    rotation of the upper attachment relative to the lower attachment," (the "Permit Rotation

5    Element"). According to Defendant, the Permit Rotation Element is not satisfied because the

6    configuration between coupler and coupling mount "in terms of their shape and arrangement" do

7    not enable or effectuate rotation between the upper and lower attachment. (Def's S.J. Reply

8    Memo at pgs. 9-10). However, Defendants argument ignores the plain language of claim 1.

9    Claim 1 is limited merely to bindings where the configuration "**permit[s]** rotation of the upper

10   attachment relative to the lower attachment." (*emphasis added*). Nothing in the claim requires

11   that the coupler/coupling mount actually cause the rotation. Under the correct interpretation of

12   the word "permit," the Permit Rotation Element is clearly satisfied because, as previously shown,

13   rotation is permitted between the upper and lower attachment. (Berger Decl. at pg. 5, lns. 1-7).

14        Defendant also argues that the accused device does not satisfy "permit[ting] rotation ...

15   when the upper attachment is locked to the lower attachment without release of said upper

16   attachment from said lower attachment," (the "Rotate While Locked Limitation"). The claim

17   requires merely that (1) rotation be permitted and (2) while rotation is permitted, the upper and

18   lower attachment remain locked such that release does not occur. Defendant argues that the

19   Rotate While Locked Limitation is not satisfied because the accused binding does not permit

20   "free rotation," in other words, "free rotation" of the boot and upper attachment "while the rider

21   is snowboarding." (Def's S.J. Reply Memo at pgs. 11, lns. 1-10). However, free rotation is

22   simply not required by the claim. Under the plain meaning of the Rotate While Locked

23   Limitation, claim 1 is satisfied because (1) rotation is permitted in the accused binding and (2)

24   while rotation is permitted, release does not occur. (Berger Decl. at pg. 5, lns. 8-9).

23

1       Finally, Defendant argues that the accused device does not satisfy the limitation that the

2   coupling mount be "attached to the other of said upper and lower attachments," (the "Attached

3   Limitation"), where the "other" would be the lower attachment.  For Defendant's argument to

4   succeed, this court would be required to impermissibly limit the term "attached" to "directly

5

6   fastened" as shown in the preferred embodiment.  (Def's S.J. Motion, pg. 17, ln. 14).  The

7   Federal Circuit has consistently found that "modifiers will not be added to broad terms standing

8   alone," instead, "general descriptive terms will ordinarily be given their full meaning."  *Johnson*

9   *Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) ("we agree with the

10   district court that the term [coupled] is not limited to a mechanical or physical coupling").

11       In this case, claim 1 requires only that the coupling mount be "attached" to the lower

12   attachment.  The claim does not specify how.  In this case, metal brackets, i.e. 'fork,' are used to

13   attach the lower attachment to the coupling mount.  (*cite to Tunno Decl. and Slides).  Such is

14   also clear in reviewing the Preliminary Infringement Contentions for dependent claim 21, where

15   the alignment ring 17 is part of the lower attachment.  (*cite to Tunno Decl. and Slides).  Thus,

16   the Attached Limitation is satisfied.  (Berger Decl. at pg. 4).  Or, at the very least, whether the

17   Attached Limitation is satisfied first requires claim construction, (See Subsection ___, supra),

18   and then a factual determination, both sufficient to preclude summary judgment.  *Dorel Juvenile*

19

20   *Group, Inc. v. Graco Children's Prods.*, 429 F.3d 1043, 1047 (Fed. Cir. 2005) (reversing

21   summary judgment noninfringement finding where genuine fact issues existed in comparing the

22

23   claims to the accused device).

24          **THE ORDER OF THE COURT IS FLAWED BECAUSE IT FAILED TO PERFORM A CLAIM CONSTRUCTION**

25

26       The court should have conducted a claim construction at least with respect to the terms

27   "upper attachment" and "lower attachment."  These terms were clearly in dispute in Defendant's

28   motion for summary judgment and should have been construed by the court.  The first step in

CH1 11057438.4

1   determining infringement is to interpret the meaning of the language of the claims. *Markman v.*

2   *Westview Instruments*, 52 F.3d 967 (Fed. Cir. 1995) (en banc). The Order makes no mention of

3   construing claims pursuant to *Markman* or even to whether the court merely applied the plain

4   and ordinary meaning of the terms "upper attachment" or "lower attachment."

5        In fact, it would have been appropriate for the court to allow the parties to submit claim

6   construction briefs and to conduct a separate claim construction hearing pursuant to Local Rule

7

8   4.[4] Having conducted a proper claim construction, the court could have then properly

9   [4] This is the accepted procedure according to the Local Rules and the procedure that Plaintiff had
    anticipated that would be followed, which would have allowed Plaintiff to amend its Original
10  Infringement Contentions pursuant to Local Patent Rule 3-1.

11  **THE NATURE OF THE BINDING CONSTRUCTION MADE COUNSEL'S MISTAKE**
12  **FORESEEABLE**

13       Both Rossignol and Berger disclosed to each other that the term "attached", the terms
14
15  "coupler" and "coupling mount", all needed to be construed. Construction of the term "lower

16  attachment" would shed light on the characterization and/or mis-characterization of the base

17  plate of Rossignol's accused devise. That process is precisely the process which gives rise to an

18  opportunity for the parties to amend their infringement contentions, and for that matter invalidity

19  contentions. The difficulty is in the characterization of the Rossignol base plate, but whether it is
20
21  part of the coupler or lower attachment, it nonetheless facilitates rotation of the upper attachment

22  relative to the lower attachment. Since the coupler and the lower attachment are all attached, it is

23  a foreseeable mistake to characterize the base plate as part of the lower attachment. In either

24  event, this does not change the fact that the function of the Rossignol binding is a duplication of

25  the Berger patent allowing the upper attachment to rotate relative to the lower attachment i.e. that

26  portion of the lower attachment actually anchored to the board. The practical use of the

27  Rossignol product allowed them to effectively complete with the Berger binding in sales to rental

28

25

shops across America where no other binding could so do.  No binding, other then Berger's and

Rossignol's, create a circumstance where the rider could have a step-on snowboard binding

facilitating the riders application of direct pressure to the board for control while boarding and

yet having something that could be adjusted in the rotation of the foot position without having to

use a screwdriver.  The only two bindings in the world that facilitate this were the Rossignol

S.I.S "tool free" and the Berger 360.  Claim 1 of the 530 Patent encompasses the description of

both of devises.

## RULE 60(B)1 PROVIDES AUTHORITY FOR THE COURT TO RELIEVE THE PARTY OF COUNSEL'S GOOD FAITH MISTAKES

Rule 60(b)1 had been used in patent cases to allow relief from inadvertent mistakes [see:

*Bros. Inc. v. W. E. Grace Manufacturing Company* (1965) 351 Fed. 2nd 208].  A mistaken belief

by counsel in opportunities to utilize later proceedings was grounds for granting a 60(b)1 motion

[see: *Corning Glassworks v. Sumitomo Electric USA Inc. 683 Fed. Supp. 979*].  The United

States Supreme Court in *Pioneer Investments Services Company v. Brunswick Associates Limited

Partnership et, al.* (1992) 507 U.S. 380; 113 S. Ct. 1489; 123 L. Ed. 2nd 74, defined the factors

for the Court's consideration in determining excusable neglect pursuant to Rule 60(b)1 [507 U.S.

380, 395].  The Court indicated that the determination should be based upon equity taking into

account the relevant circumstances.  At page 398, the Court observed that unusual procedural

circumstances reinforced the excusable nature of counsel's mistake.

*Fidelity Fed. Bank, FSB v. Durga Ma Corp.*, 387 F.3d 1021, 1024 (9th Cir. 2004)

The district court has discretion to correct a judgment for mistake or inadvertence, either on the

part of counsel. *Kingvision Pay-Per-View Ltd. v. Lake Alice Bar,* 168 F.3d 347, 350 (9th Cir.

1999) *O'Connor v. Boeing N. Am., Inc.*, 114 F. Supp. 2d 949, 950 (C. Dist. Cal. 2000).

26

CH1 11057438.4

1  determined whether Defendants had proven noninfringement of claim 1 of the '530 patent. As

2  there was no claim construction, the court erred in finding summary judgment.

