# EXHIBIT A

1              IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4                                        Certified Copy

5    --------------------------------

6    RICHARD W. BERGER and BRANT      )

7    W. BERGER,                       )

8          Plaintiffs,               )

9       vs.                          ) No. C07-05279-JSW

10   SEYFARTH SHAW, LLP, an Illinois  ) VOLUME I

11   limited liability partner; JACK  )

12   L. SLOBODIN, an individual;      )

13   BURNETT, BURNETT & ALLEN, a      )

14   California partnership; DOUGLAS  )

15   B. ALLEN, an individual, and     )

16   DOES 1-100, inclusive,           )

17          Defendants.               )

18   --------------------------------

19

20

21   VIDEOTAPED DEPOSITION OF RICHARD W. BERGER

22              MONDAY, MAY 12, 2008

23

24

25   PAGES 1 - 331

                                                        1

1    Q.    Then what?

2    A.    I went into the restaurant business.

3    Q.    Then what?

4    A.    I think -- I then went into Berger

5  Enterprises with my son.  I started Berger          09:32AM

6  Enterprises and then a company after that called

7  Brandgo Incorporated.

8    Q.    Any others?

9    A.    Not that I could think of right now.

10    Q.    How are you currently employed?          09:32AM

11    A.    I'm not.

12    Q.    Are you unemployed at the present time?

13    A.    I'm basically retired.

14    Q.    How long have you been retired?

15    A.    Since 2003.          09:32AM

16    Q.    What's your date of birth?

17    A.    March 6th, '39.

18    Q.    You've listed Continental Art Products,

19  real estate development, restaurant business, Berger

20  Enterprises and Brandgo.          09:33AM

21        Are there any other companies or projects

22  you've been involved with in business for yourself

23  since '69 or '70?

24    A.    I can't think of any.

25    Q.    Okay.  Let's go back to the first,          09:33AM

15

1    Continental Art Products.  During what period of

2    time were you involved in that business?

3        A.    For about two years.

4        Q.    So, say, approximately '70 to '72?

5        A.    Yes.                                    09:33AM

6        Q.    What was that business?

7        A.    It was a manufacturing company and -- for

8    art.

9        Q.    What did you manufacture?

10       A.    Wooden frames.                           09:33AM

11       Q.    Where was it located?

12       A.    Santa Clara on Scott Boulevard.

13       Q.    Did you have any partners in that

14   business?

15       A.    No.                                      09:34AM

16       Q.    Did you -- withdrawn.

17             Did it require capital to start the

18   business?

19       A.    Did I what?

20       Q.    Did it require capital, money, to start  09:34AM

21   the business?

22       A.    Well, yeah.

23       Q.    Where did you get the money to start the

24   business?

25             MR. HANSEN:  Objection.  In terms of how  09:34AM
                                                          16

1    these prior businesses were funded, I mean I'm

2    giving you leeway in terms of just having some

3    background information, but I think we should stick

4    to the discovery categories that we stipulated to.

5    How his prior ventures were funded I don't think has    09:34AM

6    anything to do with that.

7              MR. PETERS:  You may answer.

8              MR. HANSEN:  No, you may not.

9         I'm going to instruct him not to answer.

10             MR. PETERS:  You're going to instruct him    09:34AM

11   not to answer?

12             MR. HANSEN:  Yeah, I am.

13             MR. PETERS:  Is that instruction based in

14   any way on privilege?

15             MR. HANSEN:  No.  It's -- well, it is    09:34AM

16   based on financial privacy, but it's primarily based

17   on the stipulation between the parties as to the

18   scope of discovery.

19             MR. PETERS:  Well, the stipulation between

20   the parties has to do with that we'd separate out    09:34AM

21   the patent issues and do the representational issues

22   first.

23             MR. HANSEN:  Correct.

24             MR. PETERS:  And this is his first

25   deposition.  I'm entitled to go into his background.    09:34AM
                                                              17

1          MR. HANSEN:  Right.

2          MR. PETERS:  If you think you're entitled

3    to instruct him not to answer basically based on

4    relevance grounds about his background in this case

5    when his credibility is going to be an issue, then          09:35AM

6    we're going to end up in court about it.

7          MR. HANSEN:  Okay.

8          MR. PETERS:  It's not based on privilege.

9    It's a completely improper instruction.  If you want

10   to give it, I can't stop you.          09:35AM

11   BY MR. PETERS:

12       Q.    Are you going to follow his instruction

13   not to answer?

14         MR. HANSEN:  It's based on financial

15   privacy as privilege, but it's also based on the          09:35AM

16   stipulated scope of discovery.  So, yeah, I'm going

17   to instruct him not to answer.

18         MR. ALLEN:  I would contest your

19   stipulated scope of discovery.  I know of no

20   restriction on discovery other than the patent          09:35AM

21   issues are reserved.

22         MR. PETERS:  That's right.  But we're not

23   going to argue with him.  He's instructed the

24   witness not to answer.  It's completely improper.

25   We'll just end up taking it up with the court and          09:35AM
                                                                18

1    seeking sanctions if we decide we want to.

2    BY MR. PETERS:

3        Q.    What happened to Continental Art Products?

4    What happened to the business?

5        A.    I sold it.                                09:35AM

6        Q.    To whom?

7        A.    Pardon?

8        Q.    To whom?

9        A.    It was three individuals that had a -- I

10   believe it was an LLC.  I can't even remember their    09:36AM

11   names or the name of their enterprise.

