# EXHIBIT B

1        IN THE UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF CALIFORNIA

3         SAN FRANCISCO DIVISION

4                              Certified Copy

5  ---------------------------------

6  RICHARD W. BERGER and BRANT     )

7  W. BERGER,                  )

8        Plaintiffs,       )

9    vs.               ) No. C07-05279-JSW

10  SEYFARTH SHAW, LLP, an Illinois )

11  limited liability partner; JACK  )

12  L. SLOBODIN, an individual;    )

13  BURNETT, BURNETT & ALLEN, a    )

14  California partnership; DOUGLAS  )

15  B. ALLEN, an individual, and   )

16  DOES 1-100, inclusive,       )

17        Defendants.       )

18  ---------------------------------

19

20

21    VIDEOTAPED DEPOSITION OF BRANT BERGER

22       WEDNESDAY, MAY 14, 2008

23

24

25  PAGES 1 - 275

                                     1

1

2                          BRANT BERGER,

3          The deponent herein, was sworn and

4          testified as follows:

5                                                      09:24AM

6          THE VIDEOGRAPHER:  Thank you.  Please

7   proceed.

8

9                          EXAMINATION

10  BY MR. PURCELL:                                    09:24AM

11      Q.    Good morning.

12      A.    Good morning.

13      Q.    Could you state your name for the record.

14      A.    Brant William Berger.

15      Q.    Mr. Berger, you attended your father's    09:24AM

16  deposition on Monday; correct?

17      A.    Yes.

18      Q.    Your father is here for your deposition

19  today?

20      A.    Yes, he is.                              09:24AM

21      Q.    You sat through the full day of your

22  father's deposition?

23      A.    Yes.

24      Q.    You heard every question that he was

25  asked?                                            09:24AM

6

1          MR. FINLEY: Objection. I withdraw the

2     objection.

3          THE WITNESS: I was here for the full day.

4     I don't know if I could tell you that I heard every

5     question.                                          09:24AM

6     BY MR. PURCELL:

7     Q.     You were generally paying attention to the

8     questions and answers at the deposition; correct?

9          MR. FINLEY: Objection. Vague and

10    ambiguous. You said "generally paying attention."   09:24AM

11    If you could explain what that means.

12         THE WITNESS: I was here all day. I can't

13    say that I heard every question.

14    BY MR. PURCELL:

15    Q.     Were you not paying attention in portions     09:24AM

16    of the deposition?

17         MR. FINLEY: Objection. Argumentative.

18         THE WITNESS: I was here all day. I can't

19    say that I heard every question.

20    BY MR. PURCELL:                                      09:25AM

21    Q.     Were you making an attempt to listen to

22    the questions that were asked?

23         MR. FINLEY: Objection. Don't answer that

24    question. This is argumentative and badgering the

25    witness. He's answered your question. It's been     09:25AM

7

1    asked and answered a number of times.

2          MR. PURCELL:  You're instructing the

3    witness not to answer?  What's the basis for the

4    instruction, Counsel?

5          MR. FINLEY:  That you're badgering the          09:25AM

6    witness.

7          MR. PURCELL:  That's not a valid basis for

8    instructing the witness not to answer under the

9    federal rules.

10          MR. FINLEY:  Is that true?  Well, I always      09:25AM

11    thought that if you badgered a witness, it was a

12    valid way to object and instruct the witness not to

13    answer.  And I'm going to stand by my objection

14    unless you change your question.  You're arguing

15    with the witness.                                     09:25AM

16    BY MR. PURCELL:

17      Q.    My question is:  Did you generally make an

18    attempt to pay attention to the questions that were

19    asked of your father at the deposition on Monday?

20          MR. FINLEY:  Objection.  Asked and             09:25AM

21    answered.  The question is vague and ambiguous as to

22    "generally."  The question has been asked and

23    answered.  And it's badgering.  It's argumentative.

24          If you understand the question any

25    differently than you've answered it, I would ask you  09:25AM

                                                            8

1    to go ahead and answer it.

2              THE WITNESS:  I don't think I can answer

3    it any differently.

4    BY MR. PURCELL:

5        Q.    And your answer was that you were here in    09:25AM

6    the room, but you can't say whether or not you were

7    paying attention to the questions that were asked?

8              MR. FINLEY:  Objection.  Argumentative.

9    Misstates prior testimony.

10    BY MR. PURCELL:                                        09:26AM

11       Q.    You can answer.

12       A.    I was here in the room, yes.  I can't say

13    if I heard every question.

14       Q.    And, similarly, you can't say if you heard

15    every answer?                                          09:26AM

16             MR. FINLEY:  Objection.  Argumentative.

17    Asked and answered.

18    BY MR. PURCELL:

19       Q.    You can answer.

20             MR. FINLEY:  If you understand the            09:26AM

21    question, you can answer.

22             MR. PURCELL:  Counsel, stop with the

23    speaking objections.

24             MR. FINLEY:  We're going to take a break.

25             MR. PURCELL:  We're not going off the         09:26AM
                                                             9

1    record, by the way.

2             (The Deponent and Counsel exit the

3              deposition room.)

4             (The Deponent and Counsel enter the

5              deposition room.)                    09:28AM

6             MR. PURCELL:  Could the reporter read back

7    the pending question.

8             (Record read as follows:

9               "Q.  And, similarly, you can't say if

10              you heard every answer?")            09:29AM

11            MR. FINLEY:  And I'm going to make the

12   same objections that I made to that question when he

13   first asked it.

14   BY MR. PURCELL:

15       Q.    You can answer.                       09:29AM

16       A.    I was here all day during the deposition.

17   I don't know how to answer that question.  I don't

18   know what you mean.

19       Q.    My question is:  Did you hear every answer

20   that your father gave to Mr. Peters' questions at    09:29AM

21   the deposition on Monday?

22            MR. FINLEY:  Asked and answered.

23   BY MR. PURCELL:

24       Q.    Do you not know how to answer that

25   question?                                       09:29AM

                                                         10

1          MR. FINLEY:  Objection.  Argumentative.

2   If you have a pending question, you might want to

3   let him answer the pending question before you

4   re-ask a new question.  That's a different question.

5          MR. PURCELL:  Counsel, I appreciate that.    09:29AM

6   If you want to make an objection, you can make an

7   objection.  You're not entitled to make speaking

8   objections or speeches or coach your witness.

9          MR. FINLEY:  I am not coaching my witness.

10  I'm making objections to your question, and I'm      09:30AM

11  going to make the objections that I want to make to

12  your questions because they're improper.

13          You come in with this attitude that you

14  want to badger this witness for some reason.  He's

15  here to testify and he's given his time to come      09:30AM

16  here.  So I'd just ask that you be respectful and

17  ask proper questions.  That's all I'm asking.

18  BY MR. PURCELL:

19      Q.   You can answer the question.

20          MR. FINLEY:  If you understand it.           09:30AM

21          THE WITNESS:  I think I already answered

22  that question.

23  BY MR. PURCELL:

24      Q.   I'm not sure which question you're

25  referring to.                                        09:30AM

                                                              11

1          Let me ask this:  Are you not able to

2    answer the question whether you heard every answer

3    that your father gave to the deposition questions on

4    Monday?

5              MR. FINLEY:  Objection.  Vague.  Asked and          09:30AM

6    answered.

7              THE WITNESS:  I believe I already answered

8    that question.

9    BY MR. PURCELL:

10         Q.    And your answer to that question was that          09:30AM

11   you were here in the room; correct?

12         A.    I was here in the room, yes.

13         Q.    And, just to be clear, you're not able to

14   say whether you heard every answer to the questions

15   that your father was asked on Monday?          09:30AM

16             MR. FINLEY:  Objection.  Argumentative.

17   Asked and answered.

18   BY MR. PURCELL:

19         Q.    Is that right?  You're not able to answer

20   that question?          09:31AM

21             MR. FINLEY:  Objection.  Argumentative.

22             THE WITNESS:  I believe I already answered

23   the question.

24   BY MR. PURCELL:

25         Q.    I don't believe you did answer that          09:31AM
                                                                   12

1    question, Mr. Berger.

2            The question is:  Are you not able to

3    answer the question as to whether you heard every

4    answer to the questions your father was asked at his

5    deposition on Monday?                               09:31AM

6            MR. FINLEY:  Objection.  Vague and

7    ambiguous.  The question also has a negative in it

8    that makes the question confusing.

9            MR. PURCELL:  Counsel, seriously, the

10   speaking objections are completely improper.  You    09:31AM

11   can object to the form of the question.  You can say

12   vague, ambiguous.  You can say calls for

13   speculation.  You're not entitled to make speeches.

14           MR. FINLEY:  The question is

15   unintelligible as phrased because you're putting a   09:31AM

16   negative in it that creates an ambiguity in the

17   question.

18           MR. PURCELL:  Counsel, this is --

19           MR. FINLEY:  And I -- would you stop

20   interrupting me, please.                             09:31AM

21           MR. PURCELL:  This is a prototypical

22   speaking objection.  You're coaching the witness.

23   It's not proper.  I'm going to ask you to stop.

24           MR. FINLEY:  Your question is

25   unintelligible as phrased.  You continue to ask      09:32AM

                                                         13

1    questions that have negatives in them that are

2    confusing to the witness.  And it's a question that

3    I believe he's answered.  And you're arguing with

4    the witness.

5              MR. PURCELL:  I don't believe he has          09:32AM

6    answered it.

7    BY MR. PURCELL:

8        Q.    Once again, my question is:  Are you able

9    to answer the question whether you heard every

10   answer that your father gave to the deposition       09:32AM

11   questions on Monday?

12             MR. FINLEY:  Objection.  Vague.  Asked and

13   answered.  Argumentative.

14             THE WITNESS:  I believe I answered that

15   question the best I can.                              09:32AM

16   BY MR. PURCELL:

17       Q.    And what was your answer to that question,

18   just to be clear?

19             MR. FINLEY:  Asked and answered.

20             THE WITNESS:  I answered that question      09:32AM

21   already.

22   BY MR. PURCELL:

23       Q.    What was your answer?

24       A.    Are you able to read my answer back?

25       Q.    I'd rather have your answer again.          09:32AM

                                                               14

1    A.    I believe I already answered the question

2    the best that I can.

3    Q.    What was that answer, Mr. Berger?  That's

4    all I'm asking for.

5         MR. FINLEY:  Objection.  Argumentative.    09:32AM

6    You're just arguing with the witness over something

7    that's meaningless.

8    BY MR. PURCELL:

9    Q.    You can answer the question.

10    A.    I was here all day.    09:33AM

11    Q.    And did you listen to the questions that

12    your father was asked and answered?

13         MR. FINLEY:  Objection.  Argumentative.

14    Asked and answered.

15    BY MR. PURCELL:    09:33AM

16    Q.    It's a fairly simple yes or no question.

17         MR. FINLEY:  Objection.  Argumentative.

18    BY MR. PURCELL:

19    Q.    You can answer.

20    A.    I believe I answered the question already.    09:33AM

21    Q.    And what was your answer to that question?

22    A.    Are you able to read that answer back for

23    me?

24    Q.    Mr. Berger --

25         MR. FINLEY:  He would like the court    09:33AM
                                                    15

1    Q.    Other than the email from counsel, as you

2   sit here today, you don't recall any other documents

3   that you reviewed in preparation for your deposition

4   here today?

5            MR. FINLEY:  Objection.  Misstates his          09:42AM

6   testimony.

7            THE WITNESS:  I've been reviewing

8   documents for a while.

9   BY MR. PURCELL:

10    Q.    Okay.  I understand that.                         09:42AM

11            And my question is:  Other than the email

12   from counsel, do you recall any -- strike that.

13            My question is:  Other than the email from

14   counsel that you specifically identified, do you

15   recall any other document that you reviewed in          09:43AM

16   preparation for your deposition here today?

17    A.    After I was notified of this deposition?

18    Q.    Correct.

19    A.    I don't recall.

20    Q.    In preparing for your deposition here          09:43AM

21   today, did you meet with counsel?

