# EXHIBIT D

**The attached excerpts from the deposition of Plaintiff Richard Berger are most of the excerpts that were presented to Judge White in connection with his July 10, 2008 Order.  (See Document 90-2.)**

1          IN THE UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4                         **Certified Copy**

5  --------------------------------

6  RICHARD W. BERGER and BRANT    )

7  W. BERGER,                   )

8        Plaintiffs,      )

9     vs.                 ) No. C07-05279-JSW

10  SEYFARTH SHAW, LLP, an Illinois  ) VOLUME I

11  limited liability partner; JACK  )

12  L. SLOBODIN, an individual;    )

13  BURNETT, BURNETT & ALLEN, a    )

14  California partnership; DOUGLAS  )

15  B. ALLEN, an individual, and    )

16  DOES 1-100, inclusive,       )

17        Defendants.      )

18  --------------------------------

19

20

21    VIDEOTAPED DEPOSITION OF RICHARD W. BERGER

22          MONDAY, MAY 12, 2008

23

24

25  PAGES 1 - 331

                                                    1

1    Q.    Then what?

2    A.    I went into the restaurant business.

3    Q.    Then what?

4    A.    I think -- I then went into Berger

5  Enterprises with my son.  I started Berger    09:32AM

6  Enterprises and then a company after that called

7  Brandgo Incorporated.

8    Q.    Any others?

9    A.    Not that I could think of right now.

10    Q.    How are you currently employed?    09:32AM

11    A.    I'm not.

12    Q.    Are you unemployed at the present time?

13    A.    I'm basically retired.

14    Q.    How long have you been retired?

15    A.    Since 2003.    09:32AM

16    Q.    What's your date of birth?

17    A.    March 6th, '39.

18    Q.    You've listed Continental Art Products,

19  real estate development, restaurant business, Berger

20  Enterprises and Brandgo.    09:33AM

21         Are there any other companies or projects

22  you've been involved with in business for yourself

23  since '69 or '70?

24    A.    I can't think of any.

25    Q.    Okay.  Let's go back to the first,    09:33AM

                                                          15

1    Continental Art Products.  During what period of

2    time were you involved in that business?

3         A.    For about two years.

4         Q.    So, say, approximately '70 to '72?

5         A.    Yes.                                              09:33AM

6         Q.    What was that business?

7         A.    It was a manufacturing company and -- for

8    art.

9         Q.    What did you manufacture?

10        A.    Wooden frames.                                   09:33AM

11        Q.    Where was it located?

12        A.    Santa Clara on Scott Boulevard.

13        Q.    Did you have any partners in that

14   business?

15        A.    No.                                              09:34AM

16        Q.    Did you -- withdrawn.

17              Did it require capital to start the

18   business?

19        A.    Did I what?

20        Q.    Did it require capital, money, to start         09:34AM

21   the business?

22        A.    Well, yeah.

23        Q.    Where did you get the money to start the

24   business?

25              MR. HANSEN:  Objection.  In terms of how        09:34AM

                                                                  16

1    these prior businesses were funded, I mean I'm

2    giving you leeway in terms of just having some

3    background information, but I think we should stick

4    to the discovery categories that we stipulated to.

5    How his prior ventures were funded I don't think has      09:34AM

6    anything to do with that.

7              MR. PETERS:  You may answer.

8              MR. HANSEN:  No, you may not.

9         I'm going to instruct him not to answer.

10             MR. PETERS:  You're going to instruct him      09:34AM

11    not to answer?

12             MR. HANSEN:  Yeah, I am.

13             MR. PETERS:  Is that instruction based in

14    any way on privilege?

15             MR. HANSEN:  No.  It's -- well, it is          09:34AM

16    based on financial privacy, but it's primarily based

17    on the stipulation between the parties as to the

18    scope of discovery.

19             MR. PETERS:  Well, the stipulation between

20    the parties has to do with that we'd separate out       09:34AM

21    the patent issues and do the representational issues

22    first.

23             MR. HANSEN:  Correct.

24             MR. PETERS:  And this is his first

25    deposition.  I'm entitled to go into his background.    09:34AM

                                                                17

1          MR. HANSEN:  Right.

2          MR. PETERS:  If you think you're entitled

3     to instruct him not to answer basically based on

4     relevance grounds about his background in this case

5     when his credibility is going to be an issue, then          09:35AM

6     we're going to end up in court about it.

