1  Justin T. Beck, Esq. (Cal. Bar No. 53138)
2  Ron C. Finley, Esq. (Cal. Bar No. 200549)
   Alfredo A. Bismonte, Esq. (Cal. Bar No. 136154)
3  Craig Alan Hansen, Esq. (Cal. Bar No. 209622)
   Beck, Ross, Bismonte & Finley, LLP
4  50 West San Fernando Street, Suite 1300
   San Jose, CA 95113
5  Tel: (408) 938-7900
   Fax: (408) 938-0790
6  Email: jbeck@beckross.com
           rfinley@beckross.com
7          abismonte@beckross.com
           chansen@beckross.com
8
   Attorneys for Plaintiffs
9  Richard W. Berger and Brant W. Berger

10                 **UNITED STATES DISTRICT COURT**

11                **NORTHERN DISTRICT OF CALIFORNIA**

12  RICHARD W. BERGER and BRANT W.          Case No. C 07-05279 JSW
    BERGER,
13                                          **DECLARATION OF CRAIG HANSEN IN**
                    Plaintiffs,             **OPPOSITION TO DEFENDANTS**
14                                          **SEYFARTH SHAW LLP'S AND JACK**
           v.                               **SLOBODIN'S MOTION FOR SANCTIONS**
15
    SEYFARTH SHAW LLP, an Illinois limited  **Date:    November 7, 2008**
16  liability partnership; JACK L. SLOBODIN, **Time:    9:00 a.m.**
    an individual; BURNETT, BURNETT, &      **Place:   Courtroom 2, 17th Floor**
17  ALLEN, a California partnership;        **Judge:   Hon. Jeffrey S. White**
    DOUGLAS B. ALLEN, an individual;
18  and DOES 1-100, inclusive;
19                  Defendants.
20  AND RELATED COUNTERCLAIMS
21
22         I, Craig Hansen, declare:
23         1.      I an attorney with the law firm of Beck, Ross, Bismonte & Finley, LLP, counsel of
24  record for plaintiffs Richard W. Berger and Brant W. Berger.  I have personal knowledge of the
25  matters stated in this declaration and, if called as a witness, would competently testify to them.
26         2.      Seyfarth's motion relates to a July 10, 2008 discovery order requiring plaintiffs to
27  "pay the costs of the depositions … (transcript and court reporter costs, not attorneys' fees)" for
28  the depositions of plaintiffs Richard Berger and Brant Berger.  At the time that order was entered,

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

neither the Court nor plaintiffs had any information about what "costs of the depositions" Seyfarth had paid or was seeking.

3.      Seyfarth later sent plaintiffs invoices for the two depositions which included transcript costs of $3,232.65 ($1,762.20+$1,470) plus exhibit costs of $164.45 ($139.75+$24.70), for a total of $3,397.10.  Out of an abundance of caution, plaintiffs also agreed to pay Seyfarth's "Video Services" fees of $2,931.25 ($1,618.75+$1,312.5), as those fees are defined as "Deposition Costs" under Civil Local Rule 54-3(c).  Accordingly, plaintiffs paid Seyfarth $6,328.05.

4.      Plaintiffs filed this action in state court on September 12, 2007.  It was later removed to this court on October 17, 2007.

5.      Because Seyfarth insisted it would not engage in meaningful settlement discussions until the Court ruled on its defense that it had no attorney-client relationship with plaintiffs when the alleged malpractice occurred, plaintiffs agreed during the Rule 26(f) conference to conduct discovery in two separate phases – the *first phase* focusing on *when* an attorney-client relationship had existed between plaintiffs and defendants, and the *second phase* focusing on the remaining issues in this case.  Under that agreement, the parties agreed to limit the *first phase* depositions to the attorney-client relationship issue only so that Seyfarth could promptly file a summary judgment motion.  The parties further agreed that they could take a second round of depositions on the remaining issues during the *second phase* of discovery.  The parties memorialized that agreement in a Joint Case Management Conference statement filed on February 29, 2008.

6.      When the parties filed their Joint CMC Statement, they anticipated that the Court would adopt their proposed discovery plan *before* plaintiffs' depositions were taken.  But the Court unexpectedly continued the initial CMC to a date beyond the plaintiffs' scheduled depositions.  In order to resolve that timing issue, the parties agreed to conduct the depositions in accordance with the Joint CMC Statement—regardless of whether it had been adopted as an order of the Court.  True and correct copies of e-mail correspondence between counsel confirming that agreement (with relevant portions underlined) is attached hereto as **Exhibit A**.

7.      Following that exchange, Seyfarth proposed also "including the fraud and negligent misrepresentation claims in the first phase, as they <u>appear to be linked to the representation issue</u>,

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

require little discovery and are susceptible to quick resolution, one way or the other." A true and correct copy of an e-mail setting forth Seyfarth's proposal (with relevant portions underlined) is attached hereto as **Exhibit B**. Plaintiffs agreed to that proposal, and a modified Joint CMC Statement was filed on April 11, 2008.

8.    Richard Berger's deposition was conducted on May 12, 2008. Brant Berger's deposition was conducted the following day on May 13, 2008.

9.    During those depositions, Seyfarth's counsel did not limit his deposition questions to the areas agreed to in the Joint CMC Statement – i.e., (1) *when* an *attorney-client relationship* had existed between plaintiffs and defendants, (2) whether Seyfarth committed *fraud* or *negligent misrepresentation*. Rather, Seyfarth's counsel asked unrelated questions pertaining to:

- The source of funding of plaintiffs' prior businesses unrelated to the subject patents;

- The name of the bank in which plaintiffs had deposited funds acquired from prior ventures;

- The identity of persons other than plaintiffs who may have an "economic interest" in this litigation;

- The terms of engagement agreements between plaintiffs and their corporate counsel;

- The substance of unrelated communications with prospective counsel who plaintiffs met with concerning this litigation; and

- The present dealings between plaintiffs and their prior business, Berger Enterprises, Inc. and their business associate, John Branton.

10.    When Seyfarth's counsel refused to stay within the stipulated scope of discovery, I repeatedly reminded him of the parties' discovery agreement. But despite those repeated admonitions, Seyfarth's counsel proceeded to ask improper and impermissible questions. Accordingly, I was left with no choice but to object to those questions and instruct plaintiffs not to answer. Relevant excerpts from the Richard Berger deposition transcript are attached hereto as **Exhibit C**.

11.    During the Brant Berger deposition, Seyfarth's counsel asked questions directly aimed at attorney-client communications, such as "what subjects" plaintiffs discussed with their

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

1   present counsel during pre-deposition meetings.  In order to safeguard the privilege, plaintiffs

2   followed their counsel's instruction not to answer.