3  ### CONCLUSION

4  Plaintiff's counsel mistakenly attached the wrong claim chart. The mistake was compounded by

5  Counsel's belief in the ability to amend the contentions following a scheduled Markman hearing

6  where more experienced patent litigation counsel would review the contentions and have an

7  opportunity to make appropriate revisions was a further mistake. Those mistakes were not

8  intentional and reasonably foreseeable in light of the history of the invention and difficulties in

9

10  Berger's getting representation following Rossignol's usurpation of their previous counsel.

11      It is unlikely that Rossignol relied upon the mistake, so much as they sized upon it. They

12  changed their anticipated schedule for summary judgment and immediately filed without raising

13  any question or discussion with the undersigned, regarding the inclusion of the base plate with

14  the lower attachment, in one but not all of the claims. Comparing the accused device with the

15  claims reveals infringement in that the industry recognized lower attachment remained stationary

16  while the upper attachment rotated. In so far as Plaintiff failed to address the stationary character

17  of part (5b) at the hearing that was neglect.

18

19      Hiring someone else's attorney foreseeably interferes with his assertion of his rights, and

20  contributes to delay. The resulting and foreseeable consultation with subsequent counsel give

21

22      Picking up the wrong claim chart and affixing it to the preliminary infringement

23  contentions was the undersign's mistake. Assuming that there would be meet and confer on the

24  contentions, and believing that the contentions would not be contested until the scheduled

25

26

27

28

27

1    rise to a greater probability of mistakes.  Plaintiff requests that this Court excuse the neglect of

2    counsel and set aside the Courts judgment.

3         Further, the not rotating aspects of the lower attachment were disclosed, and the defense

4    erroneously diverted the Court's attention away from those contentions.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CH1 11057438.4

# EXHIBIT D

From: Douglas Allen [mailto:burnettburnettallen@yahoo.com]
Sent: Thursday, May 18, 2006 9:33 AM
To: RICHARD BERGER
Subject: Fwd: Berger v. Rossignol- Draft of Motion

Attachments: Fwd: Berger v. Rossignol- Draft of Motion

Note: forwarded message attached.

Attorneys for Plaintiff
Douglas B. Allen, SBN 99239
Burnett, Burnett, & Allen
160 WEST SANTA CLARA STREET, SUITE 1200
San Jose, California 95113
(408) 298-6540

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(SAN FRANCISCO DIVISION)

| | | |
|---|---|---|
| Richard W. Plaintiffs and Brant W. Plaintiffs | ) | Case No. 3:05-CV-02523-CRB |
| | ) | |
| Plaintiff, | ) | **PLAINTIFF'S MOTION UNDER FED. R. CIV. P. 59(E) AND 60(B) TO VACATE JUDGMENT** |
| | ) | |
| v. | ) | |
| | ) | **\*\* HEARING TIME AND DATE \*\*** |
| Rossignol Ski Company, Incorporated Rossignol S.A.; Skis Rossignol S.A. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| Rossignol Ski Company, Inc., | ) | |
| | ) | |
| Counterclaim Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Richard W. Plaintiffs and Brant W. Plaintiffs | ) | |
| | ) | |
| Counterclaim Defendants | ) | |
| | ) | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

Memorandum of Points and Authorities — Page 1

I. Summary of the Argument — Page 1

II. Factual Background — Page 1

Background of the Intvention of the Berge Binding — Page 3

Rossignol's Infringement — Page 5

Rossignol's Actions Forseeably Contributed to the Conclusion that Led to the Mistaken Contention — Page 8

Counsel had a Good Faith Belief that the Preliminary Infringement Contentions were Subject to Amendment without Leave of the Court — Page 12

Defendant was not Predjudiced, but Rather Seized Upon the Mistake of Counsel — Page 13

The Court's Grant of Summary Judgment Should be Vacated Due to Error — Page 15

The Court has the Power to Vacate its Grant of Summary Judgment Under Rule 60 and Rule 59(e) — Page 16

The Court's Grant of Summary Judgment was Based on its Mistaken Belief that Plaintiff's Preliminary Infringement Contentions Failed to Disclose a Proper Corresponding Lower Attachment — Page 17

The Preliminary Infringement Contentions Disclosed Item 5(b), the Stationary "Hold-Down Disk," as the Lower Attachment — Page 17

The Court's Finding was also Based on the Mistaken Belief that Plaintiff's Conceded Non-Infringement Under the Preliminary Infringement Contentions by its Statements Regarding Item 4 — Page 20

Defendant's Discussion of Item 4 in its Summary Judgment Motion was a Red Herring Attempt to Divert the Court's Attention Away

from Plaintiff's Inclusion of Item 5(b)                              Page 20

Plaintiff's Responded to Defendant's Red Herring Attempt, Refocusing

    the Court's Attention on Item 5(b), the Hold-Down Disk          Page 21

The Court's Error was not Merely Harmless Error Because Defendant's

    Remaining Noninfringement Arguments Failed to Support

    Summary Judgment                                              Page 22

The Order of the Court is Flawed Because it Failed to Perform a Claim

    Construction                                                  Page 24

The Nature of the Binding Construction Made Counsel's Mistake

    Forseeable                                                    Page 25

Rule 60(b) Provides Authority for the Court to Relieve the Party of

    Counsel's Good Faith Mistakes                                 Page 26

Conclusion                                                          Page 27

CH1 11057438.4

# **TABLE OF AUTHORITIES**

CH1 11057438.4

## **TABLE OF EXHIBITS**

Exhibit 1    The Infringement Claim Chart attached to Plaintiffs' Preliminary Infringement Contentions submitted January 4, 2006 under Local Rule 3.1.

Exhibit 2    Numbered photographs attached to Plaintiffs' Preliminary Infringement Contentions.

Exhibit 3    Excepts from Defendant's March 21, 2006 "Motion for Summary Judgment of Unenforceability (Due to Equitable Estoppel), Noninfringement and/or Invalidity."

Exhibit 4    Excepts from Rossignol Ski Company Inc's Preliminary Invalidity Contentions submitted February 17, 2006.

Exhibit 5    Unpublished Cases

CH1 11057438.4

## TABLE OF ABBREVIATIONS

**Allen Decl.** refers to the March 27, 2006 "Declaration of Douglas B. Allen in Support of Motion for Leave to File Amended Disclosure of Asserted Claims and Preliminary Infringement Contentions"

**Berger Decl.** refers to the March 21, 2006 "Declaration of Richard W. Berger in Support of Plaintiffs' Opposition To Rossignol's Motion for Summary Judgment"

**Def's Opp. Memo Re: Motion to Amend.** refers to Defendant's April 3, 2006 "Memorandum in Opposition re motion for Leave to File Amended Disclosure of Asserted Claims and Preliminary Infringement Contentions"

**Def's S.J. Motion** refers to Defendant's March 21, 2006 "Motion for Summary Judgment of Unenforceability (Due to Equitable Estoppel), Noninfringement and/or Invalidity."

**Def's S.J. Reply Memo** refers to Defendant's April 3, 2006 "Reply Memorandum in Further Support of Rossignol's Motion for Summary Judgment"

**Motion to Amend Disclosure** refers to Plaintiffs' March 27, 2006 "Motion for Leave to File Amended Disclosure of Asserted Claims and Preliminary Infringement Contentions"

**Order** refers to the Honorable Judge Charles R. Breyer's April 25, 2006 "order granting Defendant's Motion for Summary Judgment, denying Plaintiffs' Motion for Leave to File and denying Plaintiffs' Motion for Summary Judgment."

**Preliminary Infringement Contentions** refers to Plaintiffs' Preliminary Infringement Contentions submitted January 4, 2006 under Local Rule 3.1.

**Pls' Cross Motion** refers to Plaintiff's March 27, 2006 "Cross Motion for Summary Judgment"

**Pls' Opp. Memo Re: Motion to Amend** refers to Plaintiffs' March 7, 2006 Reply Memorandum In Support of Leave to File Amended Disclosure."

**Pls' Reply** refers to "Plaintiff's April 7, 2006 Reply Memorandum To Rossignol's Opposition to Plaintiff's Cross-Motion For Summary Judgment"

**Pls' S.J. Opp. Memo** refers to Plaintiff's March 27, 2006 "Memorandum in Opposition To Rossignol's Motion for Summary Judgment."

**Proposed Amended Contentions** refers to Plaintiffs' March 27, 2006 "Disclosure Of Asserted Claims And Preliminary Infringement Contentions."