12       Q.    Okay.  Well, after that, what did you do?

13       A.    I took my family to Mexico for a period of

14   time.

15       Q.    How long were you in Mexico?              09:36AM

16       A.    About six months.

17       Q.    What did you do after that?

18       A.    When I came back, I moved to Morgan Hill.

19       Q.    How about employment-wise, what did you do

20   after that?                                          09:36AM

21       A.    I purchased six and a half acres of

22   property, subdivided it, was building a restaurant,

23   planned a 40-unit bowling alley behind it.  About

24   '76 I bought a cocktail lounge.

25       Q.    Did you use the proceeds of the sale of    09:37AM
                                                              19

1    the art business to fund the ventures that you've

2    just described?

3        A.    Partly, yes.

4        Q.    How about the other part?

5        A.    It was financed through a bank.                    09:37AM

6        Q.    Which bank?

7             MR. HANSEN:   Objection.  Same objections

8    in terms of where the money came from under the

9    financial right of privacy.  Plus it's outside the

10   scope of discovery.  I'm going to instruct him not   09:37AM

11   to answer those as well.

12   BY MR. PETERS:

13       Q.    Are you going to follow your attorney's

14   instruction not to answer?

15       A.    Absolutely.                                         09:37AM

16       Q.    You said you were in the real estate

17   development business?

18       A.    I was developing real estate.

19       Q.    Okay.  When you said you were developing

20   real estate, was that the six and a half acres of    09:38AM

21   property that you subdivided that you're referring

22   to?

23       A.    Yes.

24       Q.    Other than that, did you do anything else

25   in the real estate development business?             09:38AM

                                                              20

```
1      A.    I remodeled a restaurant in Los Altos.

2      Q.    Was that the cocktail lounge or something

3  else?

4      A.    It was a restaurant and bar.

5      Q.    Okay.  What was the name of that          09:38AM

6  restaurant-bar?

7      A.    Main Street Bar & Grill.

8      Q.    Okay.

9      A.    And I had bought a house up at Holiday

10 Lake that I was finishing.  It was incomplete.       09:38AM

11     Q.    Okay.  Anything else you did that you

12 haven't told us about that involved the real estate

13 development business that you were in?

14     A.    No, not that I can think of.

15     Q.    Any -- well, you told us about you        09:39AM

16 remodeled the restaurant and a bar, that you opened

17 a bowling alley and a cocktail lounge?

18     A.    No.

19     Q.    What's incorrect about that?

20     A.    Once I had the plans approved for the      09:39AM

21 bowling alley, I didn't build it.

22     Q.    I see.

23           The cocktail lounge, did you --

24     A.    In Morgan Hill?

25     Q.    Yeah.                                      09:39AM
                                                             21
```

1    A.    The provisional patent was done by a

2  patent attorney in Colorado, which I can't remember

3  his name.  We then had an attorney in Aptos.  And we

4  finally went to Fish & Richardson and had Reg Suyat

5  handle the patent.                                  10:07AM

6    Q.    Now, you worked at Berger Enterprises

7  during what period of time?

8    A.    Again, I become hazy on the year we

9  incorporated, but I worked there from the time we

10  incorporated on.                                   10:08AM

11    Q.    Until when?

12    A.    It seems like it's never stopped.

13    Q.    Through the present time, are you still

14  working --

15    A.    Yes.  Yes.                                 10:08AM

16    Q.    You're still working for Berger

17  Enterprises?

18    A.    Working for them.  Working with Berger

19  Enterprises.

20    Q.    Do you still own stock in Berger          10:08AM

21  Enterprises?

22    A.    Yes.

23    Q.    Does Berger Enterprises have any interest

24  in this litigation?

25            MR. HANSEN:  Object to the extent it calls  10:08AM

43

1    for a legal conclusion.

2    BY MR. PETERS:

3        Q.    You may answer.

4        A.    That's something I'm going through an

5    attorney on.                                            10:08AM

6        Q.    Well, tell me what your understanding is.

7        A.    Of what?

8        Q.    Of whether Berger Enterprises has any

9    interest in this litigation.

10       A.    I think that's between my attorney and      10:09AM

11   myself, the corporate attorney.

12       Q.    Well, I'm not asking you for any

13   communications between you and your attorney.  I'm

14   asking for your understanding of whether Berger

15   Enterprises has any interest in this litigation?      10:09AM

16       A.    There is no conclusion to that right now.

17       Q.    You and your son are the plaintiffs in

18   this litigation.

19       A.    Yes.

20       Q.    Does anyone else, including any entity,     10:09AM

21   have any economic interest in this litigation?

22       A.    That's --

23             MR. HANSEN:  Just object to the extent it

24   calls for attorney-client communications and to the

25   extent it calls for information that's protected by    10:09AM
                                                               44

1    the financial right to privacy.  It also is outside

2    the scope of the stipulated discovery under the CMC

3    statement.

4         I know you characterized that statement as

5    essentially allowing anything other than issues          10:09AM

6    pertaining to the patent, but I don't think that's a

7    fair characterization of that.  We sat down and

8    identified issues that we believe are relevant in

9    this case and carved out eight issues that we're

10   going to allow discovery to proceed on.  And issues      10:10AM

11   as to who has an interest in this litigation fall

12   outside of those categories.

13        And I would instruct him not to answer on

14   all those grounds.