22    A.    Yeah.

23    Q.    On how many occasions?

24    A.    Well, this morning.

25    Q.    Other than this morning, did you meet with  09:43AM
                                                                24

1    counsel to prepare for your deposition today?

2        A.    Yeah.

3        Q.    On how many -- on how many occasions other

4    than this morning?

5        A.    I would say several times.                        09:43AM

6        Q.    More than five?

7            MR. FINLEY:  I think he's asking

8    specifically in preparation for the deposition, not

9    in general terms of the case.  And you can correct

10   me if I'm wrong.                                            09:44AM

11           MR. PURCELL:  No.  That's fair, actually.

12   BY MR. PURCELL:

13       Q.    I'm not meaning to ask you about general

14   meetings you had with your counsel.  I realize that

15   the word "general" may be confusing.  I'm not asking  09:44AM

16   of meetings you had with your counsel to discuss the

17   case in the abstract.  I'm talking about meetings

18   specifically to prepare for your deposition here

19   today.

20       A.    Well, when you say that, I feel I've been    09:44AM

21   preparing for this deposition since we hired the

22   attorneys.

23       Q.    At how many meetings with counsel, if any,

24   did you specifically discuss the strategy of today's

25   deposition?                                            09:44AM
                                                                25

1          MR. FINLEY:  Objection.  I'm going to

2   object to the extent that that may invade the

3   attorney-client privilege.  And I'm going to ask you

4   not to convey any discussions between yourself and
                                                           09:44AM
5   counsel at any meeting.

6          MR. PURCELL:  I'm not asking for --

7          MR. FINLEY:  If he just wants the number

8   of meetings, I will certainly allow that question.

9          MR. PURCELL:  Yeah, that's correct.
                                                           09:45AM
10  BY MR. PURCELL:

11     Q.    I'm not asking for the communications you

12  had with your lawyers.  I'm asking at how many

13  meetings, if any, did you and your counsel discuss

14  today's deposition specifically?

15         MR. FINLEY:  And just one further thing.      09:45AM

16  Is your question broad enough to encompass any time

17  his potential deposition was discussed at any

18  meeting with us?

19  BY MR. PURCELL:

20     Q.    I'm talking about meetings at which you     09:45AM

21  discussed the conduct of today's deposition.

22         MR. FINLEY:  Vague and ambiguous.  Are you

23  meaning specifically in preparation for the

24  deposition?

25         MR. PURCELL:  I'd just like an answer to      09:45AM
                                                              26

1    my question.

2              MR. FINLEY:  Yeah.  But I don't --

3              MR. PURCELL:  If he can answer it, I'd

4    like his answer.

5              MR. FINLEY:  I'll just object that the          09:45AM

6    question is vague.  But to the extent that you

7    understand it.

8              MR. PURCELL:  Counsel, please keep your

9    objections brief.  You're not supposed to coach your

10   witness.                                                  09:45AM

11             MR. FINLEY:  I object to the fact that you

12   complain that I'm coaching the witness.  I'm making

13   speaking objections -- I'm sorry.  Withdraw that.

14             I'm making objections to the form of your

15   questions.                                                09:46AM

16             THE WITNESS:  Other than meeting with my

17   attorneys from the beginning of this case, the

18   meeting that I had for this deposition was this

19   morning.

20   BY MR. PURCELL:                                           09:46AM

21       Q.   And how long did that meeting last?

22       A.   30 minutes.

23       Q.   And where was that meeting?

24       A.   I met my attorney at his office.

25       Q.   Was your father present during the              09:46AM
                                                                       27

1    meeting?

2        A.    Yes.

3        Q.    And was Mr. Finley present during the

4    meeting?

5        A.    Yes.                                         09:46AM

6        Q.    Anyone else?

7        A.    No.

8        Q.    Did you meet with your attorneys

9    yesterday?

10       A.    Yes.                                         09:46AM

11       Q.    And who was present at that meeting?

12       A.    It was Ron Finley, my father, myself and a

13   couple of people that brought in drinks now and

14   then.

15       Q.    And did you discuss your deposition today   09:47AM

16   at that meeting yesterday?

17           MR. FINLEY:  Objection.  Asked and

18   answered.  Vague.

19           THE WITNESS:  No.

20   BY MR. PURCELL:                                        09:47AM

21       Q.    What subjects did you discuss?

22           MR. FINLEY:  Don't answer that question.

23   That invades the attorney-client privilege.  Do not

24   answer that question.

25           MR. PURCELL:  Counsel, I'm going to ask        09:47AM

                                                                   28

1   you to reconsider that.  I'm not asking for specific

2   communications.  I'm asking for general subject

3   matter, which is the same information that would be

4   on a privilege log.

5           MR. FINLEY:  I'm instructing you not to          09:47AM

6   give any information that was communicated between

7   you and any counsel for you at any meeting.

8           MR. PURCELL:  That is improper.

9           MR. FINLEY:  If you can answer his

10  question -- and I'd ask you to let me finish before    09:48AM

11  you interrupt me again.

12          MR. PURCELL:  Well, I'm not sure when

13  you're done because you talk so long.

14          MR. FINLEY:  I don't want you to give any

15  information that was communicated between counsel,      09:48AM

16  including the subjects of information communicated,

17  unless I instruct you otherwise.  If you can answer

18  his question around that and it doesn't invade the

19  attorney-client privilege, you can go ahead.

20          MR. PURCELL:  Counsel, that's an improper        09:48AM

21  and overbroad instruction.  And we're going to add

22  that to the list of the subjects on which we're

23  going to move to compel.

24          MR. FINLEY:  I'm awaiting the motion.

25          MR. PURCELL:  I doubt it.                        09:48AM
                                                                29

1          MR. FINLEY:  Argumentative.

2          MR. PURCELL:  That wasn't a question.

3     That's not something you can object to, Counsel.

4     BY MR. PURCELL:

5          Q.   Mr. Berger, you're going to follow your          09:48AM

6     attorney's instruction?  You're not going to tell me

7     any of the subject matters that were discussed at

8     the meeting yesterday?

9          MR. FINLEY:  That misstates the

10    instruction I gave him.  That's an improper question   09:48AM

11    to this witness in light of the instruction I gave

12    him with regard to the attorney-client privilege.

13         THE WITNESS:  My answer would be that I

14    can't give you any information about that.

15    BY MR. PURCELL:                                          09:49AM

16         Q.   And you can't give me -- well, strike

17    that.

18              On Monday, did you meet with your

19    attorneys after your father's deposition concluded?

20         A.   No.                                            09:49AM

21         Q.   Prior to Monday, when was the most recent

22    time you met with your attorneys?

23         MR. FINLEY:  Objection.  Vague.

24         THE WITNESS:  You're just asking the last

25    time I saw my attorneys?                                09:49AM

30

1    BY MR. PURCELL:

2       Q.    The last time you met with them in

3    connection with this case?

4            MR. FINLEY:  Asked and answered.

5    BY MR. PURCELL:                                    09:49AM

6       Q.    You can answer.

7       A.    The last time I met with them --

8       Q.    Prior to your father's deposition on

9    Monday in connection with this case.

10      A.    I believe we came up for the deposition    09:49AM

11   originally.  I don't know what date that was.

12      Q.    That was for the originally scheduled

13   deposition last month?

14      A.    Correct.

15      Q.    Have you ever met with your father outside   09:50AM

16   the presence of counsel to discuss your deposition

17   today?

18      A.    For that purpose?

19      Q.    Not necessarily for that purpose.

20            Have you ever met with your father outside   09:50AM

21   the presence of counsel and discussed your

22   deposition?

23      A.    The discussion comes up.

24      Q.    On roughly how many occasions did the

25   discussion come up?                                 09:50AM

                                                          31

1    Q.    Five years ago?

2    A.    Possibly.

3    Q.    You can't be more specific than that?

4    A.    It could be five years ago.

5    Q.    During your time working for Berger    10:27AM

6  Enterprises, did you have other employment?

7              MR. FINLEY:  Objection.  Vague as to time.

8              THE WITNESS:  During any time Berger

9  Enterprises was up?

10 BY MR. PURCELL:    10:27AM

11    Q.    Yeah.  Let me clarify.  So we were talking

12 about your employment history.  You talked about

13 your job in Lancaster at Antelope Valley working as

14 a respiratory therapist.  Then we segued into Berger

15 Enterprises.

16              And I'm wondering:  During the time you

17 were working for Berger Enterprises, did you have

18 any other job, such as the respiratory therapy job?

19              MR. FINLEY:  Objection.  Vague.

20              THE WITNESS:  In the beginning, I think it    10:28AM

21 was both.

22 BY MR. PURCELL:

23    Q.    And were you splitting time between Berger

24 Enterprises and the job at Antelope Valley?

25              MR. FINLEY:  Objection.  Vague as to time.    10:28AM

                                                      61

1           THE WITNESS:  When we first started?

2  BY MR. PURCELL:

3     Q.    Correct.

4     A.    I'm not sure if I would agree with

5  splitting time.  I don't know what you mean          10:28AM

6  by "splitting time."

7     Q.    Did you work for both Antelope Valley and

8  Berger Enterprises?

9     A.    When you say worked for both, what do you

10 mean worked for both?                                 10:28AM

11    Q.    You don't know what that means?

12         MR. FINLEY:  Objection.  Argumentative.

13 Don't argue with the witness, Counsel.

14 BY MR. PURCELL:

15    Q.    You can answer.                              10:28AM

16    A.    What do you mean by worked for both?

17    Q.    You know what the word "worked" means,

18 don't you, Mr. Berger?

19         MR. FINLEY:  Objection.  Argumentative.

20 Let's take a break.                                   10:28AM

21         MR. PURCELL:  No.  We're staying on the

22 record.  There is a question pending.

23         MR. FINLEY:  It's 10:30.  We've been going

24 for well over an hour.

25         MR. PURCELL:  But there's a question        10:28AM
                                                            62

1    pending, Counsel.  If you'll let him answer the

2    pending question, we can take a break.

3              (The Deponent and Counsel exit the

4              deposition room.)

5              DEPOSITION REPORTER:  Are we going off the    10:29AM

6    record?

7              MR. PURCELL:  Yeah, we can go off the

8    record.

9              THE VIDEOGRAPHER:  The time is 10:29 a.m.

10   and we are off the record.                              10:29AM

11             (Off the record.)

12             THE VIDEOGRAPHER:  The time is 10:36 a.m.

13   and we are on the record.

14   BY MR. PURCELL:

15      Q.   Mr. Berger, at any point during the time       10:36AM

16   you were working as a respiratory therapist for

17   Antelope Valley Hospital, were you also doing work

18   for Berger Enterprises?

19             MR. FINLEY:  Objection.  Vague.

20             THE VIDEOGRAPHER:  I'm going to start         10:37AM

21   over.

22             MR. PURCELL:  Sure.

23             THE VIDEOGRAPHER:  The time is 10:37 a.m.

24   and we are on the record.

25   BY MR. PURCELL:                                         10:37AM
                                                             63

1      Q.    Mr. Berger, at any time when you were

2   doing work for Antelope Valley Hospital as a

3   respiratory therapist, were you also doing work for

4   Berger Enterprises?

5            MR. FINLEY:  Objection.  Vague.          10:37AM

6            THE WITNESS:  I still don't know what you

7   mean by "work," but I was doing time -- putting time

8   into starting the company.

9   BY MR. PURCELL:

10     Q.    And then at some point, you left Antelope   10:37AM

11  Valley; correct?

12     A.    Correct.

13     Q.    And you continued to work for Berger

14  Enterprises after you left Antelope Valley?

15     A.    Correct.                                 10:37AM

16     Q.    And at some point, did you get another

17  respiratory therapy job?

18     A.    Yes.

19     Q.    When was that?

20     A.    Approximately four years ago.            10:37AM

21     Q.    All right.  So is it fair to say that

22  between the time you left Antelope Valley and the

23  time you got your current job as a respiratory

24  therapist, you didn't have any respiratory therapist

25  jobs?                                             10:38AM

                                                          64

1    against Rossignol?