7          MR. HANSEN:  Okay.

8          MR. PETERS:  It's not based on privilege.

9     It's a completely improper instruction.  If you want

10    to give it, I can't stop you.          09:35AM

11    BY MR. PETERS:

12         Q.    Are you going to follow his instruction

13    not to answer?

14         MR. HANSEN:  It's based on financial

15    privacy as privilege, but it's also based on the          09:35AM

16    stipulated scope of discovery.  So, yeah, I'm going

17    to instruct him not to answer.

18         MR. ALLEN:  I would contest your

19    stipulated scope of discovery.  I know of no

20    restriction on discovery other than the patent          09:35AM

21    issues are reserved.

22         MR. PETERS:  That's right.  But we're not

23    going to argue with him.  He's instructed the

24    witness not to answer.  It's completely improper.

25    We'll just end up taking it up with the court and          09:35AM

18

1    seeking sanctions if we decide we want to.

2    BY MR. PETERS:

3        Q.    What happened to Continental Art Products?

4    What happened to the business?

5        A.    I sold it.                                    09:35AM

6        Q.    To whom?

7        A.    Pardon?

8        Q.    To whom?

9        A.    It was three individuals that had a -- I

10   believe it was an LLC.  I can't even remember their    09:36AM

11   names or the name of their enterprise.

12       Q.    Okay.  Well, after that, what did you do?

13       A.    I took my family to Mexico for a period of

14   time.

15       Q.    How long were you in Mexico?               09:36AM

16       A.    About six months.

17       Q.    What did you do after that?

18       A.    When I came back, I moved to Morgan Hill.

19       Q.    How about employment-wise, what did you do

20   after that?                                            09:36AM

21       A.    I purchased six and a half acres of

22   property, subdivided it, was building a restaurant,

23   planned a 40-unit bowling alley behind it.  About

24   '76 I bought a cocktail lounge.

25       Q.    Did you use the proceeds of the sale of     09:37AM
                                                            19

1      A.    The provisional patent was done by a

2  patent attorney in Colorado, which I can't remember

3  his name.  We then had an attorney in Aptos.  And we

4  finally went to Fish & Richardson and had Reg Suyat

5  handle the patent.                                    10:07AM

6      Q.    Now, you worked at Berger Enterprises

7  during what period of time?

8      A.    Again, I become hazy on the year we

9  incorporated, but I worked there from the time we

10  incorporated on.                                     10:08AM

11      Q.    Until when?

12      A.    It seems like it's never stopped.

13      Q.    Through the present time, are you still

14  working --

15      A.    Yes.  Yes.                                 10:08AM

16      Q.    You're still working for Berger

17  Enterprises?

18      A.    Working for them.  Working with Berger

19  Enterprises.

20      Q.    Do you still own stock in Berger          10:08AM

21  Enterprises?

22      A.    Yes.

23      Q.    Does Berger Enterprises have any interest

24  in this litigation?

25            MR. HANSEN:  Object to the extent it calls 10:08AM

                                                              43

1    for a legal conclusion.

2    BY MR. PETERS:

3        Q.    You may answer.

4        A.    That's something I'm going through an

5    attorney on.                                    10:08AM

6        Q.    Well, tell me what your understanding is.

7        A.    Of what?

8        Q.    Of whether Berger Enterprises has any

9    interest in this litigation.

10       A.    I think that's between my attorney and    10:09AM

11   myself, the corporate attorney.

12       Q.    Well, I'm not asking you for any

13   communications between you and your attorney.  I'm

14   asking for your understanding of whether Berger

15   Enterprises has any interest in this litigation?    10:09AM

16       A.    There is no conclusion to that right now.

17       Q.    You and your son are the plaintiffs in

18   this litigation.

19       A.    Yes.

20       Q.    Does anyone else, including any entity,    10:09AM

21   have any economic interest in this litigation?

22       A.    That's --

23            MR. HANSEN:  Just object to the extent it

24   calls for attorney-client communications and to the

25   extent it calls for information that's protected by    10:09AM
                                                           44

1  the financial right to privacy.  It also is outside

2  the scope of the stipulated discovery under the CMC

3  statement.