3        12.    Seyfarth's counsel also engaged in other deposition misconduct such as yelling at

4   the witness and their counsel, and refusing to permit the witness to take bathroom breaks under the

5   false pretense that a duplicative question—which had already been answered—was still pending.

6   Pertinent excerpts from the Brant Berger deposition transcript are attached as **Exhibit D**.

7        13.    In short, believing that the parties should keep their promises to limit discovery,

8   plaintiffs' counsel asserted appropriate objections and instructions to plaintiffs.

9        14.    On June 11, 2008, the parties conducted an in-person meet and confer conference at

10  the office of Seyfarth's counsel.  During that meeting, Seyfarth took the astounding position that

11  plaintiffs counsel could not limit the scope of questions by Seyfarth attorneys regardless of the

12  agreement hammered out.

13       15.    Consistent with the Court's Standing Order re Civil Discovery, the parties

14  submitted a four-page joint letter brief on July 9, 2008, setting forth their respective positions on

15  multiple discovery items that they met and conferred upon.

16       16.    The following day, on July 10, 2008, the court issued the following order:

17               After a review of the record provided, the Court finds that
18           Plaintiffs' counsel's instructions not to answer, speaking objections
             and consultation with clients were improper and without substantial
19           justification. See Fed. R. Civ. P. 30(c)(2); see also Court's Standing
             Order for Civil Practice, Deposition Guidelines ¶¶ 4, 5.  Therefore,
20           the Court ORDERS that Plaintiffs shall pay the costs of the
             depositions which have already occurred (transcript and court reporter
21           costs, not attorneys' fees). See Fed. R. Civ. P. 37(a)(5).  In addition,
             Plaintiffs are ordered to return for their continued depositions, each
22           not to exceed five hours, expeditiously and at a time mutually agreed
             upon by the parties for the purpose of responding to those questions
23           as to which inappropriate objections or instructions not to answer
             were made.

24       17.    That Order made no mention of the stipulated scope of discovery – as set forth in

25  the Joint CMC Statements filed on February 29, 2008 (Docket No. 55) and April 11, 2008 (Docket

26  No. 71) – or to the parties express agreement that "any depositions taken during this initial round

27  of discovery will be limited to issues (1) through (6), (10) and (11)."

28       18.    On July 11, 2008, Seyfarth sent plaintiffs invoices outlining each expenditure that

1   Seyfarth incurred in connection with the plaintiffs' depositions.  In addition to transcript costs and

2   court reporter costs, those invoices included additional discretionary items such as "Realtime,"

3   "rough ASCII," "Shipping and handling" and "CD-Depo."

4           19.     On August 1, 2008, plaintiffs sent Seyfarth a check for $6,328.05 covering the

5   items that they reasonably interpreted as being required under the July 10, 2008 discovery order

6   and the Civil Local Rules.

7           I declare under penalty of perjury under the laws of the United States of America that the

8   matters contained in this declaration are true and correct.

9           This declaration was executed on September 2, 2008 in San Jose, California.

10

11

12                          /s/
                    _____
13                          Craig Hansen

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BECK, ROSS, BISMONTE & FINLEY, LLP
FAIRMONT PLAZA
50 W. SAN FERNANDO ST., 1300
SAN JOSE, CALIFORNIA 95113
TELEPHONE (408) 938-7900

# EXHIBIT A

**Craig A. Hansen**

| | |
|---|---|
| **From:** | Klaus Hamm [KHamm@kvn.com] |
| **Sent:** | Tuesday, March 18, 2008 10:50 AM |
| **To:** | Craig A. Hansen |
| **Subject:** | FW: Bergers v. Seyfarth - depositions and CMC |

Do I have your approval as well?

---

**From:** Douglas Allen [mailto:burnettburnettallen@yahoo.com]
**Sent:** Tuesday, March 18, 2008 9:34 AM
**To:** Klaus Hamm
**Subject:** RE: Bergers v. Seyfarth - depositions and CMC

Mr. Hamm,

Doug said the stipulation is fine with him.

Elena
Legal Assistant to Douglas B. Allen

*Klaus Hamm <KHamm@kvn.com>* wrote:

Thank you. I've attached the stipulation and Elliot's supporting declaration. With your and Doug's okay, I will file the papers tomorrow.

We agree that the plaintiffs' depositions should proceed as agreed under the joint CMC statement.



---

**From:** Craig A. Hansen [mailto:chansen@beckross.com]
**Sent:** Monday, March 17, 2008 9:06 AM
**To:** Klaus Hamm
**Cc:** Justin T. Beck; Douglas Allen
**Subject:** RE: Bergers v. Seyfarth - depositions and CMC

Klaus,

Plaintiffs are amenable to a stipulated request to reschedule the CMC. We are ok for the 18th, so let's go ahead with that date.

As for plaintiffs' depositions, I'm awaiting confirmation that April 15 and 16 are workable and will get back to you shortly. Assuming we proceed on those dates and we don't have a case management order in place, I believe that we should just proceed as agreed under the joint case management statement. Does that work for everybody?

Craig Alan Hansen
Beck, Ross, Bismonte & Finley, LLP
50 West San Fernando Street, Suite 1300
San Jose, CA 95113
Tel: 408.938.7900
Fax: 408.938.0790
email: chansen@beckross.com
www.beckross.com

**CONFIDENTIALITY NOTICE:** This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is **STRICTLY PROHIBITED**. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner.

Thank you, Beck, Ross, Bismonte & Finley, LLP

**From:** Klaus Hamm [mailto:KHamm@kvn.com]
**Sent:** Friday, March 14, 2008 2:26 PM
**To:** Douglas Allen; Craig A. Hansen
**Cc:** Justin T. Beck
**Subject:** RE: Bergers v. Seyfarth - depositions and CMC

Craig, are plaintiffs amenable to a stipulated request to the court to reschedule the CMC?
Thanks,
Klaus

**From:** Douglas Allen [mailto:burnettburnettallen@yahoo.com]
**Sent:** Wednesday, March 12, 2008 2:57 PM
**To:** Klaus Hamm; Craig A. Hansen
**Subject:** Re: Bergers v. Seyfarth - depositions and CMC

Mr. Hamm,

We will reschedule Mr. Richard Berger and Mr. Brant Berger's depositions for the April 15th and April 16th. Doug is available for the CMC on either April 18th or April 25th.