**Slobodin Decl.** refers to the March 27, 2006 "Declaration of Jack Slobodin in Support of Motion for Leave to File Amended Disclosure of Asserted Claims and Preliminary Infringement Contentions"

PLEASE TAKE NOTICE that on ___ June __, 2006, at 10:00 am, we will appear before the Honorable Charles R. Breyer at the United States Courthouse, 450 Golden Gate Avenue, Courtroom 8, 19th floor, San Francisco, California, and then and there present Plaintiffs' / Counterclaim Defendants' Richard W. Berger and Brant W. Berger ("Plaintiffs'") Rule 59(e) Motion to Vacate Judgment.

More specifically, Plaintiffs will move this court to vacate its April 25, 2006 order granting Defendant Rossignol Ski Company's ("Defendant's") Motion for Summary Judgment (the "Order") under Federal Rule of Civil Procedure 59(e), where the court's finding was based on three critical errors.

## MEMORANDUM OF POINTS AND AUTHORITIES

I.    Statement of the Issues.

    **A.**    Should plaintiffs be relieved from the adverse judgment due to excusable neglect under Rule 60 (b), specifically was the inadvertent attachment of the wrong claim chart (which included the rotatable base, item 4, in the chart of preliminary infringement contentions, as part of the non rotatable lower attachment), excusable neglect?

    **B.**    Was the error on the part of plaintiff harmless, in light of the fact that the identified components of the lower attachment ( 5[b] and 17, in the chart of preliminary infringement contentions), were stationary, thus satisfying the limitations of claim 1, establishing infringement by the application of claim 1 of the '530 patent to the accused devise where the upper attachment does rotate relative to the lower attachment?

    **C.**    Was plaintiff's error compounded by the court's failure to perform a claim construction for the claim terms at issue?

1

II.    Summary of the Argument.

Plaintiffs move under Rule 60(b) to vacate the court's judgment, where excusable neglect by Plaintiffs' attorney lead to the inclusion of item 4 in the Preliminary Infringement Contentions, which ultimately lead to summary judgment.    The neglect was excusable due to the unfair competitive actions on the part of defendant that contributed to plaintiffs disorganization and utilization of different counsel.  Defendants copied plaintiff's invention, undercut their pricing in the very market targeted by plaintiff, then hired away plaintiffs' attorneys due to superior bargaining position.  Then defendant upon realizing the mistake of plaintiff's counsel advanced their motion for summary judgment to sieze the opportunity, instead of allowing plaintiffs counsel an opportunity to correct their mistake.

    The court's grant of summary judgment was further based on its mistaken belief that the Preliminary Infringement Contentions failed to disclose a corresponding lower attachment in the accused device that satisfied the requirements of claim 1 -- in particular, the limitation that the upper attachment be permitted to rotate relative to the lower attachment (the "Rotate Limitation").  However, the Preliminary Infringement Contentions disclosed three alternative corresponding items that could have been the lower attachment, the first of which was item 5B, the hold-down disk.  With item 5B being the lower attachment, the Rotate Limitation of claim 1 was satisfied because, in the accused device, item 5B remains stationary while the upper attachment, plate 3, is permitted to rotate relative to it.  The fact that the Preliminary Infringement Contentions disclosed item 5B as the lower attachment should have raised a genuine issue of material fact, at the very least, thereby precluding summary judgment, thus rendering plaintiffs' error harmless.

    Plaintiffs concession that item 4, in the Preliminary Infringement Contentions, the rotatable base, would not satisfy the Rotate Limitation, should not have been read, nor were they intended as a general concession that there were no other items disclosed, such as 5B, that could have served as a valid corresponding lower attachment.  Plaintiffs' statement related only to item 4, and did not preclude the remaining item 5B from supporting Plaintiff's infringement contentions for claim 1.

    As well, Defendant's arguments in regard to item 4 was a red herring attempt to divert the court's attention to item 4, when the proper item 5B had been present and properly identified from the start.  As "5B" has been identified by Plaintiff in its Preliminary Infringement Contentions, Plaintiff had not acted in bad faith to "shuffle its position" (vis-à-vis their attempt to correct the mistake of including item "4" by moving to amend Plaintiffs' Preliminary

2

Infringement Contentions) nor had attempted a "shifting sands" approach to claim construction.

Rather plaintiff merely attached the wrong claim chart to the Preliminary Infringement

Contentions, and attempted to correct the error as soon as it was discovered.

Finally, the Order failed to provide a claim construction for, at least, the disputed claim

terms "upper attachment" and "lower attachment." Such construction would have again revealed

plaintiff's mistake to be harmless, and subject to correction under the local rules.

## BACKGROUND OF THE INVENTION OF THE BERGER BINDING

In 1996, the snowboard industry was an evolving industry emerging on to ski slopes across the world. Different types of boots and bindings were being attempted in an effort to determine efficient and convenient snowboard riding systems. Early snowboard boots and binding systems entailed a soft snowboard boot (to be distinguished from a hard ski boot), and strap-on-bindings. The straps were affixed directly to a plate on the board. The board had pre-drilled holes to attach the bindings. Strap on binding systems had a center plate screwed directly on to the board facilitating anchorage of the binding to the board. Adjustment for foot angle etc., was accomplished by removing the boot, loosening the four screws on the center plate of the binding and making the appropriate adjustments, re-tightening the screws and then reusing the binding.

Other early designs attempted to apply ski boot binding systems to snowboards. These are releasable binding systems, such as the "AITEC", and "Scott" bindings referenced in the summary judgment. These systems involved a hard ski boot (unacceptable for snowboarding), and a releasable binding (also unacceptable for snowboarding). Often in strap on and ski boot systems, attempts were made to rotate the systems while the boot was engaged to the binding. This was accomplished by inserting an additional plate or layer of devise, which elevated the riders foot off the board to an impermissible height. This denied the rider positive application of foot pressure on the board and control of the two edges of the board.

A third type of binding was the emerging step-in-binding systems. As seen by the article from "Snowboard Life"(attached to the declaration of Douglas B. Allen as exhibit 1), all of the step-in-binding systems, designed specifically for snowboarding, involved a integrated upper attachment integrated into the boot. This upper attachment allowed for the coupling of the boot to a lower attachment affixed directly to the board. By using this method, a soft boot could be used. The systems were generally more efficient since with the integrated upper attachment to the boot, the riders foot was in close proximity to the board for control. These systems had the nearly identical anchor system that the strap-in-binding systems had, which was a center plate screwed to the board by four screws directed into the pre-drilled holes. The novelty of each of the step-in systems was to allow for the rider, in soft snowboard boots, to automatically engage with the lower attachment affixed to the board by merely stepping on to the coupling mechanism. The Emery binding purchased by Rossignol (depicted in the article as the Rossignol step in binding), was precisely one of these systems and exemplified the identical mounting by four screws on to the pre-drilled holes into the board through a central disc. In each of these step-in-binding systems rotation adjustment could be facilitated by unscrewing the center plate with a screwdriver. Once the plate was loosened, the rotational aspect of the binding could be

3

adjusted and then the screws re-tightened to facilitate boarding.

In 1996, when Brant Berger went to Bear Valley for the first time, he quickly saw the need for rotatable step-in-binding to be used by rental shops. He discussed this need with the rental shops at Bear Valley and many of the ski instructors (see declaration of Richard Berger).

The innovation of the Berger binding was to take a step-in-binding system and permit rotation between the boot and its integrated upper attachment and the lower attachment, which was fixed and anchored the binding directly to the board with the four screw holes. The Berger invention created a coupling which allowed the rider to select a desired position on a 360 degree rotation, then a lock was included to fix the rotational movement of the binding (claim 4 of the 530 patent).

## ROSSIGNOL'S INFRINGEMENT

The Berger's applied for a provisional patent and proceeded to market their binding in early 1997, introducing it at the Snow Industry Association Trade Shows( "S.I.A." )(see declaration of Richard Berger, also see the "Snowboard Life"article which shows the 1997 version of the Rossignol step in binding which did not rotate). At the initial S.I.A. trade show, Rossignol sent over a representative who photographed the Berger devise. By 1998, Rossignol, had created the "tool free" S.I.S. system, which duplicated the Berger rotation in a step-in-binding system. The Rossignol binding, likewise, allowed rotation by using a step in snow board system, with a soft boot and integrated upper attachment.