15        MR. PETERS:  So you're instructing him not          10:10AM

16   to answer?

17        MR. HANSEN:  Yes, I am.

18        MR. PETERS:  And I'll tell you, sir, that

19   who has an economic interest in this litigation is

20   directly relevant to issues of representation            10:10AM

21   because there's very strict rules in this state

22   about who can assert a claim for attorney

23   malpractice and who can benefit by it.

24        So I'm going to keep asking those

25   questions.  And if you instruct him not to answer,       10:10AM

                                                                      45

1    we're going to go to court and we're going to seek

2    sanctions against you and your client.

3                MR. HANSEN:  Well, I'm happy to meet and

4    confer with you on that.  But I --

5                MR. PETERS:  We've met and conferred.  I'm        10:10AM

6    here to ask questions, not argue with you.

7                MR. HANSEN:  Okay.

8    BY MR. PETERS:

9         Q.    Does Mr. Branton have any economic

10   interest in this litigation?                                  10:10AM

11               MR. HANSEN:  Same objections.  Same

12   instruction.

13   BY MR. PETERS:

14        Q.    Has Mr. Branton ever claimed to you that

15   he has an economic interest in this litigation?              10:11AM

16               MR. HANSEN:  Same objections.  Same

17   instruction.

18   BY MR. PETERS:

19        Q.    Have you ever had a conversation, just you

20   and Mr. Branton, without any lawyers present, about          10:11AM

21   whether or not he has an economic interest in this

22   litigation?

23               MR. HANSEN:  Same objections.  Same

24   instruction.

25               MR. PETERS:  Well, you can't instruct him        10:11AM
                                                                     46

1    not to answer based on privilege when it's a

2    conversation between him and Branton.

3                MR. HANSEN:  I can instruct him to follow

4    the agreement that the parties reached as to

5    discovery.                                          10:11AM

6                You know, we talked about whether an

7    attorney-client relationship exists between

8    plaintiffs and Slobodin and Seyfarth.  You can go

9    through these item by item.  But whether John

10   Branton has an interest in the outcome of this     10:11AM

11   litigation has no bearing on any of this subject

12   matter.

13               MR. PETERS:  You're absolutely wrong.  And

14   the rationale for the agreement that I negotiated

15   with your partner or the named partner in the law  10:11AM

16   firm where you work was that we would separate out

17   the patent issues because they would be complicated,

18   and that we would deal with issues relating to

19   representation first.  And I consider all of these

20   questions to be relating to representation because  10:12AM

21   people who never had an attorney-client relationship

22   with someone can't sue them for malpractice.  They

23   can't.

24               And so what you're doing is completely

25   improper.  It's inconsistent with the spirit of the 10:12AM

                                                         47

1    deposition agreement.  It's not permitted by the

2    federal rules.  But, you know, I can't stop you from

3    violating the law, so just go ahead.

4            MR. HANSEN:  I can tell you I hammered

5    this out with Klaus Hamm from your office, and we          10:12AM

6    identified 20 issues that are pertinent in this

7    case, and we agreed that discovery would proceed on

8    issues 1 through 6 and 10 and 11.  So whatever you

9    felt was the spirit of the agreement, to the extent

10   that conflicts with how that agreement was              10:12AM

11   memorialized ultimately and submitted with the court

12   is irrelevant.

13           MR. PETERS:  Okay.  Can I see the document

14   that you're --

15           MR. HANSEN:  I have my highlighted copy.        10:12AM

16           MR. PETERS:  I'm sure it's got trade

17   secrets in it, so I --

18           MR. HANSEN:  Well, you know what, it's got

19   my highlights on it.

20           MR. PETERS:  That's all right.  I don't        10:12AM

21   want to interfere with the work product doctrine, so

22   I'll just keep asking questions.

23   BY MR. PETERS:

24      Q.    Have you ever -- have any of Mr. Branton's

25   investors in Berger Enterprises ever claimed, to        10:13AM

                                                                      48

1    your knowledge, that they have an economic interest

2    in this litigation?

3          MR. HANSEN:  Mr. Peters, I'm going to

4    instruct this witness not to answer any questions as

5    to whether anyone other than Richard Berger and          10:13AM

6    Brant Berger have an interest in the outcome of this

7    litigation on the grounds that it falls outside of

8    the stipulated scope of discovery.

9          So to the extent you make any further

10   questions, they will all be followed by an              10:13AM

11   instruction not to answer.

12   BY MR. PETERS:

13      Q.    Did there come a time that you performed

14   work for any other entity after 1990 besides Berger

15   Enterprises?                                             10:13AM

16      A.    As I stated earlier, we started Brandgo

17   Incorporated.

18      Q.    When did you do that?

19      A.    Again, I'm foggy on the dates because I

20   have to go back to the time we incorporated Berger      10:14AM

21   Enterprises.

22      Q.    Can you give us your best estimate?

23      A.    I've drawn a blank, to be truthful.

24      Q.    Okay.  What business is Brandgo in?

25      A.    It's an Internet company.                       10:14AM
                                                                  49

1    Q.    What kind of services does it perform?

2    A.    It's a shopping platform for brand

3  suppliers.

4    Q.    Is it a -- is it a software system?

5    A.    Yes.  It's an eBay platform for brand            10:14AM

6  suppliers.