2          MR. FINLEY:  Objection.  Lacks foundation.

3          THE WITNESS:  I don't believe I can answer

4    that.

5    BY MR. PURCELL:                                      10:47AM

6        Q.    Why not?

7        A.    When you say "whose idea was it" -- can

8    you ask that question again.

9        Q.    Whose idea was it to bring a lawsuit

10   against Rossignol?                                   10:47AM

11         MR. FINLEY:  Objection.  Lacks foundation.

12         THE WITNESS:  I don't believe it was -- it

13   was a single person.  It was their idea.

14   BY MR. PURCELL:

15       Q.    Okay.  What group of people had the idea  10:48AM

16   to bring a lawsuit against Rossignol?

17         MR. FINLEY:  Objection.  Lacks foundation.

18         THE WITNESS:  The group of people that did

19   go after Rossignol.

20   BY MR. PURCELL:                                      10:48AM

21       Q.    Would that be you and your father?

22       A.    We're two of the people.

23       Q.    Anyone else?

24       A.    Anyone else involved?

25       Q.    Was anyone else involved in making the    10:48AM
                                                         73

1  decision to sue Rossignol?

2          MR. FINLEY:  Lacks foundation.  Vague.

3          THE WITNESS:  I think there were more

4  people involved in the decision, but ultimately the

5  decision was ours.                                    10:49AM

6  BY MR. PURCELL:

7      Q.    What other people were involved in the

8  decision?

9      A.    I would have to say there were a few.

10     Q.    Who?                                         10:49AM

11     A.    Well, attorneys, for one.

12     Q.    What attorneys?

13     A.    Our patent prosecutor.

14     Q.    And who is that?

15     A.    Fish & Richardson.                           10:49AM

16     Q.    Any specific lawyers at Fish & Richardson?

17     A.    Yes.

18     Q.    Who?

19          MR. FINLEY:  I've lost the question.  What

20  is the question with regard to the specific lawyers   10:49AM

21  at Fish & Richardson just so we know what he's

22  answering?

23  BY MR. PURCELL:

24     Q.    You can answer the question.

25          MR. FINLEY:  I'm going to ask you to wait     10:49AM

                                                          74

1    for clarification of the question.

2              MR. PURCELL:  I'm not obligated to

3    clarify, Counsel.  You're not here to testify.  The

4    witness is here to testify.

5              MR. FINLEY:  If you understand the

6    question, go ahead and answer it.

7              THE WITNESS:  Can you ask the question

8    again.

9              MR. PURCELL:  Well, now that you've

10   coached your witness not to answer the question --        10:50AM

11             MR. FINLEY:  I object to this consistent

12   idea of coaching.  Your questions are so vague I

13   can't follow them.

14             MR. PURCELL:  I object to your consistent

15   coaching, Counsel.                                        10:50AM

16             MR. FINLEY:  I would just ask that you

17   straighten out your questions and ask a clear

18   question so that this witness can answer.

19   BY MR. PURCELL:

20     Q.    Who at Fish & Richardson was your patent         10:50AM

21   prosecutor?

22             MR. FINLEY:  Objection.  Lacks foundation.

23             THE WITNESS:  I think we considered Fish &

24   Richardson to be our patent prosecutor.

25   BY MR. PURCELL:                                           10:50AM
                                                                  75

1      Q.    What individual attorneys at Fish &

2   Richardson did you work with?

3      A.    We worked with a few.

4      Q.    Who?

5      A.    We worked with a few.                    10:50AM

6      Q.    Do you know any of their names?

7      A.    I remember one specifically.

8      Q.    Who?

9      A.    Reginald Suyat.

10     Q.    Anyone else?                              10:50AM

11     A.    I don't remember names.

12     Q.    Okay.  You worked with Reginald Suyat at

13  Fish & Richardson on the prosecution of the patents

14  that were involved in the Rossignol case; is that

15  right?                                            10:51AM

16        MR. FINLEY:  Objection.  May call for a

17  legal conclusion.

18        THE WITNESS:  I'm not sure I understand

19  that question.

20  BY MR. PURCELL:                                   10:51AM

21     Q.    Why don't you understand that question?

22        MR. FINLEY:  Because it's a bad question.

23        THE WITNESS:  I don't understand what

24  you're trying to ask me.

25  BY MR. PURCELL:                                   10:51AM
                                                         76

1    Rossignol case?

2          MR. FINLEY:  Objection.  Lacks foundation.

3    Vague.

4          THE WITNESS:  We worked with Reginald

5    Suyat on the Berger patents, yes.                    10:52AM

6    BY MR. PURCELL:

7      Q.    And that includes the patents that were at

8    issue in the Rossignol case?

9          MR. FINLEY:  Lacks foundation.

10         THE WITNESS:  We worked with Reginald        10:52AM

11   Suyat on the Berger patents.

12   BY MR. PURCELL:

13     Q.    Is there some reason why you can't answer

14   the question whether you worked with Reginald Suyat

15   on the specific Berger patents --                   10:53AM

16     A.    Because I don't understand your question.

17     Q.    What don't you understand about it?

18     A.    Because there's --

19         MR. FINLEY:  Hold it.  Don't argue with

20   this witness.  Come on.  Just ask him a question.   10:53AM

21   BY MR. PURCELL:

22     Q.    What don't you understand about my

23   question?

24         MR. FINLEY:  Excuse me for a second.  I

25   don't want you to --                                10:53AM
                                                         78

```
 1          MR. PURCELL:  Counsel, I'm not talking to

 2  you.

 3          MR. FINLEY:  If you yell at me again, I'm

 4  going to end this deposition and we will be before a

 5  judge.  Don't yell at me and don't yell at my        10:53AM

 6  witness.  We won't stand for it.  Now, please be

 7  polite to this witness.  I'm not going to take it.

 8  I don't know where you went to law school or where

 9  you learned how to take a deposition, but this is

10  unacceptable.  Ask him a question properly and be     10:53AM

11  polite, please.

12  BY MR. PURCELL:

13      Q.    What don't you understand about my

14  question?

15      A.    I don't understand what you're asking.      10:53AM

16      Q.    I'm asking if you worked with Reginald

17  Suyat at Fish & Richardson on the prosecution of the

18  patents at issue in the Berger versus Rossignol

19  case?

20          MR. FINLEY:  The question lacks              10:53AM

21  foundation.  You, Counsel, haven't established what

22  patents were at issue.  Why don't you start with

23  that so you can take the vagueness out of your

24  question.

25          MR. PURCELL:  Counsel, stop with the          10:53AM
```

1   speaking objections, all right?

2           MR. FINLEY:  I'm trying to help you out

3   here.

4           MR. PURCELL:  No, no, no, no, you're not.

5           MR. FINLEY:  I'm trying to help you out.    10:54AM

6           MR. PURCELL:  You're not.

7           MR. FINLEY:  You can't seem to get a good

8   question out.

9           MR. PURCELL:  You're obstructing the

10  deposition.

11          MR. FINLEY:  And then you want to beat up

12  the witness when he doesn't understand your question

13  and when he tells you, "I don't understand your

14  question."

15          MR. PURCELL:  Counsel, the question could    10:54AM

16  not be clearer.

17          MR. FINLEY:  If you understand his

18  question, I'd ask you to go ahead and answer it.

19          THE WITNESS:  If you could show me the

20  patents that you're talking about, I could probably   10:54AM

21  answer that.

22  BY MR. PURCELL:

23      Q.    Are you aware of the patents that were at

24  issue in the Rossignol case?

25      A.    There are several patents that we have.    10:54AM
                                                         80

1      Q.    Do you know which patents you and your

2  father sued Rossignol for infringing?

3            MR. FINLEY:  Objection.  Lacks foundation.

4            THE WITNESS:  If you could show me those

5  patents.                                          10:54AM

6  BY MR. PURCELL:

7      Q.    I'm not going to show you the patents

8  right now.  I'm asking you --

9      A.    I can't answer that, then.

10     Q.    So without the patents in front of you,    10:54AM

11  you can't answer the question as to which patents

12  you and your father sued Rossignol for infringing?

13            MR. FINLEY:  Objection.  The question

14  lacks foundation.

15  BY MR. PURCELL:                                    10:55AM

16     Q.    You can answer.

17            MR. FINLEY:  I don't believe this witness

18  and his father sued Rossignol.

19            THE WITNESS:  I believe you asked me about

20  Reginald Suyat.                                    10:55AM

21  BY MR. PURCELL:

22     Q.    Let's leave Mr. Suyat aside for one

23  second, Mr. Berger.

24            Do you as you sit here today know which

25  patents were at issue in the Berger versus Rossignol  10:55AM

                                                        81

1    "everybody involved in the case"?

2              MR. FINLEY:  Asked and answered.

3              THE WITNESS:  I think I answered that.

4    BY MR. PURCELL:

5        Q.    You haven't given me a list of names,          11:10AM

6    Mr. Berger.  That's what I'm asking for.

7              MR. FINLEY:  You want a list of names of

8    everyone involved in both the prosecution of the

9    patents and the litigation?

10             MR. PURCELL:  I want to understand what --

11             MR. FINLEY:  You really brought this

12   witness here for this?

13             MR. PURCELL:  I want to understand what

14   the answer the witness is giving means.

15   BY MR. PURCELL:                                           11:11AM

16       Q.    What do you mean by "everybody involved in

17   the case"?

18       A.    I met with everybody that we got advice

19   from.  I met with everybody involved in our patents.

20   I met with everybody involved in the litigation.         11:11AM

21   That's what I mean.

22       Q.    And, again, I'm asking you:  Who are those

23   people?

24             MR. FINLEY:  To the best of your

25   knowledge --                                             11:11AM
                                                                  95

1    BY MR. PURCELL:

2        Q.    Who do you remember meeting with?

3            MR. FINLEY:  -- would you list for him

4    everyone that you recall that is in the category

5    that he set forth?  To the extent that you sit here        11:11AM

6    today and recall that information, he wants a

7    listing.  And if you can give it, give it.

8            THE WITNESS:  Our patent prosecutors,

9    involving Reg Suyat, Jack Slobodin from Seyfarth

10   Shaw, Doug Allen from Burnett, Burnett & Allen.             11:11AM

11   Also a consultant of Jack's I met with.

12   BY MR. PURCELL:

13       Q.    Anyone else?

14       A.    At this time, I can't recall.

15       Q.    The consultant that you met with, was that        11:12AM

16   David Tunno?

17       A.    Yes.

18       Q.    Do you recall what his role was in the

19   Seyfarth -- strike that -- in the Berger/Rossignol

20   litigation?                                                 11:12AM

21       A.    He was consulting for Jack, I believe.

22       Q.    Do you recall what he was doing for Jack?

23       A.    Some legwork.

24       Q.    Can you get any more specific than that?

25       A.    No.  I think he was just doing some               11:12AM

96

1    legwork for Jack.

2        Q.    Did you ever personally retain any lawyer

3    to represent you or Berger Enterprises against

4    Rossignol?

5            MR. FINLEY:  Objection.  Calls for a legal    11:13AM

6    conclusion.  Lacks foundation.  Vague.

7            THE WITNESS:  I'm not sure what you mean

8    by "retain."

9    BY MR. PURCELL:

10       Q.    Hire?  Did you ever hire a lawyer to        11:13AM

11   represent you in the case against Rossignol?

12           MR. FINLEY:  You're defining "retained" as

13   hiring a lawyer?

14           MR. PURCELL:  I'm asking the witness a

15   question.                                             11:13AM

16   BY MR. PURCELL:

17       Q.    Did you ever hire a lawyer to represent

18   you in any lawsuit against Rossignol?

19           MR. FINLEY:  That's a different question.

20   It still lacks foundation and vague.                  11:13AM

21           THE WITNESS:  We had attorneys.  We went

22   forward with the case, so we had attorneys.  We had

23   litigators.

24   BY MR. PURCELL:

25       Q.    I understand that you did.                  11:14AM

                                                           97

1          I'm asking if you personally ever hired

2    any of those lawyers?