4          I know you characterized that statement as

5  essentially allowing anything other than issues        10:09AM

6  pertaining to the patent, but I don't think that's a

7  fair characterization of that.  We sat down and

8  identified issues that we believe are relevant in

9  this case and carved out eight issues that we're

10  going to allow discovery to proceed on.  And issues     10:10AM

11  as to who has an interest in this litigation fall

12  outside of those categories.

13          And I would instruct him not to answer on

14  all those grounds.

15          MR. PETERS:  So you're instructing him not     10:10AM

16  to answer?

17          MR. HANSEN:  Yes, I am.

18          MR. PETERS:  And I'll tell you, sir, that

19  who has an economic interest in this litigation is

20  directly relevant to issues of representation          10:10AM

21  because there's very strict rules in this state

22  about who can assert a claim for attorney

23  malpractice and who can benefit by it.

24          So I'm going to keep asking those

25  questions.  And if you instruct him not to answer,     10:10AM
                                                            45

1    we're going to go to court and we're going to seek

2    sanctions against you and your client.

3          MR. HANSEN:  Well, I'm happy to meet and

4    confer with you on that.  But I --

5          MR. PETERS:  We've met and conferred.  I'm    10:10AM

6    here to ask questions, not argue with you.

7          MR. HANSEN:  Okay.

8    BY MR. PETERS:

9      Q.    Does Mr. Branton have any economic

10   interest in this litigation?                          10:10AM

11         MR. HANSEN:  Same objections.  Same

12   instruction.

13   BY MR. PETERS:

14     Q.    Has Mr. Branton ever claimed to you that

15   he has an economic interest in this litigation?       10:11AM

16         MR. HANSEN:  Same objections.  Same

17   instruction.

18   BY MR. PETERS:

19     Q.    Have you ever had a conversation, just you

20   and Mr. Branton, without any lawyers present, about   10:11AM

21   whether or not he has an economic interest in this

22   litigation?

23         MR. HANSEN:  Same objections.  Same

24   instruction.

25         MR. PETERS:  Well, you can't instruct him     10:11AM

                                                          46

1   not to answer based on privilege when it's a

2   conversation between him and Branton.

3          MR. HANSEN:  I can instruct him to follow

4   the agreement that the parties reached as to

5   discovery.                                    10:11AM

6          You know, we talked about whether an

7   attorney-client relationship exists between

8   plaintiffs and Slobodin and Seyfarth.  You can go

9   through these item by item.  But whether John

10  Branton has an interest in the outcome of this   10:11AM

11  litigation has no bearing on any of this subject

12  matter.

13         MR. PETERS:  You're absolutely wrong.  And

14  the rationale for the agreement that I negotiated

15  with your partner or the named partner in the law  10:11AM

16  firm where you work was that we would separate out

17  the patent issues because they would be complicated,

18  and that we would deal with issues relating to

19  representation first.  And I consider all of these

20  questions to be relating to representation because  10:12AM

21  people who never had an attorney-client relationship

22  with someone can't sue them for malpractice.  They

23  can't.

24         And so what you're doing is completely

25  improper.  It's inconsistent with the spirit of the  10:12AM

                                                        47

1    deposition agreement.  It's not permitted by the

2    federal rules.  But, you know, I can't stop you from

3    violating the law, so just go ahead.

4           MR. HANSEN:  I can tell you I hammered

5    this out with Klaus Hamm from your office, and we          10:12AM

6    identified 20 issues that are pertinent in this

7    case, and we agreed that discovery would proceed on

8    issues 1 through 6 and 10 and 11.  So whatever you

9    felt was the spirit of the agreement, to the extent

10   that conflicts with how that agreement was            10:12AM

11   memorialized ultimately and submitted with the court

12   is irrelevant.

13          MR. PETERS:  Okay.  Can I see the document

14   that you're --

15          MR. HANSEN:  I have my highlighted copy.     10:12AM

16          MR. PETERS:  I'm sure it's got trade

17   secrets in it, so I --

18          MR. HANSEN:  Well, you know what, it's got

19   my highlights on it.

20          MR. PETERS:  That's all right.  I don't       10:12AM

21   want to interfere with the work product doctrine, so

22   I'll just keep asking questions.

23   BY MR. PETERS:

24       Q.    Have you ever -- have any of Mr. Branton's

25   investors in Berger Enterprises ever claimed, to      10:13AM
                                                                48

1    your knowledge, that they have an economic interest

2    in this litigation?