Elena
Legal Assistant to Douglas B. Allen

*Klaus Hamm <KHamm@kvn.com>* wrote:
```
Dear Doug and Craig,
I write regarding the scheduling of the CMC and the Bergers' depositions,
which are set for April 4, 8 and 10.  Elliot will be out of town during this
time, and Dan will be out of town the week of April 7, so we ask that you
work with us to reschedule them.
The CMC is now set for Friday, April 4.  Are you available for the CMC on
Friday, April 18 or Friday, April 25?  If so, I will draft a stipulation
requesting the court to change the date.  The Bergers' depositions are
currently noticed for April 8 and 10.  Can we reschedule them for the next
week, on April 14, 15, or 16?  Alternately, it might make sense to push the
depos back until after the CMC, in case the Court has concerns about our
case-management plan.
Finally, the Court has ordered the parties to file a new CMC statement by
March 28.  We will circulate a draft statement by next week, which will be
substantially the same as the version we previously filed.
Please let me know your thoughts.
Regards,
Klaus
```

# EXHIBIT B

**Craig A. Hansen**

| | |
|---|---|
| **From:** | Klaus Hamm [KHamm@kvn.com] |
| **Sent:** | Wednesday, March 26, 2008 10:00 PM |
| **To:** | Craig A. Hansen; burnettburnettallen@yahoo.com |
| **Subject:** | Bergers v. Seyfarth - CMC statement |
| **Attachments:** | SEYFARTH-P-JOINT CMCS_v1.DOC |

Craig and Doug,
Although Judge White pushed back the CMC, he didn't push back the deadline for the CMC
statement.  Perhaps he meant to do so; we are seeking clarification from his chambers.  If we
hear anything, we will let you know.  In the meantime, the statement is due on Friday.  We
believe only minor changes are necessary, and I've attached proposed edits.  <u>We propose</u>
<u>including the fraud and negligent misrepresentation claims in the first phase, as they appear</u>
<u>to be linked to the representation issue, require little discovery and are susceptible to</u>
<u>quick resolution, one way or the other</u>.  We also propose adjusting the discovery cutoff and
summary judgment deadline to account for the fact that we have yet to have a CMC.
Please let me know if you have any questions or comments.
Regards,
Klaus


    <<SEYFARTH-P-JOINT CMCS_v1.DOC>>

1   Justin T. Beck, Esq. (Cal. Bar No. 53138)
    Ron C. Finley, Esq. (Cal. Bar No. 200549)
2   Alfredo A. Bismonte, Esq. (Cal. Bar No. 136154)
    Craig Alan Hansen, Esq. (Cal. Bar No. 209622)
3   Jeremy M. Duggan, Esq. (Cal. Bar No. 229854)
    Beck, Ross, Bismonte & Finley, LLP
4   50 West San Fernando Street, Suite 1300
    San Jose, CA 95113
5   Tel:    (408) 938-7900
    Fax:    (408) 938-0790
6   Email: jbeck@beckross.com
            rfinley@beckross.com
7           abismonte@beckross.com
            chansen@beckross.com
8           jduggan@beckross.com

9   Attorneys for Plaintiffs
    Richard W. Berger and Brant W. Berger

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RICHARD W. BERGER and BRANT W. BERGER,<br><br>                  Plaintiffs,<br><br>    v.<br><br>SEYFARTH SHAW LLP, an Illinois limited liability partnership; JACK L. SLOBODIN, an individual; BURNETT, BURNETT & ALLEN, a California partnership; DOUGLAS B. ALLEN, an individual; and DOES 1-100, inclusive,<br><br>                  Defendants. | Case No. C07-05279 JSW<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:     March 7, 2008<br>Time:    9:00 a.m.<br>Dept:    Courtroom 2, 17th Floor<br>Judge:   The Honorable Jeffrey S. White<br><br>Date Comp. Filed:    September 12, 2007<br><br>Trial Date: None set. |

1    The parties to this action hereby submit the following Joint Case Management

2  Conference Statement.

3    **1.    Jurisdiction and Service**

4    Plaintiffs Richard Berger and Brant Berger initially filed their complaint against

5  defendants Seyfarth Shaw LLP ("Seyfarth"), Jack L. Slobodin, Burnett, Burnett, & Allen, and

6  Douglas B. Allen in California state court on September 12, 2007. On October 17, 2007,

7  defendant Allen removed this action asserting exclusive subject matter jurisdiction under 28

8  U.S.C. § 1331 and *Air Measurement Technologies, Inc. v. Akin, Gump, Strauss, Hauer & Feld,*

9  *L.L.P.*[1] and *Immunocept LLC, et al. v. Fulbright & Jaworski, LLP*,[2] because plaintiffs' claims

10  arise from alleged professional negligence in a prior patent infringement action.

11    The parties are not aware of any issues pertaining to personal jurisdiction or venue.

12    All parties named in this lawsuit have been served.

13    **2.    Facts**

14    This action arises from alleged professional negligence, breach of contract, fraud,

15  negligent misrepresentation, and breach of fiduciary duty arising from a prior patent

16  infringement action filed by plaintiffs against Rossignol Ski Company.[3] In *Rossignol*, plaintiffs

17  alleged that Rossignol infringed two of their patents, United States Patent Nos. 5,913,530 (the

18  '530 patent) and 6,196,569 (the '569 patent), pertaining to a rotatable snowboard binding.

19    In the present action, plaintiffs allege that on January 4, 2006 defendants, while

20  representing plaintiffs in *Rossignol*, submitted defective preliminary infringement contentions

21  ("PICs") which, *inter alia*, (1) mischaracterized a key component of the accused device thereby

22  rendering the device non-infringing under the '530 patent; and (2) failed to assert any

23  contentions as to the '569 patent. Plaintiffs also allege defendants intentionally concealed

24  Slobodin's and Seyfarth's role in the error when the Bergers sought relief from the error in the

25  prior action. Plaintiffs contend that relief would have been granted if the true facts had been

26  _____

27  [1] No. 2007-1035, 2007 WL 2983660 (Fed. Cir. October 15, 2007).
     [2] No. 2006-1432, 2007 U.S. App. LEXIS 24095 (Fed. Cir. October 15, 2007).

28  [3] *Berger v. Rossignol*, Case No. C 05-02523.

1

414074.01

1  disclosed to the Court.

2      Plaintiffs allege that, as a result of defendants' acts of professional negligence and

3  concealment, the District Court entered judgment in favor of Rossignol on April 25, 2006.