What Rossignol did, was add the base plate (item 4 in the plaintiffs claim chart of preliminary infringement contentions), to their coupler/coupling mount. The base plate (Item 4) sat exterior to the center disc which anchored the binding to the board and contained a release allowing the upper attachment to rotate relative to the anchor disc screwed on to the board. The Rossignol "tool free" S.I.S. binding system was anchored to the board, as was every other binding in the world, by four screws in the center of the plate. Rossignol, however, infringed upon Berger's concept by creating a new plastic base upon which their coupler was riveted that sat exterior to the anchor disc held on by anchors that slid under a geared lip on the anchor disc.

The conclusion of Rossignol's efforts was to precisely duplicate the Berger invention. Rossignol took the elements of a step-in-binding, which is to have an upper attachment comprising a boot (as in every other step-in-binding, and upper attachment with an integrated coupler or coupling mount), and a lower attachment connectable to the board (the same circular plate found in all bindings which is the direct connection to the board through the four screws into the pre-drilled holes which anchors the binding directly to the board). The Rossignol binding contained "a coupler attached to one of said upper and lower attachments and a coupling mount attached to other of said upper and lower attachments." This language duplicates existing step-in bindings, all of which contained a coupler and coupling mount designed to automatically engage to lock the rider to the board. The language of the Berger patent reads "...the coupling mount and coupler being configured to automatically engage with each other to lock the upper attachment to the lower attachment when a user wearing the boot steps on to the lower attachment..." (once again this describes every step in binding available in the industry at the time).

Various forms of couplers and coupling mounts were used to attach the integrated upper attachment and boot on to the lower attachment which was thereupon anchored to the board by the pre-drilled screw holes and screws. What made the Berger patent unique, and what was duplicated in the Rossignol S.I.S. "tool free"devise, was the rotation relative to the lower attachment,

"...when the user ...steps on to the lower attachment and to permit rotation of the upper

4

attachment relative to the lower attachment when the upper attachment is locked to the lower attachment without release of said upper attachment from said lower attachment."

With Berger, the lower attachment was the circular disk anchored directly to the board by the four screws. With the Rossignol S.I.S. system, the lower attachment was the identical disc anchored by four screws directly to the board and which did not rotate or move. The Rossignol system, by addition of the base plate (item 4 of the Berger infringement contentions), allowed for rotation of the upper attachment relative to the lower attachment ( i.e. the disc that was anchored directly to the board, "5b" in the preliminary infringement contentions).

Characterization of the base plate found in the Rossignol binding is troubling because it did not exist in the earlier Emery binding. In the earlier Emery binding, the coupler was attached directly to the base plate, and rotated only upon loosening of the four screws. Production of the Emery product by Rossignol prior to rotation in the "tool free" design involved a lower attachment that was only the disc anchored directly to the board. When Rossignol duplicated the Berger rotation, they added the plastic base plate to the coupler which facilitated the release mechanism allowing rotation around the lower disc which continued to be anchored directly to the board. The new base (item 4) was at the same elevation as the anchor plate (5b), and therefore presented some confusion to various counsel analyzing the binding. Whether the base plate (item 4 in the infringement chart), is described as part of the lower attachment or better described as part of the "coupler" all of those products are "attached".

Review of the patent language describes precisely this condition where the claims states, "...a coupler **attached** to one of said upper and lower attachments, and a coupling mount **attached** to the other of said upper and lower attachments...". Since the coupler and coupling mount are attached to the lower attachment it is difficult to distinguish between components of the coupling mount and the lower attachment. The infringement contentions contain a diagram that specifically identifies that part "5b" is "stationary".

5

**ROSSIGNOL'S ACTIONS FORSEEABLY CONTRIBUTED TO THE CONFUSION
THAT LED TO THE MISTAKEN CONTENTION**

In 1996, Brant Berger and his father first conceived of the Berger Binding, which from the inception was born of the need for rapid adjustment arising from the rental of snowboard equipment at a resort. A provisional patent application was filed, a corporation was formed to gain investors and promote the binding, and the binding was previewed at major snow industry trade shows in early 1997.

At one of the first shows, Rossignol sent representatives to the Berger show booth who took pictures of the Berger binding. Rossignol had acquired the Emery step in binding, which automatically engages with the configuration of an upper attachment integral to the boot and a lower attachment connected to the board by four screws, with automatically locking coupler and coupling mount, as did every other step in snow board binding on the market. Likewise, as with every other step in snow board on the market, the Emery design that Rossignol had purchased did not rotate while engaged.

The next snow season, in 1998, it did rotate. It duplicated the Berger design photographed a year earlier, where the upper attachment, comprising the boot and integrated coupling mount when locked to the board by the coupler attached to the lower attachment connected or affixed to the board, rotated relative to the lower attachment, that anchored the binding to the board when engaged. Not only did Rossignol copy the Berger design, but they marketed the binding to Berger's primary market, the Rental shops of resorts across the nation. In addition Rossignol undercut the Berger pricing by 30% (probably below cost), and offered financing to the rental shops on terms of 3 years (unheard of in the industry at the time which ordinarily limited terms of payment to a matter of months)(see the declaration of Richard Berger). The superior bargaining position of Rossignol combined with the infringing design

6

caused the fledgling Berger company to loose the contracts it had placed and put the thinly financed company out of business (The Court may note that the original complaint herein included unfair trade practice allegations and the company as a plaintiff. The claims were dropped due to statute of limitation defenses).

Reginald Suyat, a senior partner in the multi national law firm of Fish and Richardson, was retained to prosecute the patent on the Berger binding, following the provisional application filed by a small firm in Colorado. Precious investor capital was applied to the fees of Fish and Richardson to allow for the completion of the patents in the U.S. and for P.T.O. and foreign patents. Mr. Suyat was an eminently qualified industry respected patent prosecutor with many years of experience. While the prosecutions of the Berger patents were pending, Rossignol infringed and usurped the market. Naturally, Berger used the services to Mr. Suyat to address Rossignol's infringement. Communications with between Mr. Suyat and Rossignol of France continued for two snow market seasons after the first introduction and massive marketing of the offending Rossignol product. The Berger patent had yet to issue by the time of the May 1999, letter sent form Rossignol.

Once again however, Rossignol was not content to refrain from abusing its superior economic power. Notwithstanding a year long correspondence exchange which included personally written letters from two general directors of Rossignol, discussing an obviously adverse relationship with Berger, Rossignol hired Berger's law firm, Fish and Richardson to handle unrelated litigation against K-2. The value of the Rossignol business caused the law firm to instruct Mr. Suyat that he could no longer represent Berger adverse to Rossignol. This is why no letter was written in response to the May 1999, letter from Rossignol. Yet Rossignol knew exactly why Berger did not respond. They had usurped Berger's lawyer.

Mr. Suyat was relegated to completion of the patent. During the two year period of

7

correspondence exchange, Rossignol and Berger exchanged bindings. Mr. Suyat (on a date undertrained), prepared a claims chart and infringement contentions. In Mr. Suyat's original claims chart, the base plate, item 4, which was added to the Emery design to facilitate rotation, was not listed as one of the items included in the lower attachment.

Once the patents issued, Berger interviewed numerous counsel to consider litigation with Rossignol. In 2003, as second claim chart was created by prospective counsel, which chart did include the base plate (item 4), as part of the lower attachment along with 5b, and 17, as to claim one. Every firm interviewed, required substantial capital to contribute to the cost of the litigation, which Berger, due to the loss of the business, had not raised. Berger's investors were understandably reluctant to contribute more funds toward the failed snowboard business.

Mindful of 35 U.S.C. 286, Berger and some of his investors, became anxious to file an action against Rossignol prior to the sixth anniversary of the issuance of the first patent, the '530 patent. They sought the aide of the undersigned who had represented Berger in past litigation involving real estate. Because of the prior relationship, and the existence of Mr. Suyat's opinion regarding infringement, and with the promise that funds would be raised once the litigation was commenced, the undersigned undertook the litigation and filed. Funds were not raised quite as promised, and informal support from Mr. Slobotin of the Sayfarth firm (one of the firms interviewed for the litigation), and Mr. Suyat was likewise slow to materialize (this latter circumstance was understandable due to the lack of funds to compensate them for their time).

By fall of 2005, however, the funds were raised. Service, parties, and other matters had been sorted out. Initial disclosures were being prepared and communication had begun with opposing counsel regarding scheduling. The first conferences with opposing counsel revolved around their contentions about prior art, and the first meeting with Mr. Slobotin and Mr. Suyat was scheduled for an hour following the first CMC. That was the first substantive

8

communication between the undersigned and these attorneys, the subject of which was prior art and Rossignol's estoppel argument.