7    Q.    Is Brandgo a corporation?

8    A.    Yes.

9    Q.    California corporation?

10   A.    Yes.                                              10:15AM

11   Q.    Who are its shareholders?

12   A.    I don't have a list of them with me.

13   Q.    Do you know any of them?

14   A.    Well, I know all of them, but I can't name

15  off -- there might be 20 or 25.                          10:15AM

16   Q.    Okay.  Are you a shareholder?

17   A.    Yes.

18   Q.    Are you an employee -- withdrawn.

19         Were you an employee at any time?

20   A.    I was the CEO.                                    10:15AM

21   Q.    How long were you the CEO?

22   A.    Up until, I believe, 2003, 2004.

23   Q.    Is Brandgo still in business?

24   A.    Yes.

25   Q.    Are you still the CEO?                            10:15AM

                                                                      50

1    order.

2              Do you have any problem with that?

3              MR. PETERS:  If that's what the order

4    says.  I mean I don't have any problems with anybody

5    complying with an order.  I mean I don't know              10:59AM

6    offhand what you mean by what you just said.  But

7    I'm sure that we can instruct the court reporter

8    what you mean and take care of it not on the record

9    because I'd just like to keep going with my

10   questioning.  If it's confidential and there is a          10:59AM

11   protective order that designates how confidential

12   material is supposed to be handled, we'll all follow

13   it.

14             MR. HANSEN:  Okay.  Great.

15             MR. PETERS:  I mean if it's been entered.         10:59AM

16             MR. HANSEN:  It's been entered.  I have a

17   copy of it here.

18             MR. PETERS:  That's fine.

19   BY MR. PETERS:

20        Q.    Have a look at Exhibit 1.  It's a letter        10:59AM

21   from Fish & Richardson to you.  Is that the

22   engagement letter between Rish & Richardson and

23   Berger Enterprises?

24        A.    It sure appears to be, yes.

25        Q.    This one appears to be unsigned.  Do you        11:00AM
                                                                    77

1    recall that at some point in time you signed one?

2        A.    I don't recall.

3        Q.    Exhibit 1 is a letter Bates stamped

4    BERGER10880 through 882, and it's dated June 5,

5    1997.                                          11:00AM

6            Do you have -- and I don't want to know

7    anything about the specifics of it -- but do you

8    have a written agreement with the lawyers who are

9    representing you in this case?

10            MR. HANSEN:    Objection.    Calls for        11:00AM

11    attorney-client communications.    I'm going to

12    instruct him not to answer that.

13    BY MR. PETERS:

14        Q.    I'm not asking for the substance of any

15    communication.    I just want to know whether or not   11:00AM

16    you have a written agreement with the attorneys

17    representing you in this case.    I'm not asking

18    anything about its contents.    I just want to know

19    whether such an agreement exists.

20            MR. HANSEN:    Whether there is a written      11:01AM

21    agreement with our law firm?

22            MR. PETERS:    Correct.

23            MR. HANSEN:    I'm going to make the same

24    objection and instruction.

25            MR. PETERS:    Okay.

                                                            78

1          MR. HANSEN:  I'll consider that, and I'll

2   let you know before the close of this deposition

3   whether I'll allow that question to proceed.  But I

4   want to give that one some thought.

5          MR. PETERS:  Fine -- I mean not fine, but      11:01AM

6   you're free to do whatever you want.

7   BY MR. PETERS:

8       Q.    You said you were represented by someone

9   named Milt Rosenberg from Los Gatos?

10      A.    Yes.                                          11:01AM

11      Q.    What was the scope of his representation?

12      A.    After the dissolution of the partnership

13  was ordered, Robert Franks appealed it for nearly

14  four and a half years.  He put up a cash bond and

15  hired three attorney firms and appealed it.           11:01AM

16      Q.    And so Mr. Rosenberg represented you in

17  connection with the appeals from the Franks

18  litigation?

19      A.    Yes.

20      Q.    What were the terms of his representation    11:02AM

21  of you?

22      A.    I believe he was paid as he billed.

23      Q.    Paid by the hour?

24      A.    Yes.

25      Q.    Did you have a written agreement with him?   11:02AM

                                                                79

1      A.    I don't recall.

2      Q.    Did you pay him?

3      A.    Yes.

4      Q.    Did you consider it your obligation

5  pursuant to your agreement with Mr. Rosenberg to pay    11:02AM

6  him?

7            MR. HANSEN:  Objection.  Calls for a legal

8  conclusion.

9  BY MR. PETERS:

10     Q.    You may answer.                              11:02AM

11     A.    Well, I paid him, so I must have felt he

12 was obligated.

13     Q.    Okay.  You said you consulted with an

14 attorney named Joe Dieho.  What did you consult with

15 Mr. Dieho about?                                        11:02AM

16           MR. HANSEN:  I would object to the extent

17 it's calling for attorney-client communications.  If

18 there is any part of that question that falls

19 outside of that scope, you can answer, but...

20 BY MR. PETERS:                                          11:03AM

21     Q.    Well, did you consult -- well, can you

22 answer the question?

23     A.    Yeah.  It's pertaining to the corporation.

24     Q.    Which corporation?

25     A.    Berger Enterprises.                           11:03AM

                                                                80

1   agreement both ways, that you want him to be your

2   attorney and that the attorney agrees to be your

3   attorney?

4          MR. HANSEN:  Objection.  Vague and

5   ambiguous.  Incomplete hypothetical.  Calls for a       11:11AM

6   legal conclusion.