3       A.    I was president of Berger Enterprises,

4    Inc.  I was part of making the decision on moving

5    forward.                                          11:14AM

6       Q.    So you were also part of the decision to

7    hire lawyers in connection with the case?

8       A.    I was part of the decision to go forward

9    with the case.

10      Q.    Okay.  Did you ever hire any lawyers, you   11:14AM

11   personally?

12      A.    When you say "hire" --

13         MR. FINLEY:  The question is vague and it

14   lacks foundation.  Him personally as opposed to him

15   as president of Berger Enterprises, Inc.?          11:14AM

16   BY MR. PURCELL:

17      Q.    Did you, Brant Berger, ever hire a lawyer

18   to represent you or the company against Rossignol?

19         MR. FINLEY:  Objection.  Compound.  Vague.

20         THE WITNESS:  Can you repeat that again.     11:14AM

21   BY MR. PURCELL:

22      Q.    Did you, Brant Berger, personally ever

23   hire a lawyer to represent yourself or Berger

24   Enterprises against Rossignol?

25         MR. FINLEY:  Objection.  Compound and        11:15AM
                                                           98

1    vague.

2         THE WITNESS:  I was part of the

3    decision-making on the attorneys going forward.

4    BY MR. PURCELL:

5         Q.    And how were you "part of the                11:15AM

6    decision-making on the attorneys going forward"?

7         A.    I was president of Berger Enterprises,

8    Inc.

9         Q.    Right.  But what did you do?

10        A.    I was part of the decision-making on it       11:15AM

11   going forward.

12        Q.    What did you do to do your part as part of

13   the decision-making team going forward?

14             MR. FINLEY:  Objection.  Vague.

15   Argumentative.  Asked and answered.                      11:15AM

16             THE WITNESS:  I was part of the decision.

17   I was the president of Berger Enterprises, Inc.

18   BY MR. PURCELL:

19        Q.    And what did you do?

20        A.    I was part of the decision.                   11:16AM

21        Q.    What did you do to participate in the

22   making of the decision?

23             MR. FINLEY:  Objection.  Argumentative.

24   Vague.  Lacks foundation.

25             THE WITNESS:  Part of the decision was         11:16AM
                                                                   99

1    saying if we were going forward or not.

2    BY MR. PURCELL:

3        Q.    All right.  I'm talking about hiring a

4    lawyer, not deciding whether to go forward with the

5    lawsuit.  What, if any, decision-making authority          11:16AM

6    did you exercise in terms of hiring a lawyer?

7              MR. FINLEY:  Hang on for a second.

8              Can you read that back for me.

9              (Record read as follows:

10               "Q.  All right.  I'm talking about

11               hiring a lawyer, not deciding whether to

12               go forward with the lawsuit.  What, if

13               any, decision-making authority did you

14               exercise in terms of hiring a lawyer?")

15             MR. FINLEY:  That's not the same question.   11:16AM

16    BY MR. PURCELL:

17        Q.    You can answer.

18             MR. FINLEY:  The question is vague.

19             THE WITNESS:  I don't -- can you say that

20    one more time.                                             11:17AM

21    BY MR. PURCELL:

22        Q.    What, if any, decision-making authority

23    did you exercise in deciding to hire a lawyer?

24        A.    When you say "hire a lawyer," I don't

25    understand what you're saying.                             11:17AM
                                                                  100

1          MR. FINLEY:  Objection.  Asked and

2     answered.  Would you please stop arguing with this

3     witness.

4          MR. PURCELL:  As soon as he starts

5     answering my questions, I will.  I just want answers    11:23AM

6     to questions.  These are simple questions.

7          MR. FINLEY:  That you've asked three or

8     four times and have gotten answers to.

9          MR. PURCELL:  I haven't gotten answers to

10    them.                                                   11:23AM

11         MR. FINLEY:  You'll dig back in again to

12    get a different answer?

13         MR. PURCELL:  I haven't gotten answers to

14    them.

15         THE WITNESS:  We have a chief legal            11:23AM

16    officer.  I'm the president of the corporation.  My

17    father was the CEO of the corporation.  There's

18    people involved in the decision-making with the

19    advice that we're given.

20    BY MR. PURCELL:                                         11:23AM

21       Q.    And who makes the decision?  Is it you and

22    your father?

23         MR. FINLEY:  That's a different question.

24         THE WITNESS:  I'm the president of the

25    corporation.  My father was the CEO of the          11:23AM

                                                            107

1    corporation.  With the advice given, we make

2    decisions for Berger Enterprises, Inc.

3    BY MR. PURCELL:

4        Q.    You and your father make the decisions?

5        A.    We are a part of the decision.                11:24AM

6        Q.    Who else is part of the decision?

7        A.    Stockholders.

8        Q.    Did the stockholders of Berger Enterprises

9    have any role to play in hiring counsel to sue

10   Rossignol?                                               11:24AM

11           MR. FINLEY:  Objection.  Vague.

12           THE WITNESS:  Yeah.  People involved in

13   the corporation -- it's a corporation.

14   BY MR. PURCELL:

15       Q.    What does that mean?                           11:24AM

16       A.    We help run the corporation.  We don't own

17   the corporation.  The corporation is owned by

18   stockholders.

19       Q.    Did the stockholders play any role in

20   deciding whether to hire a lawyer to sue Rossignol?      11:24AM

21       A.    I need to use the rest room.

22       Q.    I'd appreciate it if you would answer the

23   question that's pending.

24           MR. PURCELL:  You're walking out without

25   answering the pending question?                          11:25AM
                                                              108

1          MR. FINLEY:  I think we're going to take a

2   break.

3          THE WITNESS:  Yeah.  I just need to use

4   the rest room, okay?

5          MR. PURCELL:  Stay on the record.  How          11:25AM

6   much time is left on the tape?

7          MR. FINLEY:  Stay on past the tape.  Keep

8   it running.

9          THE VIDEOGRAPHER:  Three minutes.

10          MR. PURCELL:  Since we're about to run out   11:26AM

11   of tape, we can go off the record and you can change

12   the tape.  Thanks.

13          THE VIDEOGRAPHER:  This marks the end of

14   tape No. 1.  We are off the record at 11:26 a.m.

15          (Off the record.)                            11:26AM

16          THE VIDEOGRAPHER:  We are on the record at

17   approximately 11:33 a.m.  This is the beginning of

18   tape 2 in the deposition of Brant W. Berger.

19          Please proceed.

20          MR. PURCELL:  Could you read back the         11:33AM

21   pending question.

22          (Record read as follows:

23             "Q.  Did the stockholders play any role

24             in deciding whether to hire a lawyer to

25             sue Rossignol?")                           11:34AM

                                                         109

1          THE WITNESS:  I myself am a stockholder.

2   BY MR. PURCELL:

3      Q.    Did any stockholder --

4          THE VIDEOGRAPHER:  I apologize.  I need to

5   redo the whole thing again.                          11:34AM

6          We are on the record at approximately

7   11:34 a.m.  This is the beginning of tape 2 in the

8   deposition of witness Brant W. Berger.

9          Please proceed.

10         MR. FINLEY:  I just want to note for the     11:34AM

11  record that we off the record had a question and an

12  answer that wasn't part of the videotape just so

13  that gets on the record somehow.  And you can fix it

14  any way you want, Dan.

15         DEPOSITION REPORTER:  It was on the

16  record.

17         MR. FINLEY:  Oh, it was on your record.

18  Okay.

19         MR. PURCELL:  It was not on the video

20  record.                                             11:34AM

21         MR. FINLEY:  Okay.  All right.

22  BY MR. PURCELL:

23     Q.    Were any stockholders other than -- strike

24  that.

25         Were any Berger Enterprises stockholders    11:35AM
                                                            110

1    other than yourself or your father involved in the

2    decision to hire counsel to sue Rossignol?

3          MR. FINLEY:  Objection.  Calls for a legal

4    conclusion.  Lacks foundation.

5          THE WITNESS:  Anybody holding stock that    11:35AM

6    were involved in the decision?

7    BY MR. PURCELL:

8      Q.    Correct.

9      A.    Yes.

10     Q.    Who else?                                 11:35AM

11     A.    Doug Allen.

12     Q.    Mr. Allen is a stockholder in Berger

13   Enterprises?

14     A.    Uh-huh.

15     Q.    And what was his involvement in deciding  11:35AM

16   whether to hire a lawyer to sue Rossignol?

17     A.    He was chief legal officer.

18     Q.    And so he consulted with you and your

19   father?

20     A.    We consulted with Doug continually.  He   11:35AM

21   was the chief legal officer of the corporation.

22     Q.    And among the things you consulted with

23   Mr. Allen about was the decision to file a lawsuit

24   against Rossignol; correct?

25     A.    Correct.                                  11:35AM
                                                       111

1           MR. FINLEY:  Lacks foundation.

2           THE WITNESS:  According to the advice from

3    the attorneys, I don't think there was any urgency.

4    BY MR. PURCELL:

5        Q.    But did your father ever express concern        11:53AM

6    that no complaint had been filed in 2004?

7           MR. FINLEY:  Lacks foundation.

8           THE WITNESS:  I don't recall.

9    BY MR. PURCELL:

10       Q.    In early 2005, do you know what, if any,         11:53AM

11   work Mr. Slobodin was doing on the Berger/Rossignol

12   case?

13          MR. FINLEY:  Objection.  Vague.  May call

14   for speculation.

15          THE WITNESS:  I'm not sure exactly what he         11:54AM

16   was doing as far as work like -- I'm not sure.

17   BY MR. PURCELL:

18       Q.    When a complaint was eventually filed, I

19   think you testified it was filed sometime in 2005;

20   is that right?                                              11:54AM

21       A.    Correct.  I believe it was in 2005.

22       Q.    Do you know if Mr. Slobodin filed that

23   complaint or whether someone else did on behalf of

24   the plaintiffs?

25          MR. FINLEY:  Objection.  May call for a           11:54AM
                                                                  128

1  legal conclusion.

2         THE WITNESS:  I'm not sure how the filing

3  took place.

4  BY MR. PURCELL:

5     Q.   Do you know if Mr. Slobodin's name         11:54AM

6  appeared on the complaint?

7         MR. FINLEY:  I would say that the

8  complaint speaks for itself.

9  BY MR. PURCELL:

10    Q.   You can answer.                             11:54AM

11    A.   The complaint speaks for itself.

12    Q.   Do you know whether Mr. Slobodin's name

13 appeared on the complaint?

14    A.   I think the complaint speaks for itself.

15    Q.   I'm asking you a question.  Do you know as  11:55AM

16 you sit here today whether Mr. Slobodin's name

17 appeared on the complaint?

18    A.   I'm not sure if his name appeared on there

19 or not.  I don't believe so.

20    Q.   You don't believe so?                       11:55AM

21    A.   Huh-huh.

22    Q.   Why wouldn't his name be on the complaint

23 if he was your lead counsel?

24        MR. FINLEY:  Objection.  Lacks foundation.

25 Argumentative.                                       11:55AM

                                                        129

1          THE WITNESS:  I remember Jack wanting to

2    surprise the other side.

3    BY MR. PURCELL:

4        Q.   What do you remember about that?

5        A.   I remember him wanting to come in at the        11:55AM

6    last minute.

7        Q.   Did Mr. Slobodin tell you this?

8        A.   I didn't talk to Mr. Slobodin.

9        Q.   Did Mr. Slobodin tell somebody else this?

10       A.   Yes.                                             11:55AM

11       Q.   Who did he tell?

12       A.   Doug Allen and my father.

13       Q.   When did he tell him that?  Do you know?

14       A.   I'm not sure when.

15       Q.   It was before your meeting with                 11:56AM

16   Mr. Slobodin in 2006?

17       A.   Correct.

18       Q.   What did he say to Mr. Allen and your

19   father?