3          MR. HANSEN:  Mr. Peters, I'm going to

4    instruct this witness not to answer any questions as

5    to whether anyone other than Richard Berger and          10:13AM

6    Brant Berger have an interest in the outcome of this

7    litigation on the grounds that it falls outside of

8    the stipulated scope of discovery.

9          So to the extent you make any further

10   questions, they will all be followed by an          10:13AM

11   instruction not to answer.

12   BY MR. PETERS:

13       Q.    Did there come a time that you performed

14   work for any other entity after 1990 besides Berger

15   Enterprises?          10:13AM

16       A.    As I stated earlier, we started Brandgo

17   Incorporated.

18       Q.    When did you do that?

19       A.    Again, I'm foggy on the dates because I

20   have to go back to the time we incorporated Berger          10:14AM

21   Enterprises.

22       Q.    Can you give us your best estimate?

23       A.    I've drawn a blank, to be truthful.

24       Q.    Okay.  What business is Brandgo in?

25       A.    It's an Internet company.          10:14AM
                                                              49

1     Q.    On how many occasions?

2     A.    Two, maybe three.

3     Q.    What have you and Mr. Branton discussed

4  about Berger Enterprises?

5           MR. HANSEN:  Okay.  So then we're going to    03:03PM

6  go into the same objections.  We're objecting to

7  conversations pertaining to anything having to do

8  with the outcome of this litigation.  And interest

9  in the outcome of this litigation is attorney-client

10  privileged and getting into financial right to    03:03PM

11  privacy and being outside the stipulated scope of

12  discovery.  And to the extent that question calls

13  for such information, I would instruct the witness

14  not to answer.

15          MR. PETERS:  It is a completely improper    03:03PM

16  speech to give.

17          MR. HANSEN:  They're objections.

18  BY MR. PETERS:

19     Q.    The question is:  What have you and

20  Mr. Branton discussed about Berger Enterprises?  A    03:03PM

21  question to which there can't possibly be a

22  legitimate attorney-client privilege objection.  You

23  may answer the question.

24     A.    We spoke about reviving Berger

25  Enterprises.                                         03:03PM
                                                           203

1      Q.    What did you say to him and what did he

2  say to you on that subject?

3            MR. HANSEN:  I'm going to instruct you not

4  to answer that.

5            THE WITNESS:  All right.                    03:04PM

6            MR. PETERS:  And the basis for the

7  instruction?

8            MR. HANSEN:  I stated the basis.

9  BY MR. PETERS:

10     Q.    In August of 2005, did you participate in   03:04PM

11 any meetings about raising money to fund the

12 litigation?

13     A.    I could have.  You mean with John Branton

14 or others or --

15     Q.    Right.                                       03:04PM

16     A.    Which one?

17     Q.    Well, with anybody.

18     A.    It would have been with John Branton if I

19 did.

20     Q.    What do you recall about those              03:04PM

21 discussions?

22     A.    On that date, I don't.

23     Q.    Well, how about any time between June of

24 '05 and the end of '05, did you meet with John

25 Branton to discuss raising money for the litigation?  03:05PM
                                                          204

1    A.    Yes.

2    Q.    On how many occasions?

3    A.    Several.

4    Q.    Meaning more than five?

5    A.    More than two.                                    03:05PM

6    Q.    Was anyone else present during those

7    conversations?

8    A.    At one meeting it was Fred DeKlotz and

9    Doug Allen and John Branton and myself.

10    Q.    Where did that meeting take place?          03:05PM

11    A.    At Fred DeKlotz's office.

12    Q.    How long did it last?

13    A.    45 minutes to two and a half hours.  I'm

14    not sure.

15    Q.    Okay.  What do you recall being said?       03:05PM

16    A.    I recall Fred DeKlotz stating a higher

17    percentage, and it would represent all of the

18    shareholders of Berger Enterprises.  That was his

19    proposal.

20    Q.    Can you explain what you mean by that?      03:06PM

21    A.    Just what I said.  The higher percentage

22    would go to represent the corporation, the monies to

23    be given to the shareholders as well as the

24    investors.