4      Defendants Slobodin and Seyfarth deny they took any actions that could have given rise

5  to an attorney-client relationship with plaintiffs as of January 4, 2006 (*i.e.*, when the PICs were

6  served) or when any other alleged acts of professional negligence took place.  They also deny

7  they had any role in preparing the PICs and contend their representations to the various courts

8  that adjudicated the *Rossignol* case were accurate.

9      Defendants contend that they fulfilled all contractual obligations to plaintiffs, satisfied all

10  fiduciary duties owed to plaintiffs, and did not make any false statements to plaintiffs.

11  Defendants also contend that plaintiffs did not rely on any false statements allegedly made by

12  defendants.

13      Finally, defendants contend that the facts demonstrate that (1) even absent the false

14  statements allegedly made by defendants to the court in the underlying case, that the court would

15  not have granted plaintiffs relief from errors in their PICs; (2) Rossignol's snowboard binding

16  did not infringe the '530 patent or the '569 patent; (3) the patents are not valid or enforceable;

17  and (4) the Bergers would have been estopped and barred by the doctrine of laches from

18  enforcing them against Rossignol.

19      Defendant Allen asserts that the Bergers' lawsuit against him is barred by the one-year

20  malpractice statute of limitations under Cal. Civ. Proc. Code § 340.6 and that plaintiffs allege

21  claims against him fail as being uncertain and ambiguous.

23  **3.   Legal Issues**

24  The parties have identified the following disputed legal issues in this case:

414074.01

(1)    When an attorney-client relationship first came into existence between plaintiffs and defendants Slobodin and Seyfarth;

(2)    When a contractual relationship first came into existence between plaintiffs and defendants Slobodin and Seyfarth;

(3)    When defendants Slobodin and Seyfarth first came to owe a fiduciary duty to plaintiffs;

(4)    Whether plaintiffs' claims against Allen are barred by the malpractice statute of limitations under Cal. Civ. Proc. Code § 340.6;

(5)    When an attorney-client relationship existed between plaintiffs and defendant Allen;

(6)    Whether plaintiffs and defendant Allen entered into a settlement agreement that bars the present claims asserted against defendant Allen;

(7)    Whether defendants were negligent in their representation of the plaintiffs in *Rossignol*;

(8)    Whether defendants breached a contract with plaintiffs;

(9)    Whether defendants breached any fiduciary duties owed to plaintiffs;

(10)   Whether defendants committed fraud against plaintiffs;

(11)   Whether defendants committed negligent misrepresentation against plaintiffs;

(12)   Whether plaintiffs' claims against Allen are uncertain;

(13)   Whether, and to what extent, plaintiffs suffered damages as a result of the alleged acts of fraud and concealment;

(14)   Whether plaintiffs would have achieved a better result in *Rossignol* absent the alleged acts of professional negligence;

(15)   The meaning of the asserted claims of the '530 and '569 patents;

(16)   Whether Rossignol infringes either the '530 patent or the '569 patent;

(17)   Whether the '530 patent or '569 patent are invalid under 35 §§ 102, 103 or 112;

(18)   Whether the '530 patent or the '569 patent are enforceable;

414074.01

1       (19)   Whether the plaintiffs are estopped or barred by laches from enforcing the '530

2             patent or the '569 patent against Rossignol; and

3       (20)   What damages the plaintiffs would have recovered against Rossignol in *Rossignol*

4             but for the alleged negligence of defendants.

5      **4.**    **Motions**

6      On March 7, the Court denied (1) Seyfarth's and Slobodin's motion to dismiss (2)

7 Seyfarth's and Slobodin's motion to strike; (3) Allen's motion to dismiss; and (4) Plaintiffs'

8 conditional cross-motion for summary adjudication against Allen.

9      In order to streamline this litigation and to possibly facilitate a prompt resolution of this

10 matter, the parties have agreed to initially focus their discovery efforts on issues (1) through (6),

11 (10) and (11) above, which are the preliminary, and potentially dispositive, issues in this case.

12 The parties then plan to submit those issues to the Court by way of motions for summary

13 judgment to be filed by defendants Slobodin and Seyfarth and by defendant Allen.

14      The parties expect to complete discovery concerning issues (1) through (6), (10) and (11)

15 within 120 days of the April 8, 2008 case management conference (*i.e.*, by August 18, 2008).

16      Defendants expect to file their related motions for summary judgment 60 days after that

17 (*i.e.*, by October 17, 2008).

18      If defendants prevail on their motions for summary judgment, the parties will proceed

19 accordingly.  Otherwise, the parties will further meet and confer promptly after the Court's

20 ruling to devise a discovery plan for the remaining issues pending in this litigation and to explore

21 the possibility of engaging in settlement discussions.  Resolution of the remaining issues may

22 necessitate an additional summary judgment motion from defendants, and the parties thus

23 respectfully request that the Court determine that good cause exists for the filing of additional

24 summary judgment motions by defendants should this action proceed beyond the Court's ruling

25 on defendants' initial summary judgment motions concerning issues (1) through (6), (10) and

26 (11).

27      **5.**    **Amendment of Pleadings**

28      The parties do not anticipate any amendments to the pleadings at this time.

### 6.   Evidence Preservation

Plaintiffs have taken reasonable steps to preserve all pertinent evidence in this case including forwarding all pertinent documents to their counsel.

Defendants Slobodin and Seyfarth have taken steps to preserve evidence relevant to the issues reasonably evident in this action, including the interdiction of any document-destruction program and ongoing erasures of e-mails and other electronic documents.

Defendant Allen has taken reasonable steps to preserve evidence including electronic documents in his possession.

### 7.   Disclosures

The parties made their initial document productions on February 15, 2008, and continue to make productions on a rolling basis.  The parties expect to serve their initial written disclosures under Fed. R. Civ. P. 26 on or before February 29, 2008.

### 8.   Discovery

As set forth above at Section 4, the parties intend to limit their initial discovery to issues (1) through (6), (10) and (11) as listed above at Section 3.  The parties agree that any depositions taken during this initial round of discovery will be limited to issues (1) through (6), (10) and (11) and will be limited to one day of seven hours pursuant to Fed. R. Civ. P. 30(d)(2).  However, such depositions will not count against the ten-deposition limit under Fed. R. Civ. P. 30(a)(2)(A)(i) or the seven-hour limit under Fed. R. Civ. P. 30(d)(2) with respect to any subsequent depositions taken after the Court rules on defendants' initial motion for summary judgment referenced above at Section 4.

### 9.   Class Actions

Not applicable.

### 10.   Related Cases

On October 24, 2007, the Court entered an order deeming this matter related to *Berger v. Rossignol*, Case No. C 05-02523.

### 11.   Relief

Plaintiffs seek compensatory damages against defendants of approximately $75 million.