The undersigned had to obtain unorganized files from the defunct corporation in order to comply with the initial disclosure requirements. Most of the files were in a storage locker, and some were in other counsel's files. Collecting these together caused the delay in making the initial disclosures. All of these matters pressed up upon the Christmas holiday season, and an extremely hectic trial schedule for the undersigned in December through February (6 trials in three months in four courts). Further extensive interrogatories and document requests had been served by Rossignol, requiring additional time.

The undersigned intended to utilized the claims chart of Mr. Suyat in the preliminary infringement contentions, however the original had not been located, only a copy with inter-lineation (underlining in the text). Due to the lateness of the disclosures, the undersigned despaired of finding the original. In actually making the disclosure, however, the undersigned mistook a claims chart created by un-retained counsel interviewed for the patent litigation, as a clean copy of the Suyat chart, not noticing the mistaken identification of the base plate (item 4) in claim one. The undersigned therefore erroneously disclosed the wrong claims chart. Instead of using the well considered chart prepared by the prosecutor of the patent, the chart by prospective but unretained litigation counsel was erroneously used.

Since the opposing counsel and myself were meeting and conferring on numerous topics, I further erroneously assumed we would meet and confer regarding our respective contentions once their preliminary invalidity contentions were issued. This did not occur. No discussion regarding the infringement contentions occurred. No one raised any question about the inclusion of the base plate as part of the lower attachment in claim one. Instead a surprise motion for summary judgment was filed. The undersigned immediately called and requested to be given

9

more time to respond to the summary judgement which had been set without the courtesy of clearing the date.

Mr. Slobotin had simultaneously agreed to enter the case. Upon review of the motion, he discovered the mistake, and immediately called opposing counsel to see if they would stipulate to modification of the infringement contentions. They refused and the motion to amend the contentions was prepared.

## COUNSEL HAD A GOOD FAITH BELIEF THAT THE PRELIMINARY INFRINGEMENT CONTENTIONS WERE SUBJECT TO AMENDMENT WITHOUT LEAVE OF THE COURT

As described above, the undersigned, although an experienced trial counsel was not experienced in patent litigation or in the application of the local patent rules of the Northern District. Simultaneous with the undersign's preparation for the disclosure of the asserted claims and preliminary infringement contentions as required under Rule 3-1, discussion was transpiring between the parties regarding a schedule to be submitted to the Court in the "Joint Case Management Conference Statement"( A copy of that schedule is attached as an exhibit to the "Declaration of Douglas B. Allen" as exhibit 2). The schedule did not contemplate summary judgment motions until well after the *Markman* hearing. At the "Case Management Conference" the Court set the date for the *Markman* hearing and no person at the hearing discussed the possibility of any intervening motions, but only obligations of disclosure and to meet and confer.

Rule 3-6, reviewed by the undersigned, indicates that the preliminary infringement contentions become final after the *Markman* hearing. For thirty days following the *Markman* hearing, the preliminary infringement contentions would be subject to modification without leave of Court pursuant to Rule 3-6(a).

With the understanding that experienced patent litigation counsel would be available to

10

assist in the *Markman* hearing i.e. Mr. Slobodin, the undersigned was of the belief that appropriate amendments or modifications of the preliminary infringement contentions would occur following a process that included meeting and conferring prior to the *Markman* hearing, conduct of the *Markman* hearing, construction of claim terms and later consideration of the Court's ruling following a *Markman* hearing. The undersign's belief in the ability to amend these matters is not only based upon the undersigns plain reading of the rules, but was compounded by the defendant's proposed litigation schedule indicating that no motions for summary judgment or other dispositive motions would be filed until after the Markman hearing.

## DEFENDANT WAS NOT PREJUDICED, BUT RATHER SEIZED UPON THE MISTAKE OF COUNSEL

Plaintiffs brought this action against Defendant alleging that certain snowboard bindings manufactured and/or sold by Defendant infringed U.S. Patent No. 5,913,530, (the "530 patent . On January 4, 2006, Plaintiffs submitted their Preliminary Infringement Contentions to opposing counsel pursuant to Patent Local Rule 3.1 ( .R. 3.1 . (Allen Decl. at pg. 2, lns. 9-12). Claim 1 of the 30 patent ( laim 1 , requires, in-part, an upper attachment, a lower attachment, and permitting otation of the upper attachment relative to the lower attachment, (the otation Limitation . (Exh. 1 at pg. 1). As such, the Preliminary Infringement Contentions disclosed plate 3 as the upper attachment, and three alternative corresponding items that could have been the lower attachment, including **B**, 4, 17 connectable to a board. (Exh. 1 at pg. 1) (*emphasis added*); (Order at Pg. 9, ln. 16) ((quoting ) (Exh. 1 at pg. 1)). In the accused device, item 5B remains stationary while the upper attachment, part 3, is permitted to rotate relative to it. (Exh. 3 at pg. 4, lns. 3-4) (Defendant describing old-down disk 5B fixed to the snowboard ; (Exh. 2 at pg. 6) ( emains stationary . Plaintiffs disclosed also item 4, a rotatable base, as a lower attachment. As plaintiffs have conceded, the Rotation Limitation is not satisfied if item 4 was

11

the only lower attachment because item 4 rotates with the upper attachment.[1]

On March 21, 2006, Defendant filed a motion for summary judgment on unenforceability, non-infringement and/or invalidity. In its summary judgment motion, Defendant *conveniently* bypassed addressing the inclusion of item 5B in the Preliminary Infringement Contentions in favor of addressing only Plaintiffs inclusion of item 4, the rotatable base. (Exh. 3 at pg. 4, 14). Despite Defendant acknowledgement that the Preliminary Infringement Contentions disclosed old-down disk 5B fixed to the snowboard in referring to the lower attachment, Defendant proceeded to focus only on the inclusion of otatable base 4 in arguing non-infringement of the Rotation Limitation. (Exh. 3 at pg. 14, lns. 2-15).

Plaintiffs responded to Defendant red herring argument concerning item 4 by explaining that item 5B, the hold down disk, was the proper lower attachment. (Pls Reply at pg. 2); (Pls S.J. Opp. Memo. at pg. 11); (Motion to Amend Disclosure, Exhs. A, C); (Motion to Amend Disclosure, Exhs. A); (Berger Decl. at pg. 4, lns. 1-4).

The court granted Defendant's motion for summary judgment based on the mistaken belief that Plaintiffs' Preliminary Infringement Contentions failed to disclose a corresponding lower attachment that satisfied the Rotation Limitation. According to the court: " it is undisputed that plate 3--the upper attachment--does not rotate relative to what plaintiffs' identify as the lower attachment...." (Order at pg. 9, lns. 19-24). In light of finding merely that item 4 did not rotate nor satisfy the Rotation Limitation, the court found that accused device "does not infringe as a matter of law." (Order at pg. 9, lns. 19-24). The court did not address Plaintiffs' inclusion of part 5B in the Preliminary Infringement Contentions, nor did it address Plaintiff's

---

[1] Plaintiffs also disclosed item 17 as an alternative lower attachment. Item 17 was not shown in the diagrams accompanying the original contentions. However item 17 is the white disk disposed under item 5B, the hold-down disk. The white disk was labeled as part 2 in Rossignol's Summary Judgment Motion, and in the Proposed Amended Disclosures. (Exhibit 3, at pg. 4); (Proposed Amended Disclosures, Exh. A, E); (Berger Decl. at pg. 4, lns. 1-4).

12

assertions that part 5B, the hold-down disk was the proper lower attachment. The diversion of the Court's attention away from part 5b to the rotatable base item 4, reinforces that Rossignol was not prejudiced by the mistaken inclusion of part 4, but rathere knowingly seized upon the mistake to advance their anticipated schedule for a motion for summary judgment from late 2006, early 2007, as set forth in their proposed schedule to the Court and counsel in November 2005, and take advantage of the technical defect in plaintiff's disclosure before it was discovered.