7   BY MR. PETERS:

8      Q.   You may answer.

9      A.   I don't know what you're referring to in

10  retainer.  But if I meet with an attorney and we        11:11AM

11  give information back and forth and I get advice, I

12  assume that attorney is representing me.

13     Q.   Okay.  So each of the attorneys that you

14  met with that Mr. Kanel introduced you to, they

15  became your attorney --                                 11:11AM

16         MR. HANSEN:  Objection.

17  BY MR. PETERS:

18     Q.   -- in your mind?

19         MR. HANSEN:  Objection.  Misstates prior

20  testimony.  Lacks foundation.  Argumentative.          11:11AM

21  BY MR. PETERS:

22     Q.   You may answer.

23         MR. HANSEN:  Calls for a legal conclusion.

24         THE WITNESS:  No.

25  BY MR. PETERS:                                          11:12AM

                                                              89

1     Q.     Prior to August of 2003, had you ever met

2 Jack Slobodin?

3     A.     I don't believe so, no.

4     Q.     Prior to August of 2003, had you ever

5 spoken to Jack Slobodin?                      11:12AM

6     A.     I don't believe so.

7     Q.     Prior to 2003, had you ever communicated

8 with Jack Slobodin?

9          MR. HANSEN:  Object.  Vague and ambiguous.

10 In terms of individually or through his agents?    11:12AM

11          MR. PETERS:  You know, you can say "vague

12 and ambiguous," but don't try to coach the witness

13 because it's just a little too obvious and it's not

14 appropriate.

15 BY MR. PETERS:                             11:12AM

16     Q.     You may answer.

17     A.     Can you repeat that question?

18     Q.     Prior to 2003, had you ever communicated

19 with Jack Slobodin?

20     A.     I don't recall.  I could have via the     11:12AM

21 telephone through my patent attorney.  I don't

22 recall.

23     Q.     Prior to August of 2003, had you consulted

24 with any other attorneys about potential litigation

25 related to your snowboard binding system?     11:13AM

                                                              90

1    A.    Yes.

2    Q.    Who?

3    A.    Darren Jones, the corporate patent

4  attorney for K2.  Rich Doyle, an attorney that used

5  to work with Fish & Richardson, a patent litigation        11:13AM

6  attorney.  And an attorney from San Jose that came

7  down to see me that's not a patent attorney, but he

8  handled patent litigation, and I don't recall his

9  name right now.

10    Q.    Okay.  And did you meet with those           11:13AM

11  attorneys for the purposes of representing you and

12  Berger Enterprises in litigation relating to your

13  snowboard binding system?

14    A.    Yes.

15    Q.    Did -- so did you meet with Darren Jones?    11:14AM

16    A.    Yes.

17    Q.    When did you meet with him?

18    A.    It's probably in '98, and I also met with

19  him in March of '99 at the Las Vegas trade show.

20    Q.    Were you interested in having Mr. Jones      11:14AM

21  represent you in connection with potential

22  litigation involving Rossignol?

23    A.    His involvement, yes.

24    Q.    And did you discuss that with him?

25    A.    Yes.                                         11:15AM
                                                                91

1      Q.    And did he agree to become involved?

2      A.    Yes.

3      Q.    And what were the terms -- what was the

4   scope of his agreement to become involved?

5      A.    Him and the corporate product development    11:15AM

6   person wanted to license our product and they wanted

7   to sue Rossignol.

8      Q.    And he worked for K2?

9      A.    He was the corporate patent attorney for

10  K2.                                                   11:15AM

11     Q.    But you weren't discussing with him his

12  representing you or Berger Enterprises?

13     A.    No.  He was representing the patent.  He

14  wanted to license the patent and sue Rossignol.

15     Q.    Okay.  And that never happened?           11:15AM

16     A.    No.

17     Q.    Why not?

18     A.    They found they had a problem with

19  Shimano, who they were using their design for their

20  existing step-in binding, and their agreement with    11:16AM

21  them interfered.

22     Q.    K2's agreement with Shimano interfered?

23     A.    Yes.

24     Q.    So you were never able to partner with K2

25  and sue Rossignol?                                    11:16AM

                                                              92

1          MR. HANSEN:  Objection.  Calls for

2    speculation.

3          THE WITNESS:  Because Rossignol had hired

4    Fish & Richardson firm in a lawsuit against K2, and

5    they said that there was a conflict of interest.          11:32AM

6    Reg Suyat couldn't represent me.

7    BY MR. PETERS:

8       Q.    When did that occur?

9       A.    Right -- as soon as Reg Suyat sent the

10   last letter to Rossignol, the strongest letter, and       11:32AM

11   it went to the board of directors and all of the

12   people we had met with.

13      Q.    So in the spring of 1999, Mr. Suyat and

14   Fish & Richardson could no longer represent you in

15   this matter?                                              11:32AM

16          MR. HANSEN:  Objection.  Calls for a legal

17   conclusion.

18          THE WITNESS:  They could still represent

19   me pertaining to the patent.  They couldn't

20   represent me against Rossignol.                           11:32AM

21   BY MR. PETERS:

22      Q.    And, thereafter, you were looking for an

23   attorney who could represent you against Rossignol;

24   correct?

25      A.    Yeah.  There's four of them listed.             11:32AM
                                                                    102

1      Q.     Okay.  Okay.  You're referring to

2    Exhibit 2, is that right, when you say there are

3    four of them listed?

4      A.     Yes.  The paper you just gave me that's
                                                            11:33AM
5    marked confidential.