20            MR. FINLEY:  It may call for speculation.        11:56AM

21            THE WITNESS:  I believe exactly that.

22   BY MR. PURCELL:

23       Q.   Exactly what?

24       A.   He wants to wait until the last minute and

25   surprise the other side.                                 11:56AM

                                                              130

1      A.    I was part of the decision.

2      Q.    In what way were you involved in the

3  decision?

4           MR. FINLEY:  Objection.  Asked and

5  answered.  Argumentative.                        12:00PM

6  BY MR. PURCELL:

7      Q.    You can answer the question.

8      A.    I did.  Sorry.

9      Q.    In what way were you involved in the

10  decision?                                        12:00PM

11           MR. FINLEY:  Asked and answered.

12  BY MR. PURCELL:

13      Q.    You said you were part of the decision.  I

14  understand that.

15           In what way were you part of the decision?  12:00PM

16           MR. FINLEY:  Asked and answered.

17  BY MR. PURCELL:

18      Q.    Are you refusing to answer the question,

19  Mr. Berger?

20      A.    No.  I answered your question.          12:00PM

21      Q.    What you said was that you were part of

22  the decision.  I understand that completely.

23           I'm asking you as a follow-up:  In what

24  way were you part of the decision?  What did you do?

25      A.    I was part of the decision.             12:00PM
                                                        135

1      Q.    You're just restating your previous

2  answer.  What did you do to make the decision?

3          MR. FINLEY:  You're just arguing -- this

4  is ridiculous.  He said he was part of the decision

5  to hire Slobodin.  And you keep saying, "What did he   12:01PM

6  do?"  I'm not following your questioning.  I

7  couldn't answer this.

8          THE WITNESS:  You understand what a

9  decision is?

10 BY MR. PURCELL:                                       12:01PM

11     Q.    What did you do as part of making the

12 decision to hire Mr. Slobodin?

13          MR. FINLEY:  Objection.  Badgering the

14 witness.  Asked and answered.

15          THE WITNESS:  I was part of the decision.   12:01PM

16 BY MR. PURCELL:

17     Q.    Did you talk to anybody about it?

18          MR. FINLEY:  About what?

19 BY MR. PURCELL:

20     Q.    You can answer the question.             12:01PM

21          MR. FINLEY:  Vague.

22          THE WITNESS:  I was the president of

23 Berger Enterprises, Inc.  And you're asking me, did

24 I talk to anybody about my decision?

25 BY MR. PURCELL:                                       12:01PM

                                                         136

1    Q.    That's what I'm asking.

2    A.    Yes.

3    Q.    Who did you talk to about hiring

4   Mr. Slobodin?

5         MR. FINLEY:  That's a different question.    12:01PM

6         THE WITNESS:  I talked to my father.

7   BY MR. PURCELL:

8    Q.    Anyone else?

9    A.    Yes.

10   Q.    Who?                                          12:02PM

11   A.    The people we got advice from.

12   Q.    Who?

13        MR. FINLEY:  Hang on for a second.  You

14   know, this is just rude.  Would you stop barking at

15   this witness and let him answer the questions        12:02PM

16   without your insistent "who?  Who?"  If you want a

17   list, ask him for a list of the people that he spoke

18   with and he can give it to you.

19   BY MR. PURCELL:

20   Q.    You can answer the question.

21        MR. FINLEY:  You don't have to be rude.

22   You don't have to be rude to the witness.

23   BY MR. PURCELL:

24   Q.    Who besides your father did you talk to

25   about hiring Mr. Slobodin?                          12:02PM

                                                          137

```
 1    that meeting other than your father?

 2        A.    Right after that meeting, I talked to my

 3    father.

 4        Q.    And at some point after that, did you talk

 5    to someone else who had been at that meeting about      01:22PM

 6    what happened at that meeting?

 7        A.    I talked to Jack after that.

 8        Q.    But you didn't talk to Jack until 2006;

 9    correct?

10        A.    Correct.                                      01:22PM

11        Q.    And did Jack say anything about the 2003

12    meeting when you talked to him in 2006?

13        A.    I don't recall.

14        Q.    So is it fair to say that your

15    understanding that Mr. Slobodin became your lawyer      01:22PM

16    in 2003 after that meeting with your father stems

17    entirely from what your father told you about that

18    meeting?

19            MR. FINLEY:  Objection.  Vague.

20            THE WITNESS:  No, it doesn't stem               01:22PM

21    entirely.  But I had discussions with my father

22    about that meeting.

23    BY MR. PURCELL:

24        Q.    What else other than what your father told

25    you leads you to believe that Mr. Slobodin became      01:22PM
                                                                148
```

1   your lawyer in 2003?

2            MR. FINLEY:  Objection.  Vague.

3            THE WITNESS:  Are we talking any time

4   after the 2003?

5   BY MR. PURCELL:                                    01:22PM

6      Q.    No.  What else, what other piece of

7   information other than what your father told you,

8   leads you to the conclusion that Mr. Slobodin became

9   your lawyer in 2003?

10           MR. FINLEY:  Objection.  Vague.          01:23PM

11           THE WITNESS:  He showed up at court.

12   BY MR. PURCELL:

13     Q.    He showed up at court in 2006?

14     A.    Yeah.  That's after the 2003 --

15           MR. FINLEY:  Hold it.  Are you testifying  01:23PM

16   now?

17           MR. PURCELL:  That was a question.

18           MR. FINLEY:  That he showed up at court in

19   2006?

20   BY MR. PURCELL:                                    01:23PM

21     Q.    Did the fact that he showed up in court in

22   2006, that led you to believe that he'd become your

23   lawyer in 2003?

24           MR. FINLEY:  Hang on.  Can you re-read his

25   question, please.                                 01:23PM

                                                        149

1          (Record read as follows:

2            "Q.  Did the fact that he showed up in

3          court in 2006, that led you to believe

4          that he'd become your lawyer in 2003?")

5          MR. FINLEY:  I just want to say that he          01:23PM

6    never testified that he showed up in 2006; you did.

7    So if you want to ask him a question and establish

8    some foundation for the question first before you

9    jump into the question, I think that would be best.

10   Otherwise, I'm going to have to object the question          01:23PM

11   lacks foundation, is vague and ambiguous.

12          MR. PURCELL:  I sure appreciate that,

13   Mr. Finley.

14   BY MR. PURCELL:

15      Q.    Did the fact that Mr. Slobodin showed up          01:24PM

16   in court in 2006, did that lead you to believe that

17   he'd become your lawyer in 2003?

18      A.    You asked me at any time after 2003.

19      Q.    I'm saying what -- let me ask it this way:

20   What, other than what your father told you about the          01:24PM

21   meeting with Mr. Slobodin in 2003, led you to

22   believe that Mr. Slobodin had become your lawyer in

23   2003?

24          MR. FINLEY:  It's still vague.

25          THE WITNESS:  Yeah.  Are we just talking          01:24PM

150



1    2003 only?

2    BY MR. PURCELL:

3        Q.    What information that you learned at any

4    time led you to believe that Mr. Slobodin had become

5    your lawyer in 2003 other than what your father told    01:24PM

6    you about the meeting which you've already testified

7    to?

8        A.    I would say the agreement discussed.

9        Q.    What agreement?

10       A.    That he was going to come on on a    01:25PM

11   contingency.

12       Q.    When was that agreement created?

13       A.    That was discussed at that meeting.

14       Q.    The 2003 meeting?

15       A.    Yes.    01:25PM

16       Q.    Is there any document that memorializes

17   that agreement?

18            MR. FINLEY:  Objection.  Vague.  Lacks

19   foundation.

20            THE WITNESS:  I'm not sure if there is a    01:25PM

21   document.

22   BY MR. PURCELL:

23       Q.    You learned about that agreement from your

24   father; correct?

25       A.    Correct.    01:25PM

151

1    Q.    So, again, that's something that your

2    father told you after the meeting?

3    A.    Correct.

4    Q.    So is there anything else other than

5    things your father told you after the meeting that    01:25PM

6    led you to the conclusion that Mr. Slobodin had

7    become your lawyer in 2003?

8         MR. FINLEY:  He's asking in the widest

9    possible sense.  He's not narrowing it to that

10   meeting.    01:25PM

11        THE WITNESS:  So any time after 2003?

12   BY MR. PURCELL:

13   Q.    Any other piece of information that you

14   learned at any time other than what your father told

15   you about the meeting that led you to believe that    01:26PM

16   Mr. Slobodin was your lawyer in 2003?

17   A.    Yeah.

18   Q.    What?

19   A.    When he started obtaining all of our

20   documents from our patent prosecutor.    01:26PM

21   Q.    That was in 2003?

22   A.    I believe it was in 2003.

23   Q.    Anything else?

24   A.    Our product.

25   Q.    The fact that he obtained an example of    01:26PM

                                                          152

1    we brought in another attorney to do the legwork.

2        Q.    Okay.  But did Mr. Branton ever tell you

3    that Mr. Slobodin had promised to supervise

4    Mr. Allen?

5        A.    I believe so.                              01:51PM

6        Q.    When did Mr. Branton tell you that?

7        A.    I'm not sure.

8        Q.    Do you recall what year that took place,

9    that statement by Mr. Branton?

10       A.    I believe it was 2005.                      01:52PM

11       Q.    Do you recall when in 2005?

12       A.    Sometime late 2005.  In 2005.

13       Q.    Do you recall where you had this

14   conversation with Mr. Branton?  Was it in person or

15   on the phone?                                         01:52PM

16       A.    We've had numerous conversations.  I'm not

17   sure what that exact conversation -- where that was

18   or how that took place.

19       Q.    Back to your conversation with Mr. Allen

20   regarding Mr. Slobodin's supervision.  You said you   01:52PM

21   weren't sure exactly when that conversation took

22   place; is that right?

23       A.    Correct.

24       Q.    Was that in 2005?  2006?

25       A.    No.  It was definitely -- it was before I   01:52PM
                                                           174

1    met with Jack.  It was before Jack exposed himself

2    to the other side.

3        Q.    So it was before March of 2006?

4        A.    I believe so, then.  Yeah.

5        Q.    Okay.  And what did Mr. Allen say?                    01:53PM

6        A.    About?

7        Q.    Did he just tell you, "Jack has promised

8    to supervise my work in the case"?  What did he say

9    about that?

10        A.    Well, when we hired Doug on, that was the          01:53PM

11    understanding.

12        Q.    What was the source of that understanding?

13        A.    That Doug was never going to litigate this

14    case.  That we had Jack Slobodin that was going to

15    oversee it and Seyfarth.                                      01:53PM

16        Q.    And why wasn't Jack litigating the case

17    then?

18            MR. FINLEY:  Objection.  Lacks foundation.

19            THE WITNESS:  Why wasn't Jack litigating

20    the case then?                                                01:53PM

21            MR. FINLEY:  The question assumes facts.

22    It lacks foundation.

23    BY MR. PURCELL:

24        Q.    You can answer it.

25            MR. FINLEY:  If you understand it.                    01:54PM

                                                                    175

1          THE WITNESS:  I'm not sure I understand

2   it.

3   BY MR. PURCELL:

4      Q.    Why did you need to hire Doug Allen if you

5   had Jack Slobodin?                                    01:54PM

6          MR. FINLEY:  Objection.  Lacks foundation.

7          THE WITNESS:  I think I answered that.

8   BY MR. PURCELL:

9      Q.    And the answer was because Jack wanted to

10  surface at the last minute and surprise the other    01:54PM

11  side?

12         MR. FINLEY:  Objection.  Misstates the

13  testimony.

14         THE WITNESS:  Yeah.  That wasn't my

15  answer.                                              01:54PM

16  BY MR. PURCELL:

17     Q.    Well, what's the answer?

18         MR. FINLEY:  Argumentative.

19         THE WITNESS:  Doug came on to do some work

20  to relieve some of the costs to us, and Jack         01:54PM

21  Slobodin was going to oversee the whole case.

22  BY MR. PURCELL:

23     Q.    Why was Doug doing the legwork rather than

24  Jack?

25         MR. FINLEY:  Calls for speculation.  Lacks    01:54PM
                                                         176

1    foundation.