25    Q.    Is it a fair statement that one of the      03:06PM
                                                          205

1    things that you were discussing in this meeting and

2    in your other conversations was what the --

3    Mr. Branton and the shareholders of Berger

4    Enterprises would receive in exchange for putting up

5    cash to fund the litigation?                                03:06PM

6         A.    Partly.

7         Q.    That was discussed, though?

8         A.    Yes.

9         Q.    What else was discussed?

10        A.    That was the discussion, and this would      03:06PM

11   represent all of the shareholders in the corporation

12   with a higher percentage.  John Branton and Fred

13   DeKlotz were concerned about conflict of interest.

14   He was the chief financial officer, and these were

15   his clients that put the money in.                          03:07PM

16        Q.    What was the concern about conflict of

17   interest?

18        A.    You would have to ask Fred DeKlotz.

19        Q.    Did he or Mr. Branton ever express it to

20   you in any meeting?                                         03:07PM

21        A.    No.

22        Q.    Did there come a time in 2005 when those

23   discussions reached any kind of a conclusion?

24        A.    Those discussions did not.

25        Q.    Did there come a time in 2006 when those     03:07PM
                                                                  206

1    discussions reached any kind of conclusion?

2       A.    Those discussions did not.

3       Q.    Did they ever reach a conclusion?

4       A.    No.

5       Q.    Are you still to this day participating in    03:08PM

6    discussions about those same topics with Mr. Branton

7    relating to this litigation, the one that brings us

8    here today?

9              MR. HANSEN:  Same objections as before and

10   same instruction as to current discussions.    03:08PM

11             MR. PETERS:  So you're instructing the

12   witness not to answer that question?

13             MR. HANSEN:  Yes, I am.

14             (Whereupon, Defendant's Exhibit 13 was

15             marked for identification.)    03:08PM

16   BY MR. PETERS:

17      Q.    Exhibit 13 is a letter from Mr. DeKlotz to

18   Mr. Allen, Bates stamped BERGER14276 and 77.  It's

19   dated September 23rd, 2005.  Have you ever seen this

20   document before?    03:08PM

21      A.    I don't recall.

22      Q.    Was it Mr. Allen's practice, as far as you

23   knew, to share with you copies of correspondence

24   between him and Mr. DeKlotz relating to the issues

25   that you've been testifying about?    03:09PM
                                                  207

1     A.     Sometimes.  Other times he would simply

2  inform me.  We'd have discussions pertaining to it.

3     Q.    This document was produced from your

4  files, though.  I'm representing to you that Berger

5  stamp number on the bottom means it came out of your    03:09PM

6  files somehow.  Does that refresh your recollection

7  as to whether you've seen this document before?

8     A.    No.  No.

9     Q.    Mr. DeKlotz writes in the fourth paragraph

10  on the first page, "It is also my understanding from    03:09PM

11  talking with Mr. Branton that you have proposed that

12  Jack L. Slobodin and/or Seyfarth Shaw, LLP, be

13  joined as pro-counsel with you for Plaintiff in

14  those proceedings, subject to the consent thereto by

15  those lawyers."    03:10PM

16       My question for you is:  Did you

17  understand as of September 23rd, 2005 that

18  Mr. Slobodin and Seyfarth Shaw's joining the case

19  was subject to their consent?

20     A.    Where is this on the document?    03:10PM

21     Q.    I'm sorry.  The fourth paragraph, first

22  page, middle of the paragraph.

23     A.    Okay.

24     Q.    Just go ahead and take a second to read

25  that to yourself.    03:10PM

        208

1     A.    Could you ask me the question again.

2     Q.    Do you understand as of September 23rd,

3   2005, that Mr. Slobodin and Seyfarth Shaw's joining

4   the case was subject to their consent to do so?

5        MR. HANSEN:  Objection.  Vague.  Lacks    03:10PM

6   foundation.

7        THE WITNESS:  No.

8   BY MR. PETERS:

9     Q.    So you do not agree with that statement --

10       MR. HANSEN:  Objection --           03:11PM

11  BY MR. PETERS:

12    Q.    -- of Mr. DeKlotz?

13       MR. HANSEN:  Objection.  Mischaracterizes

14  the document.  The document speaks for itself.

15       THE WITNESS:  No, I do not.  And I have no  03:11PM

16  idea where he would get that information.