414074.01

1  This figure represents plaintiffs' anticipated recovery against Rossignol for lost profits,

2  reasonable royalties, and enhanced damages.

3    **12.    Settlement and ADR**

4      The parties believe they will be in a better position to determine the prospects for

5  settlement after the Court rules on defendants' initial motions for summary judgment on issues

6  (1) through (6), (10) and (11).  The parties have filed a Notice of Need For ADR Phone

7  Conference.

8    **13.    Consent to Magistrate Judge For All Purposes**

9      The parties have not consented to a magistrate judge for all purposes.

10   **14.    Other References**

11     Plaintiffs are willing to consider whether this matter is appropriate for reference to

12  binding arbitration or a special master after the Court rules on Slobodin and Seyfarth Shaw's

13  initial motion for summary judgment on issues (1) through (6).

14     Defendants Slobodin and Seyfarth believe that this matter is not appropriate for reference

15  to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

16   **15.    Narrowing of Issues**

17     Please see discussion at Sections 4 and 8 above.

18   **16.    Expedited Schedule**

19     Not applicable.

20   **17.    Scheduling**

21     As discussed at Section 4 above, the parties expect to complete discovery concerning

22  issues (1) through (6), (10) and (11) within 120 days of the April 18, 2008 case management

23  conference (*i.e.*, by August 18, 2008).

24     Defendants expect to file their related motions for summary judgment 60 days after that

25  (*i.e.*, by October 17, 2008).

26     After the Court rules on defendants' initial motions for summary judgment, the parties

27  will further meet and confer and will file a supplemental Joint Case Management Conference

28  date setting forth proposed dates for designation of experts, discovery cutoff, hearing of future

1  dispositive motions, pretrial conference and trial.

2  **18.    Trial**

3  This case will be tried to a jury.  The parties will work out which issues will be submitted

4  to a jury and the expected length of trial after the Court rules on defendants' initial motions for

5  summary judgment and will file a supplemental Joint Case Management Conference at that time.

6  **19.    Disclosure of Non-party Interested Entities or Persons**

7  Plaintiffs hereby disclose that the corporation Berger Enterprises Incorporated may have

8  a financial interest in the subject matter in controversy pursuant to a license agreement dated

9  October 4, 1996.

10  Defendants Slobodin and Seyfarth have filed the "Certificate of Related Entities or

11  Persons" required by Civil Local Rule 3-16.  It states:  "Pursuant to Civil L.R. 3-16, the

12  undersigned certifies that as of this date, other than the named parties, there is no such interest to

13  report."

14  Defendant Allen filed a certificate of related entities also including John Branton as a

15  person who may have an interest in the litigation.

16  **20.    Other Matters**

17  The parties are not aware of other matters at this time.

18

19  Dated:                                                                BECK, ROSS BISMONTE & FINLEY,
                                                                          LLP

20

21

22                                                          By: _____

23                                                              JUSTIN T. BECK
                                                                Attorneys for Plaintiffs
24                                                              Richard W. Berger and Brant W. Berger

25

26

27

28

414074.01

JOINT CASE MANAGEMENT CONFERENCE STATEMENT
CASE NO. C07-05279 JSW

1    Dated:                                        KEKER & VAN NEST, LLP

2

3                                            By: _____
4                                                ELLIOT R. PETERS
                                                 Attorneys for Defendants
5                                                SEYFARTH SHAW LLP and
                                                 JACK L. SLOBODIN
6

7
     Dated:                                        BURNETT, BURNETT & ALLEN
8

9

10                                           By: _____
                                                 DOUGLAS B. ALLEN
11                                               Attorneys for Defendants
                                                 DOUGLAS B. ALLEN and BURNETT,
12                                               BURNETT & ALLEN

13
                                    *Filer's Attestation*
14
          I, Craig Alan Hansen, the filer of this document, hereby attest that concurrence in the
15
     filing of this document has been obtained from each signatory hereto.
16

17

18

19                                           By: _____
20                                               CRAIG ALAN HANSEN

21

22

23

24

25

26

27

28

                                            8

414074.01

# EXHIBIT C

1              IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4                                        Certified Copy

5      --------------------------------

6      RICHARD W. BERGER and BRANT        )

7      W. BERGER,                         )

8              Plaintiffs,                )

9          vs.                            ) No. C07-05279-JSW

10     SEYFARTH SHAW, LLP, an Illinois    ) VOLUME I

11     limited liability partner; JACK    )

12     L. SLOBODIN, an individual;        )

13     BURNETT, BURNETT & ALLEN, a        )

14     California partnership; DOUGLAS    )

15     B. ALLEN, an individual, and       )

16     DOES 1-100, inclusive,             )

17              Defendants.               )

18     --------------------------------

19

20

21     VIDEOTAPED DEPOSITION OF RICHARD W. BERGER

22                MONDAY, MAY 12, 2008

23

24

25     PAGES 1 - 331

                                                        1

1    seeking sanctions if we decide we want to.

2    BY MR. PETERS:

3        Q.    What happened to Continental Art Products?

4    What happened to the business?

5        A.    I sold it.                                    09:35AM

6        Q.    To whom?

7        A.    Pardon?

8        Q.    To whom?

9        A.    It was three individuals that had a -- I

10   believe it was an LLC.  I can't even remember their     09:36AM

11   names or the name of their enterprise.

12       Q.    Okay.  Well, after that, what did you do?

13       A.    I took my family to Mexico for a period of

14   time.

15       Q.    How long were you in Mexico?              09:36AM

16       A.    About six months.

17       Q.    What did you do after that?

18       A.    When I came back, I moved to Morgan Hill.

19       Q.    How about employment-wise, what did you do

20   after that?                                         09:36AM

21       A.    I purchased six and a half acres of

22   property, subdivided it, was building a restaurant,

23   planned a 40-unit bowling alley behind it.  About

24   '76 I bought a cocktail lounge.

25       Q.    Did you use the proceeds of the sale of    09:37AM
                                                              19

1    the art business to fund the ventures that you've

2    just described?

3        A.    Partly, yes.

4        Q.    How about the other part?

5        A.    It was financed through a bank.                09:37AM

6        Q.    Which bank?

7              MR. HANSEN:   Objection.   Same objections

8    in terms of where the money came from under the

9    financial right of privacy.   Plus it's outside the

10   scope of discovery.   I'm going to instruct him not    09:37AM

11   to answer those as well.

12   BY MR. PETERS:

13       Q.    Are you going to follow your attorney's

14   instruction not to answer?