## THE COURT'S GRANT OF SUMMARY JUDGMENT SHOULD BE VACATED DUE TO ERROR

Plaintiffs request that the court vacate its grant of summary judgment because the court's finding was based on errors invited by defendant. The court granted Defendant's motion for summary judgment based on the apparent mistaken belief that Plaintiffs' Preliminary Infringement Contentions failed to disclose a corresponding lower attachment in the accused device that satisfied the requirements of claim 1 -- in particular the limitation that the upper attachment be permitted to rotate relative to the lower attachment. According to the court, the upper attachment disclosed in the Preliminary Infringement Contentions did not rotate relative to what the Plaintiffs disclosed as the lower attachment. However, this finding was based only on the description of item 4 as the lower attachment. The emphasis by the defense diverted attention from what the Preliminary Infringement Contentions actually disclosed as the lower attachment. In that regard, the Preliminary Infringement Contentions did disclose a corresponding lower attachment that satisfied the Rotation Limitation. Furthermore, the court's finding was also based on the mistaken belief that Plaintiffs conceded non-infringement under the Preliminary Infringement Contentions by admitting merely that item 4 would not satisfy the Rotation Limitation. Finally, the court's finding was not based on any interpretation of the

13

disputed claim term "lower attachment," which in light of the mistake by plaintiff's counsel,

compounded by the opportunism and artful diversion by the defense, was overlooked.

## THIS COURT HAS THE POWER TO VACATE ITS GRANT OF SUMMARY JUDGMENT UNDER RULE 60 AND RULE 59(E)

Rule 60(b) gives courts the power to "relieve a party . . . from a final judgment, order, or

proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; .

. . or (6) any other reason justifying relief from the operation of the judgment." Fed. R. Civ. P.

60(b) (2006). The Ninth Circuit has made it clear that "mistake" or inadvertence" under Rule

60(b) "may include mistake and inadvertence by the judge" *Kingvision Pay-Per-View v. Lake

Alice Bar*, 168 F.3d 347, 350 (9th Cir. 1999) (a "district court can correct its own mistake" under

rule 60(b)); *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 387 F.3d 1021, 1024 (9th Cir. 2004) ("The

district court has discretion to correct a judgment for mistake or inadvertence, either on the part

of counsel or the court itself."). For example, a court may vacate its grant of summary judgment

under rule 60(b) where excusable neglect by the plaintiffs and a factual oversight by the court

ultimately caused the court to mistakenly believe the plaintiffs failed to raise a genuine issue of

fact in the earlier proceedings. *O'Connor v. Boeing N. Am., Inc., 114 F. Supp. 2d 949, 950* (C.

Dist. Cal. 2000). Federal Rule 59(e) gives district courts the power to "alter or amend a

judgment" based on errors of law or fact controlling the outcome of a final judgment. Fed. R.

Civ. P. 59(e); *Norman v. Arkansas Dep't of Educ.*, 79 F.3d 748, 750 (8th Cir. 1996) ("a [r]ule

59(e) motion is therefore appropriate in cases where the court has based an order on a factual

error"); *Nikko Materials USA, Inc. v. R.E. Serv. Co.*, 2006 U.S. Dist. LEXIS 15775 (N.D. Cal.

2006) ("Rule 59(e) also provides that a party may move to alter or amend a final judgment ....")

(citations omitted); *see generally Kingvision Pay-Per-View v. Lake Alice Bar*, 168 F.3d 347, 350

(9th Cir. 1999) (applying the rule 59(e) standard for mistake of fact by judge in affirming lower

14

court's decision to amend unduly harsh judgment); *see generally First Ave. West Bldg., LLC v. James (In re Onecast Media)*, 439 F.3d 558, 561-562 (9th Cir. 2006) ("[a] timely motion for reconsideration is governed by Federal Rule of Civil Procedure 59(e).") Thus, this court has the power to alter or amend a grant of summary judgment that was based on clear factual or legal errors.

## THE COURT'S GRANT OF SUMMARY JUDGMENT WAS BASED ITS MISTAKEN BELIEF THAT PLAINTIFF'S PRELIMINARY INFRINGEMENT CONTENTIONS FAILED TO DISCLOSE A PROPER CORRESPONDING LOWER ATTACHMENT

The court granted Defendant's motion for summary judgment based on the mistaken belief that Plaintiffs' Preliminary Infringement Contentions failed to disclose a corresponding lower attachment that satisfied the Rotate Limitation. According to the court:

> it is undisputed that plate 3--the upper attachment--does not rotate relative to what plaintiffs' identify as the lower attachment; rather, the upper attachment rotates with the lower attachment. Accordingly, under plaintiffs' infringement contentions Defendant's accused device does not read on at least one limitation of claim 1 of the '530 and therefore does not infringe as a matter of law.

(Order at pg. 9, lns. 19-24). As such, the court granted summary judgment based on its mistaken belief as to "what plaintiffs' identify as the lower attachment" in the Preliminary Infringement Contentions. (Order at 10).

## THE PRELIMINARY INFRINGEMENT CONTENTIONS DISCLOSED ITEM 5B, THE STATIONARY "HOLD-DOWN DISK," AS THE LOWER ATTACHMENT

The court failed to recognize that the Preliminary Infringement Contentions disclosed three alternative corresponding items that could have been the lower attachment, the first of which was item 5B, the hold-down disk. (Order at Pg. 9, ln. 16) (*quoting* (Exh. 1 at pg. 1)) ("**5B, 4, 17 connectable to board**") (emphasis added). In the accused device, item 5B remains stationary while the upper attachment, part 3, is permitted to rotate relative to it. (Exh. 3 at pg. 4,

15

lns. 3-4) (Defendant describing "hold-down disk 5B ... fixed to the snowboard"); (Exh. 2 at pg. 1) (showing disk 5B was bolted to the board via four bolts); (Exh. 2 at pg. 6); (Exh. 2 at pg. 6) ("remains stationary"). Understanding that the lower attachment, item 5B, remains stationary, it is clear that the upper attachment is permitted to rotate relative to it. (Exh. 2 at pg. 1). Had the court considered Plaintiffs' unmistakable disclosure of item 5B as being the lower attachment, summary judgment would not have been granted because the upper attachment <u>does</u> "rotate relative to the [disclosed] lower attachment" as required by claim 1. (Order at pg. 9, lns. 19-22).

To the extent that Plaintiffs' inclusion of item 4 in the second row of the Preliminary Infringement Contentions may have confused the reader, a further reading of the chart shows that Plaintiff's intended 5B as the lower attachment, not item 4. In that regard, the fourth row of the Preliminary Infringement Contentions disclosed "a coupling mount attached to the other of said upper and lower attachments" as "5A, attached to **<u>5B</u>** ...."[2] (Exh. 1 at pg. 1). Similarly, for claim 19, the Preliminary Infringement Contentions disclosed a coupling mount "attached to said <u>lower attachment</u>" as "5A attached to **<u>5B</u>** via 4, 17." (Exh. 1 at pg. 2) (emphasis added). Next, for claim 31, the Preliminary Infringement Contentions disclosed "rotation of said upper attachment relative to said <u>lower attachment</u>" as "3 rotates relative to **<u>5B</u>**." (Exh. 1 at pg. 4) (emphasis added). Thus, by disclosing item 5B as the corresponding lower attachment in claim 1 and throughout the Preliminary Infringement Contentions, Plaintiffs' original contentions unmistakably disclosed a lower attachment that satisfied the Rotate Limitation.

Furthermore, the Preliminary Infringement Contentions' inclusion of item 4 as a potential, albeit failed, alternative to item 5B as the corresponding lower attachment should have been harmless to the reader. Plaintiffs' should not be faulted for disclosing alternative items in

---

[2] Under the for Claim 1, the lower attachment would be the "other" of the upper and lower attachments.

16

their "preliminary" disclosure.

Preliminary Infringement Contentions are merely a discovery tool to aid the parties and imperfect contentions should not be fatal. In *Renesas Tech. Corp. v. Nanya Tech. Corp.*, 2004 U.S. Dist. LEXIS 23601 (N.D. Cal. 2004), this court declined to strike preliminary contentions where the contentions contained deficiencies.  Rather, the court permitted the plaintiff opportunity to amend its preliminary infringement contentions to correct any deficiencies.  *Id.* ("[t]hat Renesas' contentions are not perfect at this stage is not fatal").  According to the court:

> Patent L.R. 3-1 does not require [plaintiff] to produce evidence of infringement or to set forth ironclad and irrefutable claim constructions [sic], nor does it require a plaintiff to provide support for its contentions. .... Instead, a party need only set forth "particular theories of infringement with sufficient specificity to provide defendants' with notice of infringement" beyond the claim language itself."