6      Q.     Okay.  That's Exhibit 2?

7      A.     Yes.

8      Q.     And where is it marked confidential?

9      A.     I'd like to consult with my attorney right
                                                            11:33AM
10   now, if I could.

11     Q.     Well, just answer my question, and then --

12     A.     No.  I'd like to consult with him right

13   now.

14     Q.     Well, there's a question pending, and

15   under the rules you need to answer the question, and  11:33AM

16   then you can take a break to consult.

17     A.     I need to consult with my attorney right

18   now.

19     Q.     Okay.

20            MR. PETERS:  Well, we'll stay on the         11:33AM

21   record.  We're not off the record.  He's leaving,

22   but there's a question pending.

23            (The Deponent and Mr. Hansen exit the

24             deposition room.)

25            (The Deponent and Mr. Hansen enter the

                                                            103

```
 1              deposition room.)

 2          MR. HANSEN:  Counsel, I'll just note for

 3   the record that this document is -- there is a

 4   request that it be maintained confidential.  At the

 5   bottom it says, "This document and the attached     11:35AM

 6   documents are confidential."  I don't know where

 7   this document came from.  It's not from our document

 8   production as it's not Bates numbered.  But I would

 9   request that it be designated as confidential under

10   the protective order.                               11:35AM

11   BY MR. PETERS:

12      Q.   Do you recognize Exhibit 2?

13      A.   Yes.

14      Q.   What do you recognize it to be?

15      A.   A confidential letter with confidential     11:35AM

16   documents sent to John Branton.

17      Q.   Can you tell us when it was sent to John

18   Branton?

19      A.   In 2003.

20      Q.   How are you able to recall that?           11:35AM

21      A.   Because it was prior to meeting with Jack

22   Slobodin.

23      Q.   How do you know that?

24      A.   Because we needed to raise money to get an

25   attorney, and that was the purpose of this letter.  11:36AM
                                                         104
```

1    Q.    Okay.  You've told us about -- the

2  first -- top of the letter reads, "John, as you

3  know, we have met with four different patent

4  attorneys (Reg Suyat, Dan Mount, Darren Jones and

5  Rich Doyle)."                                    11:36AM

6          Had you met with all of those attorneys

7  for purposes of discussing possible litigation

8  against Rossignol?

9    A.    The main reason was if there was

10  infringement, their opinion on infringement.      11:36AM

11    Q.    Other than those four attorneys, had you

12  met with any other attorneys as of the time you

13  prepared this letter to discuss the possibility of

14  suing Rossignol?

15    A.    I don't believe so, as I answered earlier.  11:36AM

16    Q.    And so was there a gap in time between

17  when you met with the last of those four attorneys,

18  Suyat, Mount, Jones and Doyle, about representing

19  you against Rossignol and when you then met with

20  Jack Slobodin in August of 2003?                  11:37AM

21    A.    There could have been.

22    Q.    And other than your medical condition in

23  2003, is there any explanation or any reason why

24  there was a gap in time?

25    A.    And Reg Suyat's medical condition.         11:37AM
                                                     105

1        Q.    Have you had any conversations with

2    Mr. Branton about Berger Enterprises in the last six

3    months?

4              MR. HANSEN:  Same objection and same

5    instruction.  To the extent he can answer outside of    03:02PM

6    that scope, he can answer.

7              THE WITNESS:  The conversations I had were

8    instructed by Joe Dieho to me --

9              MR. HANSEN:  Don't go into attorney-client

10   communications.                                         03:02PM

11             THE WITNESS:  All right.

12             MR. HANSEN:  If you can't answer without

13   disclosing attorney-client communications, then

14   don't answer.

15             THE WITNESS:  Okay.                           03:02PM

16             MR. PETERS:  But I'm asking him about

17   conversations with John Branton, who is not his

18   attorney and never was -- isn't even an attorney.

19   BY MR. PETERS:

20        Q.    So have you had conversations with          03:02PM

21   Mr. Branton about Berger Enterprises within the last

22   six months?  Yes or no?

23        A.    Pertaining to?

24        Q.    Berger Enterprises.

25        A.    Yes.                                         03:02PM
                                                                  202

1    Q.    On how many occasions?

2    A.    Two, maybe three.

3    Q.    What have you and Mr. Branton discussed

4  about Berger Enterprises?

5            MR. HANSEN:  Okay.  So then we're going to    03:03PM

6  go into the same objections.  We're objecting to

7  conversations pertaining to anything having to do

8  with the outcome of this litigation.  And interest

9  in the outcome of this litigation is attorney-client

10  privileged and getting into financial right to    03:03PM

11  privacy and being outside the stipulated scope of

12  discovery.  And to the extent that question calls

13  for such information, I would instruct the witness

14  not to answer.

15            MR. PETERS:  It is a completely improper    03:03PM

16  speech to give.

17            MR. HANSEN:  They're objections.

18  BY MR. PETERS:

19    Q.    The question is:  What have you and

20  Mr. Branton discussed about Berger Enterprises?  A    03:03PM

21  question to which there can't possibly be a

22  legitimate attorney-client privilege objection.  You

23  may answer the question.

24    A.    We spoke about reviving Berger

25  Enterprises.                                        03:03PM
                                                        203

1      Q.    What did you say to him and what did he

2  say to you on that subject?

3           MR. HANSEN:  I'm going to instruct you not

4  to answer that.