2         But you can answer.

3         THE WITNESS:  Doug was doing the legwork

4    to help save costs.

5    BY MR. PURCELL:                                    01:54PM

6         Q.    In what way was having Doug do the legwork

7    saving costs to Berger Enterprises?

8         A.    He was also the chief legal officer at

9    Berger.

10        Q.    Okay.  That's nonresponsive to my        01:55PM

11   question.

12        MR. FINLEY:  Hold it.  Don't argue with

13   the witness.

14        MR. PURCELL:  I'm going to move to strike

15   the answer as nonresponsive.                        01:55PM

16        MR. FINLEY:  You can move to do whatever

17   you want to do, but that's his answer.

18        MR. PURCELL:  It's not an answer to the

19   question that I asked, Counsel.

20        MR. FINLEY:  In your opinion or in his         01:55PM

21   opinion?

22        MR. PURCELL:  Well, I think the question

23   will speak for itself.

24        MR. ALLEN:  Mr. Finley --

25        MR. FINLEY:  Would you just stay out of

                                                         177

1    that these phantom things are noted in the record.

2    But you should have stated an appearance before you

3    started speaking.

4           MR. ALLEN:  Well, you seem to be the most

5    familiar with phantom things, so I'll leave you to          01:56PM

6    be the authority on it.

7           (Record read as follows:

8              "Q.  In what way was having Doug do

9              the legwork saving costs to Berger

10             Enterprises?"

11             A.  He was also the chief legal

12             officer at Berger.")

13   BY MR. PURCELL:

14      Q.   How was having Doug do the legwork saving

15   costs?                                                       01:56PM

16          MR. FINLEY:  Asked and answered.

17   BY MR. PURCELL:

18      Q.   You can answer it.

19      A.   I answered it.

20      Q.   And your answer is that he was already the          01:57PM

21   chief legal officer.

22           How did that save costs?

23      A.   Doug was going to do a lot of the work

24   cheaper than another attorney because he was already

25   an attorney for Berger Enterprises.                          01:57PM

                                                                  179

1      Q.    If you were paying Mr. Slobodin on

2   contingency, why did it matter that Mr. Allen would

3   do the work more cheaply?

4           MR. FINLEY:  Objection.  Lacks foundation.
                                                        01:57PM
5   Argumentative.

6           THE WITNESS:  Seyfarth wasn't going to

7   come out of pocket for costs.

8   BY MR. PURCELL:

9      Q.    And so, therefore, they couldn't do any
                                                        01:57PM
10  work on the case?

11     A.    It was a financial decision.  It had

12  nothing to do with whether they were going to do

13  work on the case or not.  We either paid them the

14  costs or we brought in Doug and paid the costs
                                                        01:58PM
15  through Doug.

16     Q.    Did you have the money to pay for costs at

17  that time?

18          MR. FINLEY:  This has already been asked

19  and answered.

20          THE WITNESS:  We got money for the costs.   01:58PM

21  BY MR. PURCELL:

22     Q.    When did you get money for the costs?  In

23  2005; correct?

24          MR. FINLEY:  Objection.  Vague.  Asked and

25  answered.  Are you testifying or are you asking a   01:58PM
                                                             180

1   question?

2   BY MR. PURCELL:

3       Q.    You can answer.

4           MR. FINLEY:  If you understand the

5   question, you can answer.  If you don't --                01:58PM

6           MR. PURCELL:  Counsel, the speaking

7   objections are a violation of the rules.

8           MR. FINLEY:  I would ask you not to

9   interrupt me when I'm making objections.  Just don't

10  interrupt me.                                             01:58PM

11          MR. PURCELL:  You're making an improper

12  objection, Counsel, as you've been doing all day.

13          MR. FINLEY:  Would you hang on for a

14  second.  If you don't understand the question, would

15  you please ask for a clarification.  I want a clear       01:58PM

16  record here, and I don't want him testifying and you

17  answering that you agree with his testimony.  So if

18  you don't understand what he's saying, would you

19  please ask him to clarify.

20          THE WITNESS:  Well, okay.  I would like           01:58PM

21  that clarified, then.

22  BY MR. PURCELL:

23      Q.    All right.  You said that Seyfarth wasn't

24  coming out of pocket for costs?

25      A.    Correct.                                        01:59PM
                                                              181

1      Q.    And that was the reason you used Mr. Allen

2    to do work on the case?

3           MR. FINLEY:  Misstates prior testimony.

4    BY MR. PURCELL:

5      Q.    Is that right?

6      A.    We brought Doug in on the case.

7      Q.    Why?

8      A.    I already answered that.  I answered why

9    we brought Doug in on the case.

10     Q.    And the answer to the question was because    01:59PM

11   Seyfarth didn't want to go out of pocket for costs;

12   is that right?

13     A.    It was going to be cheaper for us to bring

14   Doug in on the case and Doug was going to do the

15   legwork.  We raised the money for the costs.          01:59PM

16     Q.    How was it going to be cheaper to bring

17   Doug in on the case if both Doug and Mr. Slobodin

18   were working on contingency and you'd raise the

19   money for the costs?

20          MR. FINLEY:  Objection.  Vague.  Lacks        01:59PM

21   foundation.  Asked and answered.

22   BY MR. PURCELL:

23     Q.    Mr. Berger, you have to answer the

24   question.

25          MR. FINLEY:  If you understand the            02:00PM

                                                          182

1    question.

2         THE WITNESS:  I thought I already did.

3    BY MR. PURCELL:

4    Q.    You have not answered the question.

5    A.    Doug was also the chief legal officer of          02:00PM

6    Berger Enterprises, Inc.

7    Q.    My question is:  How was it going to save

8    Berger Enterprises money if both Mr. Slobodin and

9    Mr. Allen were working on contingency and Berger

10   Enterprises has already raised the money for the        02:00PM

11   costs?  If all of that is true, how was it going to

12   be cheaper to use Mr. Allen instead of Mr. Slobodin?

13        MR. FINLEY:  Objection.  Asked and

14   answered.

15        THE WITNESS:  I guess you'll have to ask          02:00PM

16   Doug that.

17   BY MR. PURCELL:

18   Q.    Are you saying you don't know?

19        MR. FINLEY:  Objection.

20        THE WITNESS:  Why it would be -- sorry.           02:00PM

21   BY MR. PURCELL:

22   Q.    Are you saying you don't know?

23        MR. FINLEY:  The question has been asked

24   and answered.

25        THE WITNESS:  Are you asking me why it             02:00PM
                                                            183

1    would be -- why Doug charges less in this case than

2    another attorney?

3    BY MR. PURCELL:

4        Q.    It's true that both Mr. Slobodin and

5    Mr. Allen were taking the case on contingency;          02:01PM

6    correct?

7        A.    Yes.

8        Q.    So then why would it matter that Mr. Allen

9    charges more or less than Mr. Slobodin?

10            MR. FINLEY:  This is an incomplete            02:01PM

11    hypothetical, and you're arguing with the witness.

12            MR. PURCELL:  Counsel, again, the speaking

13    objections.

14    BY MR. PURCELL:

15        Q.    You can answer the question.                02:01PM

16            MR. FINLEY:  We're going to take a break.

17            MR. PURCELL:  I'd just like to note that

18    there is a question pending.  This is the fourth

19    time that Counsel has taken a break with a question

20    pending.                                               02:01PM

21            MR. FINLEY:  The fourth time you asked the

22    same question and got the same answer.

23            (The Deponent and counsel have exited

24             the deposition room.)

25            MR. PURCELL:  While we're waiting for them   02:02PM

                                                            184

1   to get back, if you could mark this as Exhibit 28.

2          (Whereupon, Defendant's Exhibit 28 was

3           marked for identification.)

4         MR. ALLEN:  Are we marking the Exhibits 1

5   through 28 again in this deposition?        02:02PM

6         MR. PURCELL:  We're doing it sequentially.

7         MR. ALLEN:  So we started with Berger --

8         MR. PURCELL:  Yes.  We started with 1

9   through 27 in Dick Berger, and now it's 28.

10        MR. ALLEN:  Okay.  Do you have a copy of  02:02PM

11  that for me?

12        MR. PURCELL:  Yes.  Sorry.

13        Would you read back the pending question

14  for me, please.

15        (Record read as follows:        02:06PM

16         "Q.  So then why would it matter that

17       Mr. Allen charges more or less than

18       Mr. Slobodin?")

19        MR. FINLEY:  You have to read the whole

20  question.                  02:07PM

21        (Record read as follows:

22         "Q.  It's true that both Mr. Slobodin

23       and Mr. Allen were taking the case on

24       contingency; correct?

25        A.  Yes.

                                    185

1    agreement with the Bergers by," and then there's a

2    list of bullet points.  Do you see that?

3        A.    Yes.

4        Q.    I'd just like to go through these one at a

5    time.  The first bullet point says "That there is a          02:14PM

6    breach because Seyfarth and Slobodin failed to

7    provide promised supervision, direction and support

8    to Allen before and during the Berger v. Rossignol

9    litigation."

10            Do you see that?                                    02:14PM

11       A.    Yes.

12       Q.    How did Seyfarth and Slobodin breach their

13   agreement by doing that?

14       A.    Because they didn't provide the promised

15   supervision, direction or support to Doug Allen.            02:15PM

16       Q.    And how did they fail to do that?

17            MR. FINLEY:  It's been asked and answered.

18   BY MR. PURCELL:

19       Q.    Mr. Berger, there is a question pending.

20       A.    Yeah.  I'm thinking about your question.          02:16PM

21       Q.    Okay.  Fair enough.  I didn't mean to rush

22   you.  You were just looking at me as if you were

23   waiting for a question.  I apologize.

24       A.    Doug Allen was looking for the support

25   from Seyfarth.  And it says here, "Failed to provide         02:18PM

                                                                 191

1    promised supervision, direction and support to Allen

2    before and during the Berger versus Rossignol

3    litigation."  Before and during.

4        Q.    What in your mind should Seyfarth have

5    done differently to avoid breaching the agreement          02:19PM

6    allegedly by failing to provide promised

7    supervision?

8            MR. FINLEY:  Objection.  Calls for

9    speculation.  May call for a legal conclusion.

10           THE WITNESS:  I'm not sure how to answer       02:19PM

11   that.

12   BY MR. PURCELL:

13       Q.    Can you think of anything as you sit here

14   today that Seyfarth should have done differently?

15           MR. FINLEY:  Other than what's stated in      02:19PM

16   this interrogatory response?

17   BY MR. PURCELL:

18       Q.    You can answer.

19       A.    Is that what you're asking?  Other than

20   what's stated?                                          02:19PM

21       Q.    My question is:  What should Seyfarth have

22   done differently in your mind to have avoided what's

23   alleged in the first bullet point here?

24           MR. FINLEY:  It may call for a legal

25   conclusion.  Lacks foundation.                          02:19PM
                                                            192

1              THE WITNESS:  I'm really not sure how to

2    answer that.

3    BY MR. PURCELL:

4        Q.    And why is that?  Is there some additional

5    information you need?                              02:20PM

6              MR. FINLEY:  Argumentative.

7              THE WITNESS:  I'm just not sure how to

8    answer that, what they could have done different.

9    I'm not sure how to answer that.

10   BY MR. PURCELL:                                    02:20PM

11       Q.    Can you think of anything that they should

12   have done differently?

13             MR. FINLEY:  Asked and answered.

14             THE WITNESS:  I'm not sure how to answer

15   that.                                             02:20PM

16   BY MR. PURCELL:

17       Q.    The second bullet points says that,

18   "Seyfarth and Slobodin breached their agreement with

19   the Bergers by preparing a defective claim chart and

20   legal memorandum concerning the '530 and '569       02:20PM

21   patents and transmitting them to Allen for use in

22   plaintiff's infringement contentions."

23             Do you see that?

24       A.    Yeah.

25       Q.    Have you read the claim chart that's       02:20PM
                                                         193

1    BY MR. PURCELL:

2        Q.    But without having it put in front of you,

3    you wouldn't be able to identify it?