17  BY MR. PETERS:

18    Q.    Did he get it from you?

19    A.    No.

20    Q.    Did he get it from Mr. Branton?     03:11PM

21    A.    I don't know.  He's drawing a conclusion

22  that is wrong.  I am sure he did not talk to Jack

23  Slobodin.

24    Q.    Do you consider Mr. Branton a friend?

25    A.    Yes.                        03:11PM
                                                                    209

1    Q.    Do you have any financial dealings with

2  Mr. Branton at the present time?

3         MR. HANSEN:  Objection.  Calls -- this is

4  going back to the same area that we keep going over

5  and over and over again, Counsel.                    03:12PM

6         MR. PETERS:  Well, we're not, actually.  I

7  just asked him whether he and Mr. Branton have a

8  financial relationship.

9         MR. HANSEN:  Whether they have a financial

10 relationship --                                       03:12PM

11        MR. PETERS:  It's unanswerable?  You don't

12 think a person can answer whether they have a

13 financial relationship with someone?

14        MR. HANSEN:  I think that to the extent it

15 goes into matters that we've already covered and     03:12PM

16 that we have a standing objection to --

17        MR. PETERS:  You don't have a standing

18 objection to anything.

19        MR. HANSEN:  Okay.  Well --

20        MR. PETERS:  You've instructed him not to     03:12PM

21 answer a lot of questions, but that doesn't give you

22 a standing objection.

23        MR. HANSEN:  Well, I have repeatedly

24 objected to various lines of questions targeted,

25 directly and indirectly, as the same information     03:12PM
                                                        210

1    which I have objected to repeatedly, and I have

2    repeatedly instructed the witness not to answer.  We

3    have a disagreement on that, but I'd appreciate it

4    if you would respect the objection.  To the extent

5    you want to file a motion, that is your prerogative.    03:12PM

6    But questions pertaining to discussions between this

7    witness and John Branton as to any financial

8    interests in the outcome of this litigation I'm

9    objecting to on the grounds previously stated and

10   instructing him not to answer.                          03:13PM

11           If he can answer that question without

12   going into those matters -- frankly, I don't see any

13   way around it.  I don't see this has anything to do

14   with the stipulated scope of discovery, and I think

15   it also goes into my client's financial right to       03:13PM

16   privacy.  So I'm going to, on those grounds,

17   instruct him not to answer.

18   BY MR. PETERS:

19       Q.   Putting aside any interest that

20   Mr. Branton may have or claim to have in this           03:13PM

21   litigation, do you have any financial relationship

22   with Mr. Branton at the present time?

23           MR. HANSEN:  Same objection.  Same

24   instruction not to answer.

25           (Whereupon, Defendant's Exhibit 14 was          03:14PM
                                                                  211

1                    marked for identification.)

2    BY MR. PETERS:

3        Q.      Exhibit 14 is a letter from Mr. Allen to

4    you dated October 25th, 2005.  Do you recall

5    receiving this letter?                              03:14PM

6        A.      I'm sure I did.  It was addressed to me.

7        Q.      And it says, "Enclosed is the 'Answer,

8    Affirmative Defenses and Counterclaims of Rossignol

9    Ski Company, Inc.'  Doug wants you to call him

10   immediately to set up an appointment so you can go   03:15PM

11   over the case and also talk about raising the money

12   to allow Doug to go forward with the above case."

13           Do you recall after October 25th, 2005

14   having a conversation with Mr. Allen about raising

15   the money to allow him to go forward with the case?  03:15PM

16       A.      I know we had conversations pertaining to

17   this, and it was at the time we had to get money in.

18       Q.      What do you recall saying to Mr. Allen and

19   what do you recall him saying to you on that

20   subject?                                             03:15PM

21       A.      What I recall is a letter being sent to

22   me -- emailed to me and John Branton saying he

23   couldn't proceed unless he received the money that

24   was committed.  And as much as he was our friend, he

25   would have to drop the case.                         03:15PM
                                                         212

CERTIFICATE OF REPORTER

I, JANIS L. JENNINGS, a Certified Shorthand
Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken
before me as the time and place herein set forth; that
any witnesses in the foregoing proceedings, prior to
testifying, were placed under oath; that a verbatim
record of the proceedings was made by me using machine
shorthand which was thereafter transcribed under my
direction; further, that the foregoing is an accurate
transcription thereof.

I further certify that I am neither
financially interested in the action nor a relative or
employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date
subscribed my name.

Dated:  May 20, 2008.


JANIS JENNINGS
CSR NO. 3942