15       A.    Absolutely.                                   09:37AM

16       Q.    You said you were in the real estate

17   development business?

18       A.    I was developing real estate.

19       Q.    Okay.   When you said you were developing

20   real estate, was that the six and a half acres of     09:38AM

21   property that you subdivided that you're referring

22   to?

23       A.    Yes.

24       Q.    Other than that, did you do anything else

25   in the real estate development business?              09:38AM
                                                                20

1    for a legal conclusion.

2    BY MR. PETERS:

3        Q.    You may answer.

4        A.    That's something I'm going through an

5    attorney on.                                              10:08AM

6        Q.    Well, tell me what your understanding is.

7        A.    Of what?

8        Q.    Of whether Berger Enterprises has any

9    interest in this litigation.

10       A.    I think that's between my attorney and      10:09AM

11   myself, the corporate attorney.

12       Q.    Well, I'm not asking you for any

13   communications between you and your attorney.  I'm

14   asking for your understanding of whether Berger

15   Enterprises has any interest in this litigation?     10:09AM

16       A.    There is no conclusion to that right now.

17       Q.    You and your son are the plaintiffs in

18   this litigation.

19       A.    Yes.

20       Q.    Does anyone else, including any entity,    10:09AM

21   have any economic interest in this litigation?

22       A.    That's --

23            MR. HANSEN:  Just object to the extent it

24   calls for attorney-client communications and to the

25   extent it calls for information that's protected by  10:09AM
                                                              44

1      Q.    Okay.  But you never -- Mr. Dieho never

2   represented you or Berger Enterprises; is that

3   right?

4            MR. HANSEN:  Objection.  That calls for a

5   legal conclusion.                                11:03AM

6            THE WITNESS:  That's incorrect.

7   BY MR. PETERS:

8      Q.    So Mr. Dieho did represent you?

9      A.    Yes.

10     Q.    Did he represent you individually?       11:03AM

11     A.    Yes.

12     Q.    And what was the scope of his

13   representation of you?

14     A.    Any obligation to the stockholders of

15   Berger Enterprises.  He's a corporate attorney.   11:03AM

16     Q.    Is he representing you at the present

17   time?

18     A.    Yes.

19     Q.    When did you meet with him?

20           MR. HANSEN:  He's just asking for a time   11:04AM

21   frame.

22           THE WITNESS:  Pardon?

23           MR. HANSEN:  He's asking for a time frame.

24           THE WITNESS:  It was several months ago.

25   BY MR. PETERS:                                    11:04AM
                                                        81

1       Q.    So in 2008?

2       A.    Yes.

3       Q.    And what are the terms of Mr. Dieho's

4   engagement?

5             MR. HANSEN:   I'm going to object to that      11:04AM

6   as it calls for attorney-client privileged

7   communications and also as falling outside the

8   stipulated scope of discovery.

9             MR. PETERS:   Okay.

10            MR. HANSEN:   And I'll instruct him not to      11:04AM

11  answer on those grounds.

12  BY MR. PETERS:

13      Q.    Do you have a written agreement with

14  Mr. Dieho?

15      A.    Yes.                                            11:04AM

16      Q.    Did you sign it?

17      A.    I believe so, yes.

18      Q.    Was it signed in '08?

19      A.    Yes.

20      Q.    So whatever services he's performing for       11:04AM

21  you he's performing pursuant to a written agreement?

22            MR. HANSEN:   Objection.  Calls for a legal

23  conclusion.  Vague, ambiguous, lacks foundation.

24  BY MR. PETERS:

25      Q.    You may answer.  You may answer.               11:05AM
                                                                  82

1     Q.     Okay.

2     A.     People he knew.

3     Q.     So Mr. Kanel was a friend of yours who was

4   an attorney and knew attorneys and introduced you to

5   some attorneys who might represent you?            11:06AM

6     A.     Yes.

7     Q.     Is that a fair statement of what Mr. Kanel

8   was doing?

9     A.     Yes.

10    Q.     Who were the attorneys that he introduced    11:06AM

11  you to?

12    A.     I really don't recall.

13    Q.     What was the purpose of these

14  introductions?

15    A.     To consider malpractice.                     11:06AM

16    Q.     To consider the instant -- this case

17  that --

18    A.     Yes.

19    Q.     Do you remember the names of any of those

20  people?                                              11:07AM

21    A.     I've already answered that.  I don't.

22    Q.     How many different people did Barry Kanel

23  introduce you to?

24    A.     Possibly three or four.

25    Q.     Did you meet with them?                      11:07AM

                                                              84

1      A.    Yes.

2      Q.    Did you discuss your situation with them?

3            MR. HANSEN:   Objection.   Calls for

4    attorney-client communications.

5            MR. PETERS:   I'm not asking for the                11:07AM

6    substance of the communication.

7    BY MR. PETERS:

8      Q.    I'm just saying did you have a discussion

9    with them about your situation?

10           MR. HANSEN:   That's asking about the               11:07AM

11   substance of communications.   I'm going to instruct

12   him not to answer it on the grounds that it seeks

13   attorney-client communications.

14   BY MR. PETERS:

15     Q.    Did you have discussions with each of             11:07AM

16   these people?

17     A.    Oh, yes.

18     Q.    And were you candid and open with each of

19   them?

20     A.    Yes.                                               11:07AM

21     Q.    And did any of them become your attorney?

22     A.    Yes.

23     Q.    Which one of them became your attorney?

24     A.    My present attorneys.

25     Q.    So that's how you met the Finley Beck             11:08AM
                                                                  85

1    which weren't issued yet.

2        Q.    So Berger Enterprises acquired a license

3    from you and your son Brant to exploit the patents?

4        A.    Yes.

5        Q.    Did that agreement expire at any point in        02:58PM

6    time?

7             MR. HANSEN:    Objection.    Calls for a legal

8    conclusion.

9    BY MR. PETERS:

10        Q.    You may answer.                                    02:59PM

11        A.    Am I supposed to answer that?

12        Q.    Yes.

13        A.    Okay.

14             MR. HANSEN:    If you can.

15             THE WITNESS:    That's a legal opinion I'm        02:59PM

16    involved in now because the obligations of the

17    corporation weren't met by keeping the patents

18    current, keeping it trying to manufacture the

19    product.    All of the reasons for that licensing

20    agreement not to be upheld were not met by the        02:59PM

21    corporation.

22    BY MR. PETERS:

23        Q.    Is there currently a dispute between you

24    and Berger Enterprises about who owns the rights to

25    the patent?                                                02:59PM

                                                                    199

1    A.    No.  None.

2    Q.    What's the nature of the current dispute

3  between you and Berger Enterprises?