Id. (quoting *Network Caching Technology Corp. v. Novell, Inc.*, 2003 U.S. Dist. LEXIS 9881 (N.D. Cal. 2003).

Besides, Plaintiffs should not be held to a different standard , where Defendant did the same in its Preliminary Invalidity Contentions.  Defendant's Preliminary Invalidity Contentions show Defendant disclosing alterative corresponding items in prior art references, some possibly mistaken.  For example, in identifying items in the prior art AITEC Patent that corresponded to the lower attachment of claim 1, Defendant disclosed nine alternative items including "element(s) 3, 7, 8, 22, 140, 145, 136, 137, and/or 135."[3]  (Exh. 4 at pg _ ).  Defendant would argue that it would be unfair if Defendant was require to stake its entire anticipation argument with respect to the AITEC patent on "screws 145" being the only possible element it could rely on to anticipate the lower attachment.  Furthermore, Defendant's Invalidity Contentions included

---

[3]  The nine alternative elements Defendant identified as a potential corresponding lower attachments included anchor plate 3, disk 7, ring gear 8, sliding plate 22, base 140, screws 145, spacer disk 136, holding plate 137 and rotor 135.  (Def's S.J. Motion, Exh. 5, 10).

a notable disclaimer stating that: "Rossignol's preliminary invalidity contentions ... are based on information currently available and include <u>alternative</u> positions ...." and that "Rossignol reserves the right to amend or supplement its Preliminary Invalidity Contentions depending, for example, on how Plaintiff's asserted claims are construed or applied ... by Plaintiffs." (Invalidity Contentions at pg. 2, lns. 5-15). Such disclaimers reinforced plaintiffs' counsel's good faith belief that the preliminary infringement contentions would be subject to later amendment without leave of Court.

### THE COURT'S FINDING WAS ALSO BASED ON THE MISTAKEN BELIEF THAT PLAINTIFFS CONCEDED NONINFRINGEMENT UNDER THE PRELIMINARY INFRINGEMENT CONTENTIONS BY ITS STATEMENTS REGARDING ITEM 4

Furthermore, the court's finding was also based on the mistaken belief that Plaintiffs conceded noninfringement under the Preliminary Infringement Contentions by admitting merely that item 4, the rotatable base, would not satisfy the Rotation Limitation of claim 1. The court erred when it stated, "...it is undisputed that plate 3--the upper attachment--does not rotate relative to what plaintiffs' identify as the lower attachment ...." (Order at pg. 9, lns. 19-24). The only thing that Plaintiffs were not disputing, was that item 4, in and of itself, would not satisfy the Rotation Limitation. However, Plaintiffs' statements regarding item 4 in claim 1 should not have been read as a general concession that there where no other items disclosed, such as 5B, that could have served as the infringing lower attachment.

### DEFENDANT'S DISCUSSION OF ITEM 4 IN ITS SUMMARY JUDGMENT MOTION WAS A RED HERRING ATTEMPT TO DIVERT THE COURT'S ATTENTION AWAY FROM PLAINTIFFS' INCLUSION OF ITEM 5B

Defendant's tunnel-vision like focus on Plaintiffs' inclusion of item 4 in the Preliminary Infringement contentions was a red herring, used to divert the court's attention away from what was actually disclosed in the claim chart. In its summary judgment motion, Defendant

18

*conveniently* bypassed the inclusion of item 5B in the Preliminary Infringement Contentions in favor of addressing only Plaintiffs' inclusion of item 4, the rotatable base. (Exh. 3 at pg. 4, 14). Despite Defendant's acknowledgement that the Preliminary Infringement Contentions disclosed "hold-down disk 5B .... fixed to the snowboard" in referring to the lower attachment, Defendant suspiciously proceeded to focus only on the inclusion of "rotatable base 4" in arguing noninfringement of the Rotate Limitation. (Exh. 3 at pg. 14, lns. 2-15). Defendant asserted that Plaintiffs admitted that Defendant's binding did not meet the Rotate Limitation. (Exh. 3 at pg. 14, lns. 5-12) (referring to Plaintiffs' purported "admission" of non-infringement). Furthermore, page 4 of Defendant's Summary Judgment motion depicted the accused device with item 5B, the "central hold down disk," removed. (Exhibit C at pg. 4).

As well, Defendant failed to cite any authority for the proposition that that the court can ignore one disclosed item in favor of another disclosed item in a claim chart to sustain a finding of noninfringement.    Indeed, the rules of procedure permit plaintiffs to plead in the alternative. (cite).  In light of Defendant's acknowledgment of "hold-down disk 5B .... fixed to the snowboard" in its Summary Judgment Motion, Defendant can *hardly* assert that it was "severely prejudiced" when Plaintiffs' re-disclosed item 5B as the lower attachment in its Proposed Amended Disclosure. (Opp. to Motion to Amend at pg. 11, ln. 1).

### PLAINTIFFS' RESPONDED TO DEFENDANTS' RED HERRING ATTEMPT, REFOCUSING THE COURT'S ATTENTION ON ITEM 5B, THE HOLD-DOWN DISK

For the court to state that Plaintiffs made "no other representation regarding infringement based upon the original infringement contentions" was error because Plaintiffs responded to Defendant's red herring argument regarding item 4 by explaining that item 5B, the hold down disk, was the proper lower attachment. (Order at 10).  For example, Plaintiffs asserted that "Rossignol's binding does have a lower attachment connectable to a board.  The lower

19

attachment is the disc which is attached to the board … Rossignol does not deny that they have this element." (Pls' Reply at pg. 2). Plaintiffs' asserted in their Opposition Memorandum that where the rotatable base [4] "is not part of the lower attachment, the rotation f [sic] the upper attachment relative to the lower attachment limitation' is fulfilled." (Pls' S.J. Opp. Memo. at pg. 11). Plaintiffs filed their Opposition Memorandum along with their Proposed Amended Disclosure, which, again, disclosed item 5B as the corresponding lower attachment, referring to precisely the same photograph, and the same "5B" label -- referred to in the Preliminary Infringement Contentions. (Motion to Amend Disclosure, Exhs. A, C) ("5B, which comprises what Rossignol refers to as a central hold-down disc."). Plaintiffs also responded to Defendant's *convenient* removal of item 5B from the diagram appearing on page 4, pointing out that 5B was "not shown in the photograph on page 4 of [Defendant's] Summary Judgment Brief." (Motion to Amend Disclosure, Exhs. A); (Berger Decl. at pg. 4, lns. 1-4) ("[t]he white disc together with what Rossignol calls the 'hold down disc,' which has been removed from the photograph, comprise the lower attachment.").

Thus, while it is true Plaintiffs conceded the accused device would not infringe if item 4 was the only possible lower attachment, Plaintiffs' concession regarding item 4 in claim 1 should not have been read as a general concession that there where no other items disclosed, such as 5B, that could have served as a valid corresponding lower attachment.

### THE COURT'S ERROR WAS NOT MERELY HARMLESS ERROR BECAUSE DEFENDANT'S REMAINING NONINFRINGEMENT ARGUMENTS FAILED TO SUPPORT SUMMARY JUDGMENT

The court's ultimate finding of summary judgment was based solely on the Rotate Limitation not being satisfied because the court did not review any remaining noninfringement arguments. Thus, as the court's finding regarding the Rotate Limitation should be reversed, the ultimate finding of summary judgment should be reversed as well. Nevertheless, besides the

20

Rotate Limitation, Defendant's remaining non-infringement arguments were also insufficient to warrant summary judgment.

Defendant argues that the accused device does not meet the limitation of "permit[ing] rotation of the upper attachment relative to the lower attachment," (the "Permit Rotation Element"). According to Defendant, the Permit Rotation Element is not satisfied because the configuration between coupler and coupling mount "in terms of their shape and arrangement" do not enable or effectuate rotation between the upper and lower attachment. (Def's S.J. Reply Memo at pgs. 9-10). However, Defendants argument ignores the plain language of claim 1. Claim 1 is limited merely to bindings where the configuration "**permit[s]** rotation of the upper attachment relative to the lower attachment." (*emphasis added*). Nothing in the claim requires that the coupler/coupling mount actually cause the rotation. Under the correct interpretation of the word "permit," the Permit Rotation Element is clearly satisfied because, as previously shown, rotation is permitted between the upper and lower attachment. (Berger Decl. at pg. 5, lns. 1-7).