5           THE WITNESS:  All right.                      03:04PM

6           MR. PETERS:  And the basis for the

7  instruction?

8           MR. HANSEN:  I stated the basis.

9  BY MR. PETERS:

10     Q.    In August of 2005, did you participate in   03:04PM

11 any meetings about raising money to fund the

12 litigation?

13     A.    I could have.  You mean with John Branton

14 or others or --

15     Q.    Right.                                       03:04PM

16     A.    Which one?

17     Q.    Well, with anybody.

18     A.    It would have been with John Branton if I

19 did.

20     Q.    What do you recall about those             03:04PM

21 discussions?

22     A.    On that date, I don't.

23     Q.    Well, how about any time between June of

24 '05 and the end of '05, did you meet with John

25 Branton to discuss raising money for the litigation?  03:05PM
                                                          204

1     A.    Yes.

2     Q.    On how many occasions?

3     A.    Several.

4     Q.    Meaning more than five?

5     A.    More than two.          03:05PM

6     Q.    Was anyone else present during those

7 conversations?

8     A.    At one meeting it was Fred DeKlotz and

9 Doug Allen and John Branton and myself.

10    Q.    Where did that meeting take place?   03:05PM

11    A.    At Fred DeKlotz's office.

12    Q.    How long did it last?

13    A.    45 minutes to two and a half hours.  I'm

14 not sure.

15    Q.    Okay.  What do you recall being said?  03:05PM

16    A.    I recall Fred DeKlotz stating a higher

17 percentage, and it would represent all of the

18 shareholders of Berger Enterprises.  That was his

19 proposal.

20    Q.    Can you explain what you mean by that?  03:06PM

21    A.    Just what I said.  The higher percentage

22 would go to represent the corporation, the monies to

23 be given to the shareholders as well as the

24 investors.

25    Q.    Is it a fair statement that one of the  03:06PM

                                                   205

```
 1   things that you were discussing in this meeting and

 2   in your other conversations was what the --

 3   Mr. Branton and the shareholders of Berger

 4   Enterprises would receive in exchange for putting up

 5   cash to fund the litigation?                            03:06PM

 6       A.    Partly.

 7       Q.    That was discussed, though?

 8       A.    Yes.

 9       Q.    What else was discussed?

10       A.    That was the discussion, and this would    03:06PM

11   represent all of the shareholders in the corporation

12   with a higher percentage.  John Branton and Fred

13   DeKlotz were concerned about conflict of interest.

14   He was the chief financial officer, and these were

15   his clients that put the money in.                     03:07PM

16       Q.    What was the concern about conflict of

17   interest?

18       A.    You would have to ask Fred DeKlotz.

19       Q.    Did he or Mr. Branton ever express it to

20   you in any meeting?                                    03:07PM

21       A.    No.

22       Q.    Did there come a time in 2005 when those

23   discussions reached any kind of a conclusion?

24       A.    Those discussions did not.

25       Q.    Did there come a time in 2006 when those   03:07PM
                                                             206
```

1    discussions reached any kind of conclusion?

2        A.    Those discussions did not.

3        Q.    Did they ever reach a conclusion?

4        A.    No.

5        Q.    Are you still to this day participating in    03:08PM

6    discussions about those same topics with Mr. Branton

7    relating to this litigation, the one that brings us

8    here today?

9            MR. HANSEN:  Same objections as before and

10    same instruction as to current discussions.    03:08PM

11            MR. PETERS:  So you're instructing the

12    witness not to answer that question?

13            MR. HANSEN:  Yes, I am.

14            (Whereupon, Defendant's Exhibit 13 was

15            marked for identification.)    03:08PM

16    BY MR. PETERS:

17        Q.    Exhibit 13 is a letter from Mr. DeKlotz to

18    Mr. Allen, Bates stamped BERGER14276 and 77.  It's

19    dated September 23rd, 2005.  Have you ever seen this

20    document before?    03:08PM

21        A.    I don't recall.

22        Q.    Was it Mr. Allen's practice, as far as you

23    knew, to share with you copies of correspondence

24    between him and Mr. DeKlotz relating to the issues

25    that you've been testifying about?    03:09PM
                                                      207

1    A.    Sometimes.  Other times he would simply

2    inform me.  We'd have discussions pertaining to it.

3    Q.    This document was produced from your

4    files, though.  I'm representing to you that Berger

5    stamp number on the bottom means it came out of your        03:09PM

6    files somehow.  Does that refresh your recollection

7    as to whether you've seen this document before?

8    A.    No.  No.

9    Q.    Mr. DeKlotz writes in the fourth paragraph

10   on the first page, "It is also my understanding from        03:09PM

11   talking with Mr. Branton that you have proposed that

12   Jack L. Slobodin and/or Seyfarth Shaw, LLP, be

13   joined as pro-counsel with you for Plaintiff in

14   those proceedings, subject to the consent thereto by

15   those lawyers."                                             03:10PM

16       My question for you is:  Did you

17   understand as of September 23rd, 2005 that

18   Mr. Slobodin and Seyfarth Shaw's joining the case

19   was subject to their consent?

20   A.    Where is this on the document?                        03:10PM

21   Q.    I'm sorry.  The fourth paragraph, first

22   page, middle of the paragraph.

23   A.    Okay.

24   Q.    Just go ahead and take a second to read

25   that to yourself.                                           03:10PM
                                                                 208

1      A.    Could you ask me the question again.

2      Q.    Do you understand as of September 23rd,

3   2005, that Mr. Slobodin and Seyfarth Shaw's joining

4   the case was subject to their consent to do so?