4            MR. FINLEY:  Objection.  Vague.

5            THE WITNESS:  I'd have to have my memory        02:26PM

6    refreshed by having it put in front of me.

7    BY MR. PURCELL:

8        Q.    In the second bullet point, you also state

9    that, "Seyfarth and Slobodin transmitted the claim

10   chart and legal memorandum to Mr. Allen for use in      02:26PM

11   plaintiff's preliminary infringement contentions."

12           Do you see that?

13       A.    Yeah.

14       Q.    How do you know that Mr. Slobodin and

15   Seyfarth forwarded these materials to Mr. Allen for     02:26PM

16   use in plaintiff's preliminary infringement

17   contentions?

18       A.    That was what was given to Doug by

19   Seyfarth.

20       Q.    But how do you know that that was given to     02:27PM

21   Mr. Allen by Seyfarth for use in plaintiff's

22   preliminary infringement contentions?

23       A.    I remembered we were asking for that

24   claims chart for some time, and so was Doug.

25       Q.    Do you know whether Mr. Slobodin knew that     02:27PM

                                                             198

1    the claim chart was going to be incorporated into

2    preliminary infringement contentions?

3        A.    Ask that question again.

4            MR. FINLEY:  Calls for speculation.

5    BY MR. PURCELL:                                    02:27PM

6        Q.    Do you have any information that suggests

7    that Mr. Slobodin knew that the purpose of asking

8    for those claim charts was to incorporate them into

9    the preliminary infringement contentions?

10       A.    We needed the claims chart for the case.    02:28PM

11       Q.    Okay.

12       A.    I'm not sure when they needed to go in,

13   how they needed to go in.  We needed them for the

14   case.

15       Q.    So do you have any information that        02:28PM

16   indicates that Mr. Slobodin knew that you guys

17   needed the claim charts in order to put them in

18   preliminary infringement contentions?

19       A.    Well, he was our counsel.  He was our

20   attorney.                                           02:28PM

21       Q.    And because he was your attorney, he

22   should have known that?

23            MR. FINLEY:  Are you arguing with the

24   witness?

25            MR. PURCELL:  No.  I'm asking a question.   02:28PM
                                                         199

1          MR. FINLEY:  I'm not sure.  Maybe you can

2     rephrase the question.  I'm not sure what the

3     question is.

4          MR. PURCELL:  No.  I'd just like him to

5     answer the question I asked.                          02:29PM

6          MR. FINLEY:  All right.  Would you re-read

7     that question so that I can try and make heads or

8     tails of what it is.

9          (Record read as follows:

10              "Q.  So do you have any information

11              that indicates that Mr. Slobodin knew

12              that you guys needed the claim charts in

13              order to put them in preliminary

14              infringement contentions?

15              "A.  Well, he was our counsel.  He was

16              our attorney.

17              "Q.  And because he was your attorney,

18              he should have known that?")

19          MR. FINLEY:  Well, that calls for

20     speculation.  I don't know what Jack Slobodin knows  02:29PM

21     or doesn't know and neither does this witness.

22     BY MR. PURCELL:

23          Q.    That's not the question.

24              The question is:  Because Mr. Slobodin was

25     your attorney, are you contending that Mr. Slobodin  02:29PM
                                                             200

1    ought to have known that you wanted the claim charts

2    in order to put them in preliminary infringement

3    contentions?

4        A.    I believe Jack was saying that as well.

5        Q.    And what's the basis of that belief?                02:30PM

6        A.    All of our discussions.

7        Q.    Your discussions with Mr. Slobodin

8    directly?

9        A.    My discussions with my father, my

10   discussions with Doug Allen, the discussions with         02:30PM

11   Reg Suyat.

12       Q.    And in any of those discussions, did

13   anybody ever tell you that they had communicated to

14   Mr. Slobodin that you needed the claim charts in

15   order to incorporate them into preliminary              02:30PM

16   infringement contentions?

17           MR. FINLEY:  I'm sorry.  I lost it.

18   What's the question again?

19           (Record read as follows:

20               "Q.  And in any of those discussions,

21               did anybody ever tell you that they had

22               communicated to Mr. Slobodin that you

23               needed the claim charts in order to

24               incorporate them into preliminary

25               infringement contentions?")                    02:31PM
                                                                   201

1          THE WITNESS:  I'm not sure if that

2    discussion was talked about directly with me.  I

3    knew we had to have them.  I knew we needed them.  I

4    knew we were looking for them.  We were told Jack

5    Slobodin and Seyfarth had them.                    02:31PM

6    BY MR. PURCELL:

7        Q.    The third bullet point states that,

8    "Seyfarth and Slobodin breached their agreement with

9    the Bergers by falsely representing to plaintiffs

10   during a March 19, 2006 meeting (and thereafter)    02:31PM

11   that the defective Seyfarth claim chart was in fact

12   prepared by plaintiff's patent attorney Reginald

13   Suyat."

14          Do you see that?

15       A.    Yes.                                       02:31PM

16       Q.    Now, the March 19, 2006 meeting, is that

17   the March 2006 meeting we've been discussing

18   throughout the day that was your first direct

19   contact with Mr. Slobodin?

20       A.    I believe so, yes.  I believe it was March  02:32PM

21   19th.

22       Q.    What did Mr. Slobodin say at the March 19,

23   2006 meeting about the origin of the claim chart?

24       A.    That there was a fatal error.  We needed

25   to correct it.                                       02:32PM

                                                          202

```
 1      Q.    You didn't answer it, Mr. Berger.

 2      A.    The best I can.

 3      Q.    And your answer was that Mr. Slobodin was

 4  your lead counsel.  Is that your answer?

 5      A.    Yes.                                          03:10PM

 6      Q.    And does the fact that Mr. Slobodin was

 7  the lead counsel, does that mean that he was

 8  significantly involved?  Does that by itself mean

 9  that he was significantly involved?

10      A.    He was involved.                              03:10PM

11      Q.    What did he do?

12            MR. FINLEY:  Objection.  Vague.  Calls for

13  a narrative.  May call for speculation.

14            THE WITNESS:  What did he do knowing now,

15  today?  Do you want me to answer that?               03:10PM

16  BY MR. PURCELL:

17      Q.    Sure.

18      A.    Well, he provided us with a false claims

19  chart, a fatal error in a claims chart.  He didn't

20  provide the support to Doug Allen that he was       03:11PM

21  supposed to do.  He left us hanging.

22      Q.    How did he leave you hanging?

23      A.    Everything was a breeze.  "Don't worry

24  about it.  I'll take care of it.  I'm overseeing the

25  case.  No worries."                                 03:11PM
                                                            218
```

```
 1      Q.    He never said any of that to you, though,

 2   did he?

 3      A.    In the March meeting he did.

 4      Q.    Never before that, though, did he?

 5      A.    He said it before through conversations      03:11PM

 6   that I've heard, never to me personally.

 7      Q.    Through conversations that other people

 8   have related to you?

 9      A.    Yes.

10      Q.    Anyone other than your father relate that    03:11PM

11   to you?

12      A.    I believe so.

13      Q.    Who?  Mr. Allen?  Did he ever relate that

14   to you?

15      A.    I believe so.                                 03:12PM

16      Q.    Do you recall what Mr. Allen said?

17      A.    Can you ask the question again about --

18      Q.    Do you recall what Mr. Allen said --

19      A.    About?

20      Q.    -- about Mr. Slobodin promising to take       03:12PM

21   care of everything, if anything?

22      A.    I remember Doug being worried.  I'm not

23   exactly sure what he commented to me, but I remember

24   him being worried about certain things.

25      Q.    So have you given me the full list of         03:13PM
                                                                219
```

1   everything that Mr. Slobodin did as far as his

2   involvement in the case prior to Rossignol filing

3   its summary judgment motion?

4          MR. FINLEY:  Objection.  Calls for a

5   narrative.  Vague and ambiguous.  Lacks foundation.   03:13PM

6   Outside of what's stated in the interrogatory

7   responses?

8          MR. PURCELL:  Maybe I need to clarify.

9   I'm not talking about the interrogatory responses.

10  So, again, you shouldn't coach your witness by        03:13PM

11  referring him to them.

12  BY MR. PURCELL:

13     Q.    Mr. Berger, what I'm talking about is the

14  statement in the bullet point -- the

15  next-to-the-last bullet point on page 10 which talks  03:13PM

16  about Seyfarth allegedly falsely representing to the

17  district court that it had no significant

18  involvement in the Berger v. Rossignol case.

19          And my question is:  Have you given me a

20  full list of everything that Mr. Slobodin did, his    03:14PM

21  involvement in that case, prior to Rossignol filing

22  its summary judgment motion?

23     A.    I'm not exactly sure all of what Jack

24  Slobodin did.

25     Q.    Other than providing the claim chart to      03:14PM
                                                             220

1    Mr. Allen?

2          MR. FINLEY:  That misstates prior

3    testimony.

4          THE WITNESS:  I never said that's what he

5    did.                                                03:14PM

6    BY MR. PURCELL:

7      Q.    So you're not saying that Mr. Slobodin

8    provided the claim chart to Mr. Allen?

9      A.    I believe it came from Seyfarth.  I don't

10   know who it came from directly.                     03:14PM

11     Q.    Okay.  What -- leaving aside the claim

12   chart, then, what did Mr. Slobodin do to get

13   involved in the case before Rossignol filed its

14   summary judgment motion?

15         MR. FINLEY:  That has nothing to do with    03:14PM

16   this question.

17         MR. PURCELL:  You can answer.

18         MR. FINLEY:  It calls for speculation.

19   Lacks foundation.  Who knows?  How would he know

20   what Mr. Slobodin did?                              03:14PM

21         MR. PURCELL:  He's alleging that Seyfarth

22   misrepresented that it had no significant

23   involvement in the case.

24         MR. FINLEY:  He's alleging that Jack

25   Slobodin falsely told the district court that his  03:15PM

                                                        221

1   law firm had had no significant involvement in the

2   Berger v. Rossignol matter.  Do you misunderstand

3   the response?

4   BY MR. PURCELL:

5       Q.    What did Mr. Slobodin do to get involved      03:15PM

6   in the Berger v. Rossignol case before the summary

7   judgment motion was filed?

8           THE WITNESS:  Any time before?

9   BY MR. PURCELL:

10      Q.    Yeah.                                           03:15PM

11      A.    He got into all of our confidential

12  documents.  He had full access to our patent.

13      Q.    The patent is public, isn't it?

14      A.    We have our patent prosecutor.  He had

15  access to everything there.  He gave us advice.        03:15PM

16  Numerous things.

17      Q.    On how many occasions did he give you

18  advice?  Again, "you" meaning Berger Enterprises.

19      A.    He gave advice all the way through.

20      Q.    On how many occasions prior to March 2006?   03:16PM

21      A.    Wow, I can't tell you how many occasions.

22  I know there are multiple occasions.

23      Q.    And never to you personally during that

24  time; correct?

25      A.    Never to me personally?  I don't know what   03:16PM

222

1    you mean by that.  Speaking to me personally?  I

2    never spoke with him personally, no.

3        Q.    And what, if anything, did Seyfarth do,

4    leaving aside Mr. Slobodin, to get involved in the

5    Berger v. Rossignol case prior to Rossignol filing     03:16PM

6    its summary judgment motion?

7        A.    I think Jack Slobodin is Seyfarth.

8        Q.    Did anyone other than Mr. Slobodin at

9    Seyfarth do anything to get involved in the

10   Berger v. Rossignol case --                           03:17PM

11           MR. FINLEY:  May call for speculation.

12   BY MR. PURCELL:

13       Q.    -- before Rossignol filed the summary

14   judgment motion?

15       A.    I'm not sure who he had doing what.        03:17PM

16       Q.    Do you know that he had anybody doing

17   anything?

18       A.    I'm not sure.  I'm not sure who he had

19   doing what.

20       Q.    You mentioned earlier that Mr. John       03:17PM

21   Branton was involved in raising money to cover the

22   costs of the Rossignol litigation; correct?