4         MR. HANSEN:  Objection.  Lacks foundation.

5  Misstates prior testimony.                          02:59PM

6         THE WITNESS:  That's what I'm discussing

7  with Joe Dieho.

8         MR. HANSEN:  And, again, I'm going to

9  instruct the witness not to answer questions about

10  the relationship between Berger Enterprises and the   02:59PM

11  Bergers pertaining to the Rossignol litigation as

12  being attorney-client communications, right to

13  financial privacy as well as falling outside the

14  stipulated scope of discovery.

15  BY MR. PETERS:                                       03:00PM

16    Q.    What rights did you license to Berger

17  Enterprises?

18         MR. HANSEN:  Objection.  Calls for a legal

19  conclusion.

20  BY MR. PETERS:                                       03:00PM

21    Q.    You may answer.

22    A.    I licensed Berger Enterprises the right to

23  manufacture the product described in provisional

24  patents.

25    Q.    Did you license any other rights to Berger   03:00PM
                                                            200

1    Enterprises?

2      A.    No.  I did that exclusively.

3      Q.    When was the last time you spoke to John

4    Branton?

5      A.    It was either yesterday or this morning on    03:00PM

6    the phone.

7      Q.    Did you -- what did you and Mr. Branton

8    discuss relating to Berger Enterprises or Rossignol

9    or Seyfarth?

10     A.    Nothing, really.                               03:01PM

11     Q.    Have you in the last six months had any

12   conversations relating to this litigation or Berger

13   Enterprises with John Branton?

14         MR. HANSEN:  I'm going to restate those

15   objections that I just stated and instruct the        03:01PM

16   witness not to answer to the extent it calls for

17   information concerning any interests that Berger

18   Enterprises may have pertaining to the outcome of

19   this litigation.

20         THE WITNESS:  I've been instructed by my         03:01PM

21   attorneys to not talk directly to John Branton about

22   any of this, that he should go to his attorney.

23   BY MR. PETERS:

24     Q.    But have you and Mr. Branton discussed it?

25     A.    No.                                            03:01PM
                                                            201

1      Q.    On how many occasions?

2      A.    Two, maybe three.

3      Q.    What have you and Mr. Branton discussed

4   about Berger Enterprises?

5          MR. HANSEN:   Okay.   So then we're going to   03:03PM

6   go into the same objections.   We're objecting to

7   conversations pertaining to anything having to do

8   with the outcome of this litigation.   And interest

9   in the outcome of this litigation is attorney-client

10  privileged and getting into financial right to       03:03PM

11  privacy and being outside the stipulated scope of

12  discovery.   And to the extent that question calls

13  for such information, I would instruct the witness

14  not to answer.

15          MR. PETERS:   It is a completely improper    03:03PM

16  speech to give.

17          MR. HANSEN:   They're objections.

18  BY MR. PETERS:

19     Q.    The question is:   What have you and

20  Mr. Branton discussed about Berger Enterprises?   A   03:03PM

21  question to which there can't possibly be a

22  legitimate attorney-client privilege objection.   You

23  may answer the question.

24     A.    We spoke about reviving Berger

25  Enterprises.                                          03:03PM
                                                              203

1    discussions reached any kind of conclusion?

2        A.    Those discussions did not.

3        Q.    Did they ever reach a conclusion?

4        A.    No.

5        Q.    Are you still to this day participating in    03:08PM

6    discussions about those same topics with Mr. Branton

7    relating to this litigation, the one that brings us

8    here today?

9            MR. HANSEN:  Same objections as before and

10   same instruction as to current discussions.          03:08PM

11           MR. PETERS:  So you're instructing the

12   witness not to answer that question?

13           MR. HANSEN:  Yes, I am.

14           (Whereupon, Defendant's Exhibit 13 was

15            marked for identification.)                  03:08PM

16   BY MR. PETERS:

17       Q.    Exhibit 13 is a letter from Mr. DeKlotz to

18   Mr. Allen, Bates stamped BERGER14276 and 77.  It's

19   dated September 23rd, 2005.  Have you ever seen this

20   document before?                                      03:08PM

21       A.    I don't recall.

22       Q.    Was it Mr. Allen's practice, as far as you

23   knew, to share with you copies of correspondence

24   between him and Mr. DeKlotz relating to the issues

25   that you've been testifying about?                    03:09PM
                                                           207

1        Q.    Do you have any financial dealings with

2   Mr. Branton at the present time?

3             MR. HANSEN:   Objection.   Calls -- this is

4   going back to the same area that we keep going over

5   and over and over again, Counsel.                      03:12PM

6             MR. PETERS:   Well, we're not, actually.   I

7   just asked him whether he and Mr. Branton have a

8   financial relationship.

9             MR. HANSEN:   Whether they have a financial

10  relationship --                                         03:12PM

11            MR. PETERS:   It's unanswerable?   You don't

12  think a person can answer whether they have a

13  financial relationship with someone?

14            MR. HANSEN:   I think that to the extent it

15  goes into matters that we've already covered and      03:12PM

16  that we have a standing objection to --

17            MR. PETERS:   You don't have a standing

18  objection to anything.

19            MR. HANSEN:   Okay.   Well --

20            MR. PETERS:   You've instructed him not to    03:12PM

21  answer a lot of questions, but that doesn't give you

22  a standing objection.

23            MR. HANSEN:   Well, I have repeatedly

24  objected to various lines of questions targeted,

25  directly and indirectly, as the same information      03:12PM

                                                              210

1    deposition agreement.  It's not permitted by the

2    federal rules.  But, you know, I can't stop you from

3    violating the law, so just go ahead.

4           MR. HANSEN:  I can tell you I hammered

5    this out with Klaus Hamm from your office, and we          10:12AM

6    identified 20 issues that are pertinent in this

7    case, and we agreed that discovery would proceed on

8    issues 1 through 6 and 10 and 11.  So whatever you

9    felt was the spirit of the agreement, to the extent

10   that conflicts with how that agreement was                 10:12AM

11   memorialized ultimately and submitted with the court

12   is irrelevant.

13          MR. PETERS:  Okay.  Can I see the document

14   that you're --

15          MR. HANSEN:  I have my highlighted copy.            10:12AM

16          MR. PETERS:  I'm sure it's got trade

17   secrets in it, so I --

18          MR. HANSEN:  Well, you know what, it's got

19   my highlights on it.