Defendant also argues that the accused device does not satisfy "permit[ting] rotation ... when the upper attachment is locked to the lower attachment without release of said upper attachment from said lower attachment," (the "Rotate While Locked Limitation"). The claim requires merely that (1) rotation be permitted and (2) while rotation is permitted, the upper and lower attachment remain locked such that release does not occur. Defendant argues that the Rotate While Locked Limitation is not satisfied because the accused binding does not permit "free rotation," in other words, "free rotation" of the boot and upper attachment "while the rider is snowboarding." (Def's S.J. Reply Memo at pgs. 11, lns. 1-10). However, free rotation is simply not required by the claim. Under the plain meaning of the Rotate While Locked Limitation, claim 1 is satisfied because (1) rotation is permitted in the accused binding and (2)

21

while rotation is permitted, release does not occur. (Berger Decl. at pg. 5, lns. 8-9).

Finally, Defendant argues that the accused device does not satisfy the limitation that the coupling mount be "attached to the other of said upper and lower attachments," (the "Attached Limitation"), where the "other" would be the lower attachment. For Defendant's argument to succeed, this court would be required to impermissibly limit the term "attached" to "directly fastened" as shown in the preferred embodiment. (Def's S.J. Motion, pg. 17, ln. 14). The Federal Circuit has consistently found that "modifiers will not be added to broad terms standing alone," instead, "general descriptive terms will ordinarily be given their full meaning." *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) ("we agree with the district court that the term [coupled] is not limited to a mechanical or physical coupling").

In this case, claim 1 requires only that the coupling mount be "attached" to the lower attachment. The claim does not specify how. In this case, metal brackets, i.e. 'fork,' are used to attach the lower attachment to the coupling mount. (*cite to Tunno Decl. and Slides). Such is also clear in reviewing the Preliminary Infringement Contentions for dependent claim 21, where the alignment ring 17 is part of the lower attachment. (*cite to Tunno Decl. and Slides). Thus, the Attached Limitation is satisfied. (Berger Decl. at pg. 4). Or, at the very least, whether the Attached Limitation is satisfied first requires claim construction, (See Subsection ___, supra), and then a factual determination, both sufficient to preclude summary judgment. *Dorel Juvenile Group, Inc. v. Graco Children's Prods.*, 429 F.3d 1043, 1047 (Fed. Cir. 2005) (reversing summary judgment noninfringement finding where genuine fact issues existed in comparing the claims to the accused device).

## THE ORDER OF THE COURT IS FLAWED BECAUSE IT FAILED TO PERFORM A CLAIM CONSTRUCTION

The court should have conducted a claim construction at least with respect to the terms "upper attachment" and "lower attachment." These terms were clearly in dispute in Defendant's

motion for summary judgment and should have been construed by the court. The first step in determining infringement is to interpret the meaning of the language of the claims. *Markman v. Westview Instruments*, 52 F.3d 967 (Fed. Cir. 1995) (en banc). The Order makes no mention of construing claims pursuant to *Markman* or even to whether the court merely applied the plain and ordinary meaning of the terms "upper attachment" or "lower attachment."

In fact, it would have been appropriate for the court to allow the parties to submit claim construction briefs and to conduct a separate claim construction hearing pursuant to Local Rule 4.[4] Having conducted a proper claim construction, the court could have then properly

---

[4] This is the accepted procedure according to the Local Rules and the procedure that Plaintiff had anticipated that would be followed, which would have allowed Plaintiff to amend its Original Infringement Contentions pursuant to Local Patent Rule 3-1.

## THE NATURE OF THE BINDING CONSTRUCTION MADE COUNSEL'S MISTAKE FORESEEABLE

Both Rossignol and Berger disclosed to each other that the term "attached", the terms "coupler" and "coupling mount", all needed to be construed. Construction of the term "lower attachment" would shed light on the characterization and/or mis-characterization of the base plate of Rossignol's accused devise. That process is precisely the process which gives rise to an opportunity for the parties to amend their infringement contentions, and for that matter invalidity contentions. The difficulty is in the characterization of the Rossignol base plate, but whether it is part of the coupler or lower attachment, it nonetheless facilitates rotation of the upper attachment relative to the lower attachment. Since the coupler and the lower attachment are all attached, it is a foreseeable mistake to characterize the base plate as part of the lower attachment. In either event, this does not change the fact that the function of the Rossignol binding is a duplication of the Berger patent allowing the upper attachment to rotate relative to the lower

23

attachment i.e. that portion of the lower attachment actually anchored to the board. The practical

use of the Rossignol product allowed them to effectively complete with the Berger binding in

sales to rental shops across America where no other binding could so do. No binding, other then

Berger's and Rossignol's, create a circumstance where the rider could have a step-on snowboard

binding facilitating the riders application of direct pressure to the board for control while

boarding and yet having something that could be adjusted in the rotation of the foot position

without having to use a screwdriver. The only two bindings in the world that facilitate this were

the Rossignol S.I.S "tool free" and the Berger 360. Claim 1 of the 530 Patent encompasses the

description of both of devises.

## RULE 60(B)1 PROVIDES AUTHORITY FOR THE COURT TO RELIEVE THE PARTY OF COUNSEL'S GOOD FAITH MISTAKES

Rule 60(b)1 had been used in patent cases to allow relief from inadvertent mistakes [see:

*Bros. Inc. v. W. E. Grace Manufacturing Company* (1965) 351 Fed. 2nd 208]. A mistaken belief

by counsel in opportunities to utilize later proceedings was grounds for granting a 60(b)1 motion

[see: *Corning Glassworks v. Sumitomo Electric USA Inc. 683 Fed. Supp. 979*]. The United

States Supreme Court in *Pioneer Investments Services Company v. Brunswick Associates

Limited Partnership et, al.* (1992) 507 U.S. 380; 113 S. Ct. 1489; 123 L. Ed. 2nd 74, defined the

factors for the Court's consideration in determining excusable neglect pursuant to Rule 60(b)1

[507 U.S. 380, 395]. The Court indicated that the determination should be based upon equity

taking into account the relevant circumstances. At page 398, the Court observed that unusual

procedural circumstances reinforced the excusable nature of counsel's mistake.

*Fidelity Fed. Bank, FSB v. Durga Ma Corp.*, 387 F.3d 1021, 1024 (9th Cir. 2004)

The district court has discretion to correct a judgment for mistake or inadvertence, either on the

24

determined whether Defendants had proven noninfringement of claim 1 of the '530 patent. As

there was no claim construction, the court erred in finding summary judgment.

## CONCLUSION

Plaintiff's counsel mistakenly attached the wrong claim chart. The mistake was compounded by Counsel's belief in the ability to amend the contentions following a scheduled Markman hearing where more experienced patent litigation counsel would review the contentions and have an opportunity to make appropriate revisions was a further mistake. Those mistakes were not intentional and reasonably foreseeable in light of the history of the invention and difficulties in Berger's getting representation following Rossignol's usurpation of their previous counsel.

It is unlikely that Rossignol relied upon the mistake, so much as they sized upon it. They changed their anticipated schedule for summary judgment and immediately filed without raising any question or discussion with the undersigned, regarding the inclusion of the base plate with the lower attachment, in one but not all of the claims. Comparing the accused device with the claims reveals infringement in that the industry recognized lower attachment remained stationary while the upper attachment rotated. In so far as Plaintiff failed to address the stationary character of part (5b) at the hearing that was neglect.

Hiring someone else's attorney foreseeably interferes with his assertion of his rights, and contributes to delay. The resulting and foreseeable consultation with subsequent counsel give rise to a greater probability of mistakes. Plaintiff requests that this Court excuse the neglect of counsel and set aside the Courts judgment.

Further, the not rotating aspects of the lower attachment were disclosed, and the defense erroneously diverted the Court's attention away from those contentions.

---

part of counsel. *Kingvision Pay-Per-View Ltd. v. Lake Alice Bar,* 168 F.3d 347, 350 (9th Cir.

1999) *O'Connor v. Boeing N. Am., Inc.,* 114 F. Supp. 2d 949, 950 (C. Dist. Cal. 2000).

Picking up the wrong claim chart and affixing it to the preliminary infringement

contentions was the undersign's mistake. Assuming that there would be meet and confer on the

contentions, and believing that the contentions would not be contested until the scheduled

25