5          MR. HANSEN:  Objection.  Vague.  Lacks          03:10PM

6   foundation.

7          THE WITNESS:  No.

8   BY MR. PETERS:

9      Q.    So you do not agree with that statement --

10         MR. HANSEN:  Objection --                        03:11PM

11  BY MR. PETERS:

12     Q.    -- of Mr. DeKlotz?

13         MR. HANSEN:  Objection.  Mischaracterizes

14  the document.  The document speaks for itself.

15         THE WITNESS:  No, I do not.  And I have no  03:11PM

16  idea where he would get that information.

17  BY MR. PETERS:

18     Q.    Did he get it from you?

19     A.    No.

20     Q.    Did he get it from Mr. Branton?            03:11PM

21     A.    I don't know.  He's drawing a conclusion

22  that is wrong.  I am sure he did not talk to Jack

23  Slobodin.

24     Q.    Do you consider Mr. Branton a friend?

25     A.    Yes.                                        03:11PM
                                                             209

1     Q.    Do you have any financial dealings with

2  Mr. Branton at the present time?

3          MR. HANSEN:  Objection.  Calls -- this is

4  going back to the same area that we keep going over

5  and over and over again, Counsel.                      03:12PM

6          MR. PETERS:  Well, we're not, actually.  I

7  just asked him whether he and Mr. Branton have a

8  financial relationship.

9          MR. HANSEN:  Whether they have a financial

10 relationship --                                         03:12PM

11         MR. PETERS:  It's unanswerable?  You don't

12 think a person can answer whether they have a

13 financial relationship with someone?

14         MR. HANSEN:  I think that to the extent it

15 goes into matters that we've already covered and      03:12PM

16 that we have a standing objection to --

17         MR. PETERS:  You don't have a standing

18 objection to anything.

19         MR. HANSEN:  Okay.  Well --

20         MR. PETERS:  You've instructed him not to     03:12PM

21 answer a lot of questions, but that doesn't give you

22 a standing objection.

23         MR. HANSEN:  Well, I have repeatedly

24 objected to various lines of questions targeted,

25 directly and indirectly, as the same information      03:12PM
                                                          210

1   which I have objected to repeatedly, and I have

2   repeatedly instructed the witness not to answer.  We

3   have a disagreement on that, but I'd appreciate it

4   if you would respect the objection.  To the extent

5   you want to file a motion, that is your prerogative.    03:12PM

6   But questions pertaining to discussions between this

7   witness and John Branton as to any financial

8   interests in the outcome of this litigation I'm

9   objecting to on the grounds previously stated and

10  instructing him not to answer.                         03:13PM

11          If he can answer that question without

12  going into those matters -- frankly, I don't see any

13  way around it.  I don't see this has anything to do

14  with the stipulated scope of discovery, and I think

15  it also goes into my client's financial right to     03:13PM

16  privacy.  So I'm going to, on those grounds,

17  instruct him not to answer.

18  BY MR. PETERS:

19      Q.    Putting aside any interest that

20  Mr. Branton may have or claim to have in this        03:13PM

21  litigation, do you have any financial relationship

22  with Mr. Branton at the present time?

23          MR. HANSEN:  Same objection.  Same

24  instruction not to answer.

25          (Whereupon, Defendant's Exhibit 14 was        03:14PM
                                                             211

1                   marked for identification.)

2    BY MR. PETERS:

3        Q.    Exhibit 14 is a letter from Mr. Allen to

4    you dated October 25th, 2005. Do you recall

5    receiving this letter?                          03:14PM

6        A.    I'm sure I did.  It was addressed to me.

7        Q.    And it says, "Enclosed is the 'Answer,

8    Affirmative Defenses and Counterclaims of Rossignol

9    Ski Company, Inc.'  Doug wants you to call him

10   immediately to set up an appointment so you can go   03:15PM

11   over the case and also talk about raising the money

12   to allow Doug to go forward with the above case."

13            Do you recall after October 25th, 2005

14   having a conversation with Mr. Allen about raising

15   the money to allow him to go forward with the case?  03:15PM

16       A.    I know we had conversations pertaining to

17   this, and it was at the time we had to get money in.

18       Q.    What do you recall saying to Mr. Allen and

19   what do you recall him saying to you on that

20   subject?                                        03:15PM

21       A.    What I recall is a letter being sent to

22   me -- emailed to me and John Branton saying he

23   couldn't proceed unless he received the money that

24   was committed.  And as much as he was our friend, he

25   would have to drop the case.                     03:15PM
                                                     212

                    CERTIFICATE OF REPORTER


        I, JANIS L. JENNINGS, a Certified Shorthand

Reporter of the State of California, do hereby certify:

        That the foregoing proceedings were taken

before me as the time and place herein set forth; that

any witnesses in the foregoing proceedings, prior to

testifying, were placed under oath; that a verbatim

record of the proceedings was made by me using machine

shorthand which was thereafter transcribed under my

direction; further, that the foregoing is an accurate

transcription thereof.

        I further certify that I am neither

financially interested in the action nor a relative or

employee of any attorney of any of the parties.

        IN WITNESS WHEREOF, I have this date

subscribed my name.


Dated:  May 20, 2008.


                        _____
                        JANIS JENNINGS
                        CSR NO. 3942