23       A.    Correct.

24       Q.    Do you know whether Mr. Branton has any

25   financial interest in the outcome of this legal      03:17PM

                                                          223

1    malpractice case?

2        A.    I don't believe John Branton has any

3    outcome -- any financial outcome out of this case.

4        Q.    Do you know of anybody other than you and

5    your father, the plaintiffs in this case, who have a    03:17PM

6    financial interest in the outcome of this legal

7    malpractice case?

8        A.    I don't understand what you're talking

9    about.  But if you're talking about as far as -- I

10   mean my girlfriend.  I mean there's a lot of people    03:18PM

11   that way.  I don't understand what you're talking

12   about.  Is there anybody attached to the outcome of

13   this case?

14       Q.    Other than you, your father and presumably

15   your counsel.  I won't inquire into that.    03:18PM

16           MR. FINLEY:  Objection.  Objection.

17           MR. PURCELL:  I won't inquire into that.

18           MR. FINLEY:  That's absolutely

19   objectionable.

20           MR. PURCELL:  That's not objectionable.  I    03:18PM

21   assume you're not working for free, Counsel.

22   BY MR. PURCELL:

23       Q.    Is there any private third party that has

24   any financial interest in the outcome of this case?

25       A.    Nobody that's tied to the case that I know    03:18PM

                                                              224

1    of.

2        Q.    So if you and your father recover in this

3    case, you're not going to be obligated to give a

4    portion of that recovery to any third party?  Again,

5    I'm not talking about counsel.                        03:18PM

6            MR. FINLEY:  Objection.  To the extent

7    that that invades the attorney-client privilege or

8    discussions you've had with the attorneys in this

9    case, I would instruct you not to answer the

10   question.                                             03:19PM

11   BY MR. PURCELL:

12       Q.    And I'm not asking about anything having

13   to do with your counsel, so you can put counsel to

14   one side.

15           MR. FINLEY:  Any lawyer.                      03:19PM

16           MR. PURCELL:  That's fair.

17   BY MR. PURCELL:

18       Q.    Any lawyer -- any lawyer representing you

19   in this case.

20           Is there any third party that you and your   03:19PM

21   father will be obligated to give a portion of the

22   recovery, if there is one, to at the end of this

23   case?

24           MR. FINLEY:  A third party outside of the

25   parties that are involved in this case.  Some third   03:19PM

                                                           225

1    party.  Not the lawyers, not any of the interests in

2    the case; some other third party.

3              THE WITNESS:  No, I don't believe there

4    is.

5              MR. PURCELL:  All right.  I have nothing          03:19PM

6    further, subject to potential litigation over

7    questions where the witness was instructed not to

8    answer and reasonable follow-up, et cetera,

9    et cetera, if we decide to pursue that.

10             MR. FINLEY:  I don't believe that there           03:20PM

11   was any questions that I instructed the witness not

12   to answer that you didn't follow up.

13             MR. PURCELL:  I think there was early in

14   the morning.  But in any event --

15             MR. FINLEY:  Well, let's clear it up now.         03:20PM

16   Why don't we go back and --

17             MR. PURCELL:  No.  We'll figure it out

18   from the transcript.

19             MR. FINLEY:  Well, I don't want to -- I

20   may just allow you to ask him.  So why don't we            03:20PM

21   clean it up now.

22             MR. PURCELL:  We'll figure it out from the

23   transcript.

24             MR. FINLEY:  I'm not going to figure it

25   out from the transcript because I don't want to go         03:20PM
                                                                    226

1    through the cost and expense if I'm going to allow

2    him to answer.  I don't believe I did.

3         Could you check the transcript earlier to

4    see if there's any place he was instructed not to

5    answer.  I don't believe there was.

6         DEPOSITION REPORTER:  Okay.  I need to go

7    off the record if we're going to do that.

8         MR. FINLEY:  That's okay.  I just -- I

9    don't want to have to come back.  I'm more than

10   willing to do it right now if there is some area        03:20PM

11   that I'm mistaken on.

12        THE WITNESS:  And plus we're four hours

13   away.

14        THE VIDEOGRAPHER:  The time is 3:20 p.m.

15   and we are off the record.                              03:20PM

16        (Off the record.)

17        THE VIDEOGRAPHER:  The time is 3:23 p.m.

18   and we are on the record.

19        Please proceed.

20        MR. PURCELL:  Having conferred with          03:23PM

21   opposing counsel off the record regarding the

22   instructions not to answer, we reserve our right to

23   pursue a further deposition.

24        And with that, I will turn the floor over

25   to Mr. Allen and thank Mr. Berger for his time.     03:23PM
                                                            227

1          MR. FINLEY:  All right.  Outside of that,

2    you're closing the deposition with regard to this

3    witness?

4          MR. PURCELL:  For this phase of the case,

5    yes.                                                03:23PM

6          MR. FINLEY:  All right.

7          MR. PURCELL:  Subject to follow-up on

8    Mr. Allen's questions or any redirect that you might

9    have.

10         MR. FINLEY:  Okay.                            03:24PM

11         MR. ALLEN:  Gentleman, do you want to

12   proceed now?

13         MR. FINLEY:  With this witness?

14         MR. PURCELL:  Yes.

15         MR. FINLEY:  Do you want to take a quick

16   break before we go on, or are you okay?

17         MR. ALLEN:  You want to take a break?  I

18   think it would be a good time to take a break.

19         THE WITNESS:  Okay.  Maybe if I could just

20   walk.                                               03:24PM

21         THE VIDEOGRAPHER:  The time is 3:24 p.m.

22   and we are off the record.

23         (Off the record.)

24         THE VIDEOGRAPHER:  The time is 3:34 p.m.

25   and we are back on the record.                      03:34PM
                                                             228

1      Q.    When you put your signature there, what

2   did you understand you were agreeing to, if

3   anything?

4            MR. FINLEY:  Objection.  Lacks foundation.

5            THE WITNESS:  I understood that this          03:44PM

6   agreement still stood.

7   BY MR. ALLEN:

8      Q.    Now, you see that in the second paragraph

9   after the phrase that I read, it says,

10  "Notwithstanding the fact that a petition for writ     03:44PM

11  of certiori is pending in the United States Supreme

12  Court."

13           So this letter was written after the

14  appeal was lost; correct?

15           MR. FINLEY:  I'm sorry.  Lacks foundation.    03:45PM

16  It's vague.

17           THE WITNESS:  This letter looks like it

18  was written on May 14th; correct?

19  BY MR. ALLEN:

20     Q.    Yes.                                          03:45PM

21     A.    Yeah.  And then you're asking if this

22  letter was written after the --

23     Q.    Actually, I'm trying to get to --

24     A.    -- appeal was lost?

25     Q.    Yes.  I'm trying to get to a foundational     03:45PM

                                                            237

1    issue to refresh your recollection.

2        A.    Okay.

3        Q.    You look at the date of May 14th.  You

4    look at my reference that there is a petition for

5    writ of certiori in the United States Supreme Court      03:45PM

6    which would follow the Federal Circuit Court of

7    Appeals appeal decision.  So we're clear on the

8    timing here.

9            At the time this letter had been written,

10   the Bergers had already lost the federal Circuit        03:45PM

11   Court of Appeal case against Rossignol?

12           MR. FINLEY:  Objection.  Lacks foundation.

13   Vague.

14           THE WITNESS:  That's what it looks like,

15   yeah.                                                    03:46PM

16   BY MR. ALLEN:

17       Q.    Okay.  And so the intent of the letter

18   appears to declare a termination to any rights that

19   Mister -- let me finish the question -- Mr. Branton

20   had in the case.  The handwriting appears to            03:46PM

21   reaffirm those rights.

22           Is that your understanding of what your

23   signature at the bottom is supposed to do?

24           MR. FINLEY:  I'm going to object to that

25   question.  This letter was written by you.  And this    03:46PM

238

1   witness can't testify as to what the intent of your

2   letter was; only you can. And you've already asked

3   him about the signature at the bottom. So I'm not

4   sure that he can answer that question as phrased.

5          MR. ALLEN: As you asked my indulgence,          03:46PM

6   I'm going to ask for yours. Please don't give an

7   explanation of your objection unless you ask my

8   permission first. I understand the question may be

9   difficult, but Brant can speak for himself and say,

10  "I don't really understand the question" or "No,      03:47PM

11  that wasn't what I was thinking."

12  BY MR. ALLEN:

13     Q.   I just want you to describe, with the

14  understanding of the foundations that we've gone

15  through, what did you understand was actually going   03:47PM

16  to happen here when you signed that at the bottom?

17         MR. FINLEY: Objection. Lack of

18  foundation as to what was going to happen here.

19         But if you understand the question, I'll

20  let you go ahead.                                      03:47PM

21         THE WITNESS: John Branton raised money

22  for the case. That money looks like it was being

23  released. There was an agreement with John Branton,

24  and it looks like that agreement still stood. That

25  was the purpose of that signature. And John Branton   03:48PM

                                                               239

1    and Richard Berger agreement still stands.

2    BY MR. ALLEN:

3        Q.    Did you know whether John Branton had

4    refused to fund the Supreme Court petition?

5             MR. FINLEY:  Lacks foundation.                03:48PM

6             THE WITNESS:  Refused to -- I'm sorry?

7    BY MR. ALLEN:

8        Q.    Did you know whether or not Mr. Branton

9    had refused to fund the Supreme Court petition?

10            MR. FINLEY:  Same objection.                  03:49PM

11            THE WITNESS:  I'm not sure if I knew that

12   or not.

13   BY MR. ALLEN:

14       Q.    Okay.  Fair enough.

15       A.    I'm not sure.                                03:49PM

16       Q.    My question to you about this is:  Why, if

17   the case was essentially over with, would you agree

18   to reaffirm the contract with Mr. Branton?

19            He's getting his money back.  Why would

20   you reaffirm that?                                     03:50PM

21            MR. FINLEY:  Objection.  Lacks foundation.

22   Assumes facts not in evidence.  Vague.

23            THE WITNESS:  I'm not so sure that we felt

24   anything was over with --

25   BY MR. ALLEN:                                          03:50PM

                                                           240

1        Q.    Okay.

2        A.    -- at this time.

3        Q.    Anything else that you want to add to

4    that?

5        A.    No.                                            03:50PM

6        Q.    Okay.  Looking at Exhibit 9 and 10 of your

7    father's deposition of yesterday.  You'll see two

8    versions of an engagement memorandum, both dated

9    March 9, 2005, on the last page of which you'll

10   observe what you've identified as your signature, I   03:51PM

11   believe, on both of them.  Is that correct?  Is that

12   your signature on page 5 of both of those exhibits?

13              MR. FINLEY:  I believe that lacks

14   foundation as to one of the exhibits, but you can

15   lay it.                                                03:51PM

16              THE WITNESS:  Yeah.  It's the same

17   signature page.

18   BY MR. ALLEN:

19       Q.    Okay.  Do you recall attending a meeting

20   in my office where the signatures were affixed to    03:51PM

21   these documents?

22              MR. FINLEY:  "Affixed," you mean signed?

23   Executed?

24   BY MR. ALLEN:

25       Q.    Executed is fine.                            03:51PM

                                                              241

CERTIFICATE OF REPORTER

1

2

3           I, JANIS L. JENNINGS, a Certified Shorthand

4    Reporter of the State of California, do hereby certify:

5           That the foregoing proceedings were taken

6    before me at the time and place herein set forth; that

7    any witnesses in the foregoing proceedings, prior to

8    testifying, were placed under oath; that a verbatim

9    record of the proceedings was made by me using machine

10   shorthand which was thereafter transcribed under my

11   direction; further, that the foregoing is an accurate

12   transcription thereof.

13          I further certify that I am neither

14   financially interested in the action nor a relative or

15   employee of any attorney of any of the parties.

16          IN WITNESS WHEREOF, I have this date

17   subscribed my name.

18

19   Dated:  May 23, 2008

20

21   _____

22   JANIS JENNINGS

23   CSR NO. 3942

24

25