20          MR. PETERS:  That's all right.  I don't            10:12AM

21   want to interfere with the work product doctrine, so

22   I'll just keep asking questions.

23   BY MR. PETERS:

24      Q.    Have you ever -- have any of Mr. Branton's

25   investors in Berger Enterprises ever claimed, to          10:13AM
                                                                    48

1    the financial right to privacy.  It also is outside

2    the scope of the stipulated discovery under the CMC

3    statement.

4           I know you characterized that statement as

5    essentially allowing anything other than issues          10:09AM

6    pertaining to the patent, but I don't think that's a

7    fair characterization of that.  We sat down and

8    identified issues that we believe are relevant in

9    this case and carved out eight issues that we're

10   going to allow discovery to proceed on.  And issues      10:10AM

11   as to who has an interest in this litigation fall

12   outside of those categories.

13          And I would instruct him not to answer on

14   all those grounds.

15          MR. PETERS:  So you're instructing him not        10:10AM

16   to answer?

17          MR. HANSEN:  Yes, I am.

18          MR. PETERS:  And I'll tell you, sir, that

19   who has an economic interest in this litigation is

20   directly relevant to issues of representation           10:10AM

21   because there's very strict rules in this state

22   about who can assert a claim for attorney

23   malpractice and who can benefit by it.

24          So I'm going to keep asking those

25   questions.  And if you instruct him not to answer,      10:10AM

                                                                    45

# EXHIBIT D

1          IN THE UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4                                          Certified Copy

5     ----------------------------------

6    RICHARD W. BERGER and BRANT        )

7    W. BERGER,                         )

8              Plaintiffs,              )

9         vs.                           ) No. C07-05279-JSW

10   SEYFARTH SHAW, LLP, an Illinois    )

11   limited liability partner; JACK    )

12   L. SLOBODIN, an individual;        )

13   BURNETT, BURNETT & ALLEN, a        )

14   California partnership; DOUGLAS    )

15   B. ALLEN, an individual, and       )

16   DOES 1-100, inclusive,             )

17             Defendants.              )

18   ----------------------------------

19

20

21      VIDEOTAPED DEPOSITION OF BRANT BERGER

22           WEDNESDAY, MAY 14, 2008

23

24

25   PAGES 1 - 275

                                                    1

1   meeting?

2       A.    Yes.

3       Q.    And was Mr. Finley present during the

4   meeting?

5       A.    Yes.                                    09:46AM

6       Q.    Anyone else?

7       A.    No.

8       Q.    Did you meet with your attorneys

9   yesterday?

10      A.    Yes.                                    09:46AM

11      Q.    And who was present at that meeting?

12      A.    It was Ron Finley, my father, myself and a

13  couple of people that brought in drinks now and

14  then.

15      Q.    And did you discuss your deposition today  09:47AM

16  at that meeting yesterday?

17          MR. FINLEY:  Objection.  Asked and

18  answered.  Vague.

19          THE WITNESS:  No.

20  BY MR. PURCELL:                                   09:47AM

21      Q.    What subjects did you discuss?

22          MR. FINLEY:  Don't answer that question.

23  That invades the attorney-client privilege.  Do not

24  answer that question.

25          MR. PURCELL:  Counsel, I'm going to ask   09:47AM

                                                        28

1    you to reconsider that.  I'm not asking for specific

2    communications.  I'm asking for general subject

3    matter, which is the same information that would be

4    on a privilege log.

5          MR. FINLEY:  I'm instructing you not to          09:47AM

6    give any information that was communicated between

7    you and any counsel for you at any meeting.

8          MR. PURCELL:  That is improper.

9          MR. FINLEY:  If you can answer his

10   question -- and I'd ask you to let me finish before    09:48AM

11   you interrupt me again.

12         MR. PURCELL:  Well, I'm not sure when

13   you're done because you talk so long.

14         MR. FINLEY:  I don't want you to give any

15   information that was communicated between counsel,     09:48AM

16   including the subjects of information communicated,

17   unless I instruct you otherwise.  If you can answer

18   his question around that and it doesn't invade the

19   attorney-client privilege, you can go ahead.

20         MR. PURCELL:  Counsel, that's an improper       09:48AM

21   and overbroad instruction.  And we're going to add

22   that to the list of the subjects on which we're

23   going to move to compel.

24         MR. FINLEY:  I'm awaiting the motion.

25         MR. PURCELL:  I doubt it.                        09:48AM
                                                            29

```
1    corporation.  With the advice given, we make

2    decisions for Berger Enterprises, Inc.

3    BY MR. PURCELL:

4         Q.   You and your father make the decisions?

5         A.   We are a part of the decision.              11:24AM

6         Q.   Who else is part of the decision?

7         A.   Stockholders.

8         Q.   Did the stockholders of Berger Enterprises

9    have any role to play in hiring counsel to sue

10   Rossignol?                                             11:24AM

11             MR. FINLEY:  Objection.  Vague.

12             THE WITNESS:  Yeah.  People involved in

13   the corporation -- it's a corporation.

14   BY MR. PURCELL:

15        Q.   What does that mean?                         11:24AM

16        A.   We help run the corporation.  We don't own

17   the corporation.  The corporation is owned by

18   stockholders.

19        Q.   Did the stockholders play any role in

20   deciding whether to hire a lawyer to sue Rossignol?    11:24AM

21        A.   I need to use the rest room.

22        Q.   I'd appreciate it if you would answer the

23   question that's pending.

24             MR. PURCELL:  You're walking out without

25   answering the pending question?                        11:25AM
                                                            108
```

1           MR. FINLEY:  I think we're going to take a

2     break.

3           THE WITNESS:  Yeah.  I just need to use

4     the rest room, okay?

5           MR. PURCELL:  Stay on the record.  How          11:25AM

6     much time is left on the tape?

7           MR. FINLEY:  Stay on past the tape.  Keep

8     it running.

9           THE VIDEOGRAPHER:  Three minutes.

10          MR. PURCELL:  Since we're about to run out      11:26AM

11    of tape, we can go off the record and you can change

12    the tape.  Thanks.

13          THE VIDEOGRAPHER:  This marks the end of

14    tape No. 1.  We are off the record at 11:26 a.m.

15          (Off the record.)                              11:26AM

16          THE VIDEOGRAPHER:  We are on the record at

17    approximately 11:33 a.m.  This is the beginning of

18    tape 2 in the deposition of Brant W. Berger.

19          Please proceed.

20          MR. PURCELL:  Could you read back the          11:33AM

21    pending question.

22          (Record read as follows:

23             "Q.  Did the stockholders play any role

24             in deciding whether to hire a lawyer to

25             sue Rossignol?")                            11:34AM
                